

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

OCT 18 2004

CLERK, U.S. DISTRICT COURT
By _____
Deputy

| | |
|---|---|
| EGYPTIAN GODDESS, INC., | § |
| | § |
| Plaintiff and Counter-Defendant, | § |
| | § |
| vs. | § |
| | § |
| SWISA, INC. and DROR SWISA, | § |
| INDIVIDUALLY, | § |
| | §  **CIVIL ACTION NO. 3-03-CV-0594N** |
| Defendants, Counter-Plaintiffs and | § |
| Third-Party Plaintiffs, | § |
| | § |
| vs. | § |
| | § |
| ADI TORKIYA, | § |
| | § |
| Third-Party Defendant. | § |

### COPIES OF PLAINTIFF'S AND DEFENDANTS'
### CLAIM CONSTRUCTION BRIEFING

Robert G. Oake, Jr.
Texas State Bar No. 15154300
Law Office of Robert G. Oake, Jr.
101 W. McDermott, Suite 109
Allen, Texas 75013

Rudolf O. Siegesmund
Texas State Bar No. 18324570
4627 N. Central Expressway, Suite 2000
Dallas, Texas 75205-4017

**ATTORNEYS FOR PLAINTIFF**

Michael D. Napoli
Texas State Bar No. 14803400
Linda G. Moore
Texas State Bar No. 14359500
Frederick L. Medlin
Texas State Bar No. 13895930
Kirkpatrick & Lockhart LLP
2828 North Harwood Street, Suite 1800
Dallas, Texas 75201

**ATTORNEYS FOR DEFENDANTS**

## TABLE OF CONTENTS

**TAB**

Plaintiff's Brief in Support of Motion for Claim Construction ......................................................1

Swisa's Brief in Support of its Response to Plaintiff's Motion for Claim Construction.................2

Plaintiff's Reply Brief...................................................................................................................3

United States Design Patent No. D467.389 ...................................................................................4

Page with Typed Single Claim of the Patent .................................................................................5

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| EGYPTIAN GODDESS, INC., | § | |
| | § | |
| Plaintiff and Counter-Defendant, | § | |
| | § | |
| VS. | § | |
| | § | |
| | § | |
| SWISA, INC. and DROR SWISA, | § | |
| INDIVIDUALLY, | § | |
| | § | CIVIL ACTION NO. 3-03-CV-0594-N |
| Defendants, Counter-Plaintiffs and | § | |
| Third-Party Plaintiffs, | § | |
| | § | |
| VS. | § | |
| | § | |
| ADI TORKIYA, | § | |
| | § | |
| Third-Party Defendant. | § | |

## PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR CLAIM CONSTRUCTION

July 19, 2004

Respectfully submitted,

Robert G. Oake, Jr.
Texas State Bar No. 15154300
Law Office Of Robert G. Oake, Jr.
101 W. McDermott, Suite 109
Allen, Texas 75013

Rudolf O. Siegesmund
Texas State Bar No. 18324570
4627 N. Central Expressway, Ste. 2000
Dallas, Texas 75205-4017

ATTORNEYS FOR PLAINTIFF EGYPTIAN
GODDESS, INC. and THIRD PARTY
DEFENDANT ADI TORKIYA

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| 1. | Introduction ................................................................... | 1 |
| 2. | Functionality Test ................................................................... | 2 |
| 3. | The design features of the '389 patent are not primarily functional ............ | 7 |
|  | a. The rectangular hollow tube with square ends ...................... | 8 |
|  |  1. Finger Insertion ................................................. | 9 |
|  |  2. Placement of four buffer pads ............................. | 13 |
|  | b. The raised pads ................................................................ | 14 |
|  | c. The space between the raised pads ...................................... | 15 |
| 4. | Claim Construction and Points of Novelty ................................... | 16 |
| 5. | Points of Novelty in the Subject Patent ................................... | 25 |
| 6. | Conclusion ................................................................... | 28 |

i

TABLE OF AUTHORITIES

Page(s)

*Avia Group International, Inc. v. L.A. Gear California, Inc.,*
    853 F.2d 1557 (Fed. Cir. 1988) .................................. 3

*Berry Sterling Corp. v. Pescor Plastics, Inc.,*
    122 F.3d 1452 (Fed. Cir. 1997) .................................. 4, 7

*Berry Sterling Corp. v. Pescor Plastics, Inc.,*
    1999 U.S. App. LEXIS 20789 (Fed. Cir. 1999) (unpublished) ... 5

*Bush Indus., Inc. v. O'Sullivan Indus., Inc.,*
    772 F. Supp. 1442 (D. Del. 1991) .................................. 27

*Carman Indus., Inc. v. Wahl,*
    724 F.2d 932 (Fed. Cir. 1983) .................................. 3, 5

*Catalina Lighting, Inc. v. Lamps Plus,* Inc.,
    295 F.3d 1277 (Fed. Cir. 2002) .................................. 26

*Cybor Corporation v. FAS Technologies, Inc.,*
    138 F.3d 1448 (Fed. Cir. 1998) .................................. 17, 19

*Door-Master Corp. v. Yorktowne, Inc.,*
    256 F.3d 1308 (Fed. Cir. 2001) .................................. 2, 13

*Durling v. Spectrum Furniture Co.,*
    101 F.3d 100 (Fed. Cir. 1996) .................................. 24

*Goodyear Tire & Rubber Co. v. Hercules Tire & Rubber Co.,*
    162 F.3d 1113 (Fed. Cir. 1998) .................................. 26

*Gorham Mfg. Co. v. White,*
    81 U.S. 511 (1871) .................................. 18

*Hosley Int'l Trading Corp. v. K Mart Corp.,*
    237 F. Supp. 2d 907 (N.D. Ill. 2002) .................................. 27

*In re Carletti,*
    328 F.2d 1020 (C.C.P.A. 1964) .................................. 6

*In re Dubois & Will,*
    262 F.2d 88 (1958) .................................. 3

*In re Plastics Research Corp. Litigation,*
    2002 U.S. Dist. LEXIS 20547 (E.D. Mich. 2002)   ...............   16, 19, 21

*Jack Schwartz Shoes v. Skechers U.S.A.,*
    2002 U.S. Dist. LEXIS 25699 (S.D.N.Y. 2002)   ...............   27

*L.A. Gear, Inc. v. Thom McAn Shoe Co.,*
    988 F.2d 1117 (Fed. Cir. 1993)   ...................................   2, 5, 6, 7,
    24, 27

*Lamps Plus, Inc. v. Dolan,*
    2003 U.S. Dist. LEXIS 19578  (N.D. Tex. 2003)   ...............   16, 23

*Litton Systems, Inc. v. Whirlpool Corp.,*
    728 F.2d 1423 (Fed. Cir. 1984)   ...................................   25

*Markman v. Westview Instruments, Inc.,*
    517 U.S. 370 (1996)   ...........................................   19

*Minka Lighting, Inc. v. Craftmade Intern., Inc.,*
    2001 U.S. Dist. LEXIS 14199 (N.D. Tex. 2001)   ...............   23

*Minka Lighting, Inc. v. Craftmade International, Inc.,*
    2004 U.S. App. LEXIS 770 (Fed. Cir. 2004) (unpublished)   ......   23, 25

*OddzOn Prods. v. Just Toys,*
    122 F.3d 1396 (Fed. Cir. 1997)   ...................................   2, 24

*Pacific Furniture Mfg. Co. v. Preview Furniture Corp.,*
    800 F.2d 1111 (Fed. Cir. 1986)   ...................................   3

*Pensa, Inc. v. L.A. Gear, Inc.,*
    4 U.S.P.Q.2D 1016 (D.C. Cal. 1987)   ........................   3, 4

*Read Corp. v. Portec, Inc.,*
    970 F.2d 816 (Fed. Cir. 1992)   ...................................   24

*Rockport Co., Inc. v. Deer Stags, Inc.,*
    65 F. Supp. 2d 189 (S.D.N.Y. 1999)   ........................   27

*Rosco, Inc. v. Mirror Lite Co.,*
    No. CV-96-5658 (E.D.N.Y. June 2, 1999)   ...............   6

*Rosco, Inc. v. Mirror Lite Co.,*
    139 F. Supp. 2d 287 (E.D. N.Y. 2001)   ........................   5

*Rosco, Inc. v. Mirror Lite Co.,*
    304 F.3d 1373 (Fed. Cir. 2002)   ................................   6, 13

*Seiko Epson Corp. v. Nu-Kote Int'l, Inc.,*
    190 F.3d 1360 (Fed. Cir. 1999)   ................................   6

*Sun Hill Indus. Inc. v. Easter Unlimited, Inc.,*
    48 F.3d 1193 (Fed. Cir. 1995)   ................................   19, 20, 21, 22

*Trucook v. Bond/Helman, Inc.,*
    2001 U.S. Dist. LEXIS 10244 (N.D. Ill. 2001)   ...............   7

*Unidynamics Corp. v. Automotive Products International, Ltd.,*
    157 F.3d 1311 (Fed. Cir. 1998)   ................................   17, 18, 25

*Winner Int'l Corp. v. Wolo Mfg. Corp.,*
    905 F.2d 375 (Fed. Cir. 1990)   ................................   21

## RULE AND SECONDARY SOURCE

Fed. Cir. Rule 47.11   .................................................   5

1 D. Chisum, *Patents* § 1.04[2] (1986)   ................................   3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| EGYPTIAN GODDESS, INC., | § | |
| | § | |
| Plaintiff and Counter-Defendant, | § | |
| | § | |
| VS. | § | |
| | § | |
| | § | |
| SWISA, INC. and DROR SWISA, | § | |
| INDIVIDUALLY, | § | |
| | § | CIVIL ACTION NO. 3-03-CV-0594-N |
| Defendants, Counter-Plaintiffs and | § | |
| Third-Party Plaintiffs, | § | |
| | § | |
| VS. | § | |
| | § | |
| ADI TORKIYA, | § | |
| | § | |
| Third-Party Defendant. | § | |

## PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR CLAIM CONSTRUCTION

Pursuant to this Court's order of April 21, 2004, Plaintiff Egyptian Goddess, Inc. (Egyptian Goddess), serves on defendants this brief in support of motion for claim construction, respectfully showing as follows:

1.    Introduction

This case involves nail buffer design patent number D467,389. ("the '389 Patent"). Before the Court issued an amended scheduling order, the parties filed and served briefs and response briefs on claim construction. Plaintiff therefore is in a position to discuss many of defendants' anticipated arguments, and defendants' anticipated arguments are incorporated into this brief.

The parties agree that this Court should construe the claim of the subject patent. However, the parties disagree about how claim construction should be performed. The parties agree that the Court should determine whether any portions of the claimed design are functional, but the parties

disagree on what the test for functionality is.  Further, the parties disagree on whether this Court should determine points of novelty as part of the claim construction process.  The parties also disagree as to what the proper claim construction of the subject patent should be.  These matters are discussed below.

2.  Functionality Test

Design patent infringement is determined by first construing the claim to the design, when appropriate, and then comparing it to the design of the accused device.  *See OddzOn Prods. v. Just Toys*, 122 F.3d 1396, 1404 (Fed. Cir. 1997).  When it is claimed that a design contains both functional and non-functional elements, the scope of the claim should be construed to determine if the claimed design contains any functional aspects.  *Id.*  Since defendants contend that all aspects of the claimed design are functional, this Court should review the elements of the subject design for functionality as part of the claim construction process.

The parties disagree on the appropriate test for functionality.  Plaintiff contends that an element of a design is ornamental and not functional when the design is not dictated by the function, *i.e.,* when there are several different ways to achieve the function through different designs.  This is the test that has been used by the Federal Circuit to determine functionality of design elements in the claim construction context.  *See, e.g., Door-Master Corp. v. Yorktowne, Inc.*, 256 F.3d 1308, 1313 (Fed. Cir. 2001) ("Finally, the rear features are not functional. Many different configurations of those features (oval, triangular, etc.) could perform the same functions of an integrated door and frame." (citing *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1123, (Fed. Cir. 1993) ("When there are several ways to achieve the function of an article of manufacture, the design of the article is more likely to serve a primarily ornamental purpose.")).  The test for functionality in *L.A. Gear* was used in the context of determining *patent invalidity*

and not in the context of claim construction. However, it is clear that the same test was used by the Federal Circuit for determining the functionality of *individual design elements* in the claim construction context in *Door-Master*. Therefore, this is the test that should be used by the Court in the instant case.

In *Avia Group International, supra*, (a case involving alleged invalidity of a shoe design) the Court held that the design was not functional and explained some important concepts about functionality in the design patent context, as follows:

> When function dictates a design, protection would not promote the decorative arts, a purpose of the design patent statute. *See* 1 D. Chisum, *Patents* § 1.04[2] at 1-194.1 to 1.195 (1986). There is no dispute that shoes are functional and that certain features of the shoe designs in issue perform functions. However, a distinction exists between the functionality of an article or features thereof and the functionality of the particular design of such article or features thereof that perform a function. Were that not true, it would not be possible to obtain a design patent on a utilitarian article of manufacture, *see, e.g., Pacific Furniture Mfg. Co. v. Preview Furniture Corp.*, 800 F.2d 1111, 231 USPQ 67 (Fed. Cir. 1986) (design patent for chairs), or to obtain both design and utility patents on the same article, *see, e.g., Carman Indus., Inc. v. Wahl*, 724 F.2d 932, 938-39, 220 USPQ 481, 486-87 (Fed. Cir. 1983); *In re Dubois & Will*, 46 C.C.P.A. 744, 262 F.2d 88, 90, 120 USPQ 198, 200 (1958).

With respect to functionality of the design of the '301 patent, the court stated:

> [LAG] has taken each little aspect of the upper and pointed out that many of the aspects or features of the upper have a function. Even if, arguendo, true that would not make the design primarily functional. If the functional aspect or purpose could be accomplished in many other ways that [sic] is involved in this very design, that fact is enough to destroy the claim that this design is primarily functional. There are many things in the ['301] patent on the upper which are clearly ornamental and nonfunctional such as the location of perforations and how they are arranged, and the stitching and how it's arranged, and the coloration of elements between black and white colors.

> The overall aesthetics of the various components and the way they are combined are quite important and are not functional. They are purely aesthetic. . . .

*Pensa, Inc.*, 4 USPQ2d at 1019.

On the design of the '420 patent, the court made a similar analysis of various features and concluded:

But every function which [LAG] says is achieved by one of the component aspects of the sole in this case could be and has been achieved by different components. And that is a very persuasive rationale for the holding that the design overall is not primarily functional. Moreover, there is no function which even defendant assigns to the swirl effect around the pivot point, which swirl effect is a very important aspect of the design.

. . . This is a unique and pleasing design and it's [sic] patentability in my view is not offset or destroyed by the fact that the utility patent is utilized and incorporated in this aesthetically pleasing design.

Plaintiff has given us evidence of other shoes that incorporate the utility patent and its concavity -- others of its own shoes -- but with a totally different design, and has thus established that the utility patent does not make the design patent invalid in this case.

*Pensa, Inc.*, 4 USPQ2d at 1019-20. We agree that the designs in suit have not persuasively been shown to be functional and that no genuine issue of material fact is present with respect to this issue.

*Id.* at 1563. Therefore, a design aspect is ornamental and is not functional if the design is not dictated by the function, i.e., when there are different ways to achieve the function through different designs.

Plaintiff anticipates that Defendants will argue that this Court should use a different and broader test for functionality in the claim construction context. However, according to plaintiff's research, the Federal Circuit <u>never</u> has used the functionality test advocated by defendants in the claim construction context. Further, the defendants' test is a distinct minority view in the patent invalidity context and was abandoned by the Federal Circuit in a second appeal of the very case it was mentioned in. The test was set forth by Judge Rich in *Berry Sterling Corp. v. Pescor Plastics, Inc.*, 122 F.3d 1452, 1455 (Fed. Cir. 1997) (*Berry I*) as follows:

The failure of the court to give dispositive effect to the existence of alternative designs in its validity analysis is not error. The presence of alternative designs

may or may not assist in determining whether the challenged design can overcome a functionality challenge. Consideration of alternative designs, if present, is a useful tool that may allow a court to conclude that a challenged design is not invalid for functionality. As such, alternative designs join the list of other appropriate considerations for assessing whether the patented design as a whole--its overall appearance--was dictated by functional considerations. Other appropriate considerations might include: whether the protected design represents the best design; whether alternative designs would adversely affect the utility of the specified article; whether there are any concomitant utility patents; whether the advertising touts particular features of the design as having specific utility; and whether there are any elements in the design or an overall appearance clearly not dictated by function.

Judge Rich did not cite any authority for the different and broader functionality test. Further, after the case was appealed after remand, the Federal Circuit in *Berry Sterling Corp. v. Pescor Plastics, Inc.*, 1999 U.S. App. LEXIS 20789, *12, 13 (Fed. Cir. 1999) (unreported) abandoned Judge Rich's formulation[1] and stated that the functionality test in the context of patent invalidity was as follows:

A design is functional "when the appearance of the claimed design is 'dictated by' the use or purpose of the article. If the particular design is essential to the use of the article, it can not be the subject of a design patent." *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1123 (Fed. Cir. 1993) (citations omitted). The proper inquiry for determining functionality of a design is whether the overall appearance of the design is dictated by a utilitarian or ornamental purpose. *Id.* Such a distinction makes it possible to obtain both a utility patent and a design patent on the same article. *Carman Indus. v. Wahl*, 724 F.2d 932, 938-39 (Fed. Cir. 1983). "When there are several ways to achieve the function of an article of manufacture, the design of the article is more likely to serve a primarily ornamental purpose." *L.A. Gear*, 988 F.2d at 1123.

Further, it appears that the Federal Circuit also has rejected Judge Rich's proposed test in later cases. In *Rosco, Inc. v. Mirror Lite Co.*, 139 F. Supp. 2d 287, 296 (E.D. N.Y. 2001) the district court held that a design patent on a bus mirror was invalid as functional. Citing *Berry I,*

---

[1] The case notes that "Circuit Judge Rich heard oral argument in this case, but died on June 9, 1999. The case was decided by the remaining judges in accordance with Fed. Cir. Rule 47.11."

*supra*, at 1456, the district court stated that "[a]dvertising that highlights features of the product's design as offering a specific utility is a factor that influences the determination of the functionality of a design patent." On appeal, the Federal Circuit reversed the finding of functionality (*Rosco, Inc. v. Mirror Lite Co.,* 304 F.3d 1373, 1378-1379 (Fed. Cir. 2002)), and stated the functionality test was as follows:

> We apply a stringent standard for invalidating a design patent on grounds of functionality: the design of a useful article is deemed functional where "the appearance of the claimed design is 'dictated by' the use or purpose of the article." *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1123, 25 U.S.P.Q.2D (BNA) 1913, 1917 (Fed. Cir. 1993) (citing *In re Carletti*, 51 C.C.P.A. 1094, 328 F.2d 1020, 1022, 140 U.S.P.Q. (BNA) 653, 654 (CCPA 1964)). "The design must not be governed solely by function, i.e., that this is not the only possible form of the article that could perform its function." *Seiko Epson Corp. v. Nu-Kote Int'l, Inc.*, 190 F.3d 1360, 1368, 52 U.S.P.Q.2D (BNA) 1011, 1017 (Fed. Cir. 1999). "When there are several ways to achieve the function of an article of manufacture, the design of the article is more likely to serve a primarily ornamental purpose." *L.A. Gear*, 988 F.2d at 1123, 25 U.S.P.Q.2D at 1917 (citations omitted). That is, if other designs could produce the same or similar functional capabilities, the design of the article in question is likely ornamental, not functional. Invalidity of a design patent claim must be established by clear and convincing evidence. *Id.*

> The district court found that because the mirror's oval shape, the asserted point of novelty of the '357 patent, "of necessity dictates its function," the '357 patent was invalid as functional. n2 Rosco, 139 F. Supp. 2d at 296. The court based its determination of functionality on its findings that the mirror of the '357 patent offered a unique field of view (when compared to Mirror Lite's Bus Boy mirror); that Rosco represented to the Patent and Trademark Office that its mirror provided a superb field of view; and that Rosco marketed the mirror of the '357 patent as more "aerodynamic" than other cross-view mirrors. *Id.*

> [n2 The district court's finding in this respect appears to be inconsistent with its earlier summary judgment decision, in which it noted: "A review of the other cross-over mirrors on the market reveals that several different styles of cross-over mirrors exist . . . . It cannot be said that the oval shape and flat backing are dictated by function." *Rosco, Inc. v. Mirror Lite Co.*, No. CV-96-5658, at 15 (E.D.N.Y. June 2, 1999) (order granting summary judgment in part).]

> The mere fact that the invention claimed in the design patent exhibited a superior field of view over a single predecessor mirror (here, the Bus Boy) does not establish that the design was "dictated by" functional considerations, as required by *L.A. Gear*. The record indeed reflects that other mirrors that have non-oval

- 6 -

a nail buffer. A nail buffer can have one or more different abrasive surfaces. It can be in many different shapes. For example, a nail buffer can be the shape of a stick or board that is straight or curved (see, e.g., App. 16, 17, 19), a solid block that is square, rectangular, triangular, pie-shaped, or oval (see, e.g., App. 22, 23, 24, 28, 29, 31, 32, 34, 44, 46, 49, 53, 54, 70, 71, 80, 103, 120, 123), or be hollow and in the shape of a triangle, square, or star (see, e.g., App. 35, 38, 42, 58, 111). The abrasive surfaces and underlying pads can be thin or thick (see, e.g., App. 16, 31, 35, 38, 42, 58), continuous or broken (see, e.g., 16, 31, 35, 38, 42, 58), and can reach all the way to the edge of the buffer or stop short of it (see, e.g., 16, 31, 35, 38, 42, 58). All these designs perform the functions of being able to be held by the manicurist in such a way that her own manicure is not affected and to provide one or more abrasive surfaces to file and/or buff a fingernail.

The subject patented design (App. 92) is unique in that it consists of an open, hollow square tube having rounded 90 degree corners and a plurality of rectangular attachments to the sides of, and running longitudinally along the full length of, the tube. The rectangular attachments cover flat sides of the tube. The corners of the hollow square tube are exposed. There is a rectangular attachment on the bottom side, on the front side, and on the back side. There is not a rectangular attachment on the top side.

Plaintiff anticipates that Defendants will claim the following features of the '389 design patent are functional:

a.  The rectangular hollow tube with square ends;

b.  The raised pads;

c.  The space between the raised pads.

When the proper test for functionality is applied, it is clear that the features of the subject

patent are not functional in the design patent sense and therefore are ornamental.

    a.      The rectangular hollow tube with square ends

It is anticipated that Defendants will argue that the rectangular hollow tube with square ends is functional for two reasons. First, defendants will argue that the hollow tube allows a manicurist to insert a finger and protect her fingernail while giving a manicure. Second, defendant will argue that the square ends allow for placement of four buffer pads.

    1.      Finger Insertion

The credible evidence indicates that finger insertion for manicure protection is not a bona fide function of the hollow tube. Indeed, a marketing videotape made by *defendants* illustrates that the buffer is to be used *without* insertion of a finger. Before the instant litigation commenced, defendants produced an infomercial showing a woman using the accused buffer. (App. 129, 130). The woman in defendants' own infomercial does <u>not</u> have a finger inserted inside the hollow buffer when she is using it. Rather, the woman is protecting her own manicure by simply holding the buffer without sticking any finger inside the hollow buffer.

Further, one of defendants' former independent contractors, Cassandra Punohu, states that she never was told to insert a finger in the buffer. Ms. Punohu actually taught other sub-contractors and distributors of defendants how to use the accused nail buffer. Her declaration states as follows (App. 1):

    1.      My name is Cassandra Punohu.

    2.      I am a former sub-contractor of a company owned by Dror Swisa. I was a sub-contractor from approximately November 2001 to approximately November 2003.

    3.      When I was a sub-contractor for a company owned by Dror Swisa, I sold nail buffers and trained other sub-contractors and distributors how to use and demonstrate nail buffers, including the nail buffer that contains a hollow square tube.

4.   In my experience, when purchasing a nail buffer, customers do not know the difference between, or express a preference for, a "three way" or a "four way" nail buffer.

5.   I was never told or taught to stick my fingers inside the ends of the square hollow tube, or to train others to stick their fingers inside the ends of the square hollow tube. When I trained sub-contractors and distributors of a company owned by Dror Swisa how to use the nail buffer that includes a square hollow tube, I never told or taught them to stick their fingers inside the ends of the square hollow tube. When I used this nail buffer, I did not stick my fingers inside the ends of the square hollow tube. In my experience, people do not stick their fingers inside the ends of the square hollow tube to protect their own manicures. In my experience, that is not a function of the nail buffer's square hollow tube.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 26, 2004.

/s/ Cassandra Punohu

Additionally, a professional manicurist serving as one of plaintiff's experts, Kathleen Eaton, states that she would not insert a finger in the buffer when performing a manicure because it is awkward and results in a loss of control over the buffer and a loss of flexibility in her wrist and hand movements. (App. 155, paragraph 7). Ms. Eaton states that when she was asked to use the accused buffer for a manicure, she did not stick any fingers inside the buffer. (App. 155, paragraph 6). Rather, she held the outside of the buffer with her fingers and thumb. *Id.* When she used the accused nail buffer in this manner, it was easy for her to avoid rubbing the buffer against her fingernails. *Id.* Finally, the named and actual inventor of the nail buffer design, Third Party Defendant Adi Torkiya, states that he did not make the hollow ends of the buffer design square so that a manicurist could stick one or more of their fingers in the buffer when using it. (App. 156, paragraph 3). Rather, he made the ends square so that his hollow buffer design could be distinguished, based on its appearance, in the marketplace. *Id.*

The credibility of defendants' claim that the hollow tube is functional is further cast into

- 10 -

to insert a finger to protect his or her manicure.

Plaintiff anticipates that defendants will attempt to draw a distinction between the retail use of the nail buffer and the professional use of the nail buffer. Defendants argument apparently will be that even though their own marketing videotape does not show a user sticking their finger into the buffer, a professional manicurist will stick his or her finger into the buffer when giving a manicure. Plaintiff notes that defendant has failed to identify any professional manicurist that defendant has sold the accused buffer to. Further, Plaintiff's expert professional manicurist states that she would not stick a finger in the buffer when using it. Finally, defendants have not produced any marketing materials, instructions, or other documentation indicating that a finger is to be inserted into the buffer by any manicurist, professional or otherwise. Therefore, defendants' position on finger insertion appears to have been wholly litigation inspired. In any event, as discussed below, the defendants' alleged distinction between retail and wholesale markets and individual versus professional use ultimately is not relevant due to design alternatives.

Even assuming *arguendo* that insertion of a finger to protect a manicure is a legitimate function of the square hollow tube, the design still would not be functional in a design patent sense because there are many different designs that would accomplish this purpose. Every nail buffer design included in the exhibits allows a manicurist to protect their manicure by holding the buffer in a way that their fingernails do not come into contact with the buffer or the fingernails being buffed. Indeed, every design contained in the prior art patents and the buffers illustrated in the exhibits to defendants' expert reports allow the user or manicurist to protect their own manicure. For example, the buffer sticks or boards (one-way, two way, three-way, and four-way) all can be held in such a way that the user's manicure is protected. Similarly, a solid buffer block

course, is not credible at all because the design patent at issue only shows three raised surfaces. Indeed, defendants' expert Michael Falley has stated that "[I]t is true that the fourth side is not necessary for the purpose of mounting a fourth abrasive surface , because the buffer is only a three way buffer." (Falley declaration dated Dec 18, 2003, App. 00013).

To the extent defendants are claiming functionality of tube shape due to the number of abrasive surfaces that can be placed thereon, defendants claim also is without merit. There is no direct correlation between the number of buffer surfaces and the number of abrasive surfaces. As shown by defendants own documents, a single side of a buffer can have one or two different abrasive surfaces (see, e.g., App. 16, 17, 18). A side of a buffer also can have no abrasive surface. (App. 58). Therefore, a four-sided buffer can have from one to eight different types of abrasive surfaces (assuming up to two per side). Furthermore, the corners of a four sided buffer need not be rounded (they can be sharp angles – App. 123), and the profile of a four-sided buffer need not be a square (it can be a rectangle, trapezoid, parallelogram, or any other four sided shape – see, e.g., 24 (rectangle). Defendants' claim that the four-sidedness of the subject design patent is functional is without merit.

     b.    The raised pads

Plaintiff anticipates that defendants will contend that the height of the abrasive surfaces over the substrate to accommodate the foam layer is allegedly functional in that it dissipates heat. As discussed earlier, the abrasive surfaces and underlying pads can be thin or thick (see, e.g., App. 16, 31, 35, 38, 42, 58), continuous or broken (see, e.g., 16, 31, 35, 38, 42, 58), and can reach all the way to the edge of the buffer or stop short of it (see, e.g., 16, 31, 35, 38, 42, 58). Even assuming arguendo that a layer of foam is needed beneath the abrasive surface to dissipate heat, this same function is performed by the foam block underlying the abrasive surface in a solid

- 14 -

block buffer. This precise point was made by defendants' own expert, Michael Falley, as follows: "In the hollow version of my four way buffer block, the abrasive surfaces are attached on top of one-eighth inch foam layers which in turn are attached to the plastic frame. The foam dissipates the heat produced by the friction of the nail buffing process. In my buffer blocks that are not hollow, the underlying block itself is made of foam which accomplishes the same result." (emphasis added) (App. 69). Since an alternative design can perform the same function, the design is not functional. Furthermore, the foam strips can be a different width, i.e., can be wider to overlap at the corners to eliminate the gaps that are a part of the subject design patent's appearance.

     c.     The space between the raised pads

     Plaintiff anticipates that defendants will argue that the gap between the raised surfaces is functional because it allegedly ensures that during the nail buffing process the adjacent abrasive surface will not make contact with the cuticle. Notably, defendants did not contend the gap was functional in their initial answers to interrogatories or in their initial expert reports. Although the brochure attached as Def. App. 31 contains the language "cuticle protection edge for safety," the abrasive surfaces are not raised nearly to the degree they are in the '389 design patent. Further, the whole concept of a "cuticle protection edge" is called in question by U.S. Patent No. 5,899,210 (Def. App. 53 - 56). In this utility patent, rounded corners on a triangular base are specifically provided "for working on cuticles." (Def. App. 55, col. 2, lines 32, 33). *See also* column 2, line 65 through column 3, line 8). Although the triangular design patent (Def, App. 50 – 52) contains pictures of a buffer with raised abrasive pads and gaps, no such design is shown on the triangular buffer utility patent. There is no mention of any utility of a gap in the utility patent. Further, plaintiff's expert Kathleen Eaton states that she has used solid block buffers in

her practice without so-called "cuticle protection edges" and she never has had a problem with a side of the buffer cutting into someone's cuticle. (App. 155, paragraph 8). Inventor Adi Torkiya states that he did not leave an open space between the buffer pads in his design so that a person's cuticles could be protected. (App. 156, paragraph 4).

Even assuming *arguendo* the correctness of defendants' position that a gap between the abrasive pads provides for "cuticle protection," such a gap is not functional in the design patent sense because there are different designs that will accomplish the same alleged purpose. Indeed, as long as the adjacent surface does not extend above the plane of the surface being used for buffing, no contact with the cuticle will occur unless you turn the buffer so far over that the adjacent side comes into contact with the cuticle. If the concern is that a portion of the buffer is going to "cut into the cuticle," then rounded edges would be a design alternative to gaps. To the extent a gap is desired, the gap can be large or small, and a gap can be left between abrasive surfaces that are raised at different heights (compare the height of the abrasive surfaces of the Falley Buffer Block with the height of the raised abrasive surfaces of the subject claimed design). Further, there need not be gap left between the underlying foam layers as long as there is a gap between the abrasive surfaces, i.e., a foam layer could wrap completely around the hollow tube and individual abrasive pads could be placed on top of the foam. In sum, defendants' argument that the gap between the raised pads is functional in the design patent sense is without merit.

4.    Claim Construction and Points of Novelty

Plaintiff anticipates that defendants will argue that claim construction of a design patent requires determination of points of novelty. The district courts are in conflict on the issue. *See, e.g., In re Plastics Research Corp. Litigation*, 2002 U.S. Dist. LEXIS 20547 (E.D. Mich. 2002) (supportive of defendants' argument); *Lamps Plus, Inc. v. Dolan*, 2003 U.S. Dist. LEXIS

- 16 -

19578 (N.D. Tex. 2003) (contrary to defendants' argument).

A well reasoned analysis of current Federal Circuit authority indicates that the Court should <u>not</u> determine points of novelty during the claim construction process. Rather, points of novelty should be determined by the fact finder only as part of the test for infringement. If the Court determines points of novelty as part of claim construction, it would unduly restrict the scope of the design claim to only the ornamental *and novel* aspects of the claim. Such a restriction would improperly merge the ordinary observer and point of novelty tests and would prevent a fact finder from following the Federal Circuit's instruction to determine infringement based on the overall visual impression of the ornamental aspects of the claim, and not the visual impression created by only the ornamental *and novel* aspects of the claim. See *Unidynamics Corp. v. Automotive Products International, Ltd.*, 157 F.3d 1311, 1323 (Fed. Cir. 1998) (discussed below). The flaws in defendants' anticipated arguments in favor of determining points of novelty during claim construction, and the correctness of plaintiff's position in terms of Federal Circuit authority, are explained below.

Plaintiff anticipates that Defendants will cite *Unidynamics Corp. v. Automotive Products International, Ltd.*, 157 F.3d 1311, 1323 (Fed. Cir. 1998) for the proposition that "[a] design patent only protects the novel, ornamental features of the design patented" and *Cybor Corporation v. FAS Technologies, Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) for the proposition that "[a]n infringement analysis involves two steps" and "first, the court determines the scope and meaning of the patent claims asserted, *see* Markman II … and then the properly construed claims are compared to the allegedly infringing device…" Defendants then likely will argue that it follows from the proposition that the scope of protection of a design patent is limited to ornamental and novel aspects, and that claim construction involves determining the scope of the

- 17 -

patent claim, that in a claim construction hearing the court should determine the novel aspects of the design just as it should determine which features are ornamental. Defendants' reasoning is flawed because it confuses the scope of protection afforded under the two-pronged design patent infringement test with the scope of the design claim itself.

In *Unidynamics, supra*, the statement "[a] design patent only protects the novel, ornamental features of the design patented" was not made in the claim construction context, but rather as a prelude to a discussion about the test for design patent infringement. Indeed, the very next sentence in the opinion states that "[i]n determining whether a product design infringes a design patent, two distinct tests must be applied: the ordinary observer test set forth in *Gorham Mfg. Co. v. White*, 81 U.S. 511, 528, 20 L. Ed. 731 (1871), and the point of novelty test." *Id.* at 1323. Therefore, the statement quoted from the case should not be interpreted as a requirement that points of novelty should be determined during claim construction, but rather as a general comment on the scope of protection afforded under the two-prong infringement test.

Further, reversible error committed by the trial court in *Unidynamics* illustrates why points of novelty should not be determined as part of claim construction. In *Unidynamics*, the district court granted summary judgment that the defendants' vending machines infringed Unidynamics' U.S. Design Patent No. 307,446 ( '446 design patent) on a design for a vending machine for food. The district court came to that conclusion by determining the point of novelty of the '446 patent and finding as a matter of law that the accused vending machine appropriated the point of novelty. The Federal Circuit reversed, holding that the district court had improperly merged the ordinary observer and points of novelty tests. The Federal Circuit stated as follows:

> The district court found that the point of novelty of the '446 design patent constituted the large rectangular advertising area and its placement below the snack items and above the smaller rectangular areas for displaying the types and pricing of drinks. The district court found that, as a matter of law, the LCM4

vending machines incorporated the point of novelty.

....

> In applying the ordinary observer test, however, the district court looked only to the point of novelty. The district court ignored other ornamental features such as the slight variations in door panel width, machine trim, and the placement of the lock because it found they were irrelevant to the point of novelty. The district court concluded: "on the items that can be considered the point of novelty, there is nothing left for a jury to decide, because there can be no genuine dispute regarding whether an ordinary observer would be confused: the ornamental aspects of the LCM4 and the design covered by the '446 patent are substantially the same." This merging of the ordinary observer and the point of novelty tests was legal error. *Id.*

Even though some ornamental features were not considered points of novelty ("the slight variations in door panel width, machine trim, and the placement of the lock"), the Federal Circuit held that these ornamental features must still be considered in the ordinary observer test and that to eliminate them entirely improperly merged the ordinary observer and point of novelty tests. This is the very reason that the claim construction process must not include determining points of novelty. If it did, then ornamental features not considered points of novelty by the court would be eliminated from the scope of the claim, would not be considered in the ordinary observer test, and the ordinary observer and point of novelty tests would be improperly merged. Since such an approach would also in effect improperly merge the ordinary observer and point of novelty tests, it should not be used by this Court.

Plaintiff anticipates that Defendants also will seek to support their argument for determining points of novelty in the claim construction process by citing several district court opinions. However, only one district court opinion attempts to analyze the issue in any depth. In *In re Plastics Research Corp. Litigation*, 2002 U.S. Dist. LEXIS 20547 (E.D. Mich. 2002) the court questioned, *sua sponte*, whether it should determine points of novelty as part of claim construction. Following briefing by the parties, the Court stated as follows:

> Having more fully reviewed the implications of the Supreme Court's decision in

- 19 -

*Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 134 L. Ed. 2d 577, 116 S. Ct. 1384 (1996) and the Federal Circuit's subsequent opinion in *Cybor Corporation v. FAS Technologies, Inc.*, 138 F.3d 1448 (Fed. Cir. 1998), the court is persuaded that the point of novelty is a question of law to be resolved by the judge. *See also Sun Hill Indus. Inc. v. Easter Unlimited, Inc.*, 48 F.3d 1193, 1197-98 (Fed. Cir. 1995) (treating point of novelty as a question of law that did not warrant "exercise of the fact-finding function"). It is so determined in this case, and the court next turns to determining the point of novelty. *Id.* at *3, 4.

Plaintiff respectfully suggests that the authority cited by the Court does not support the Court's conclusion. *Markman* and *Cybor* were not design patent cases involving points of novelty. Rather, they addressed the issues of whether claim construction was to be decided by the Court as a matter of law and the appropriate standard of appellate review for claim construction, respectively. Although *Sun Hill* was a design patent case, the Federal Circuit's statement that "nothing of record warrants a further exercise of the fact-finding function" (*Sun Hill, supra*, at 1197, 1198) was made in the context of declining to remand the case for an infringement determination under the correct legal standard. As explained below, in no way does this statement support the conclusion that points of novelty should be determined as part of the claim construction process.

In *Sun Hill*, the design patent claimed "the ornamental design for a bag, as shown and described" and included fifteen drawings illustrating a bag tied at the top and having one of three bottom closures. The drawings showed "a bag with vertical stripes and Halloween-style "happy" and "scary" jack-o-lantern faces on opposing sides." *Id.* at 1195. A commercial embodiment of the patent was "a large, orange, plastic lawn bag" that displayed "the claimed features of vertical stripes, opposing happy and scary faces, and one of the claimed bottom closures." *Id.* The cited prior art included the "Noteworthy bag." The Noteworthy bag could be stuffed with paper and tied at the top, and "[t]he resulting 'decorative pumpkin' had vertical stripes and opposing identical happy jack-o-lantern faces." *Id.* The accused product had a jack-o-lantern face on only

one side, lacked stripes, and had a different bottom closure than claimed in the patent.

The trial court found that some of the accused bags infringed and that some did not. In finding infringement, the trial court relied primarily upon color, size, and material, which were features not shown in the patent. The trial court found that the larger bags infringed both literally and under the doctrine of equivalents, even though the accused bags had only one face, no vertical lines, and a different bottom tuck. The trial court also found that the smaller accused bags, which were indistinguishable except in size from the larger bags, did not infringe.

The Federal Circuit reversed, holding that the trial court committed several errors. The Federal Circuit first held that the trial court committed error by relying on unclaimed features of Sun Hill's commercial embodiment to find infringement. *Id.* at 1196. The Federal Circuit also held that the trial court committed legal error by collapsing the substantial similarity test into the point of novelty test. The Court stated as follows (page 1197):

> Although the trial court recognized the point of novelty test, *Sun Hill*, 831 F. Supp. at 1034-35, the trial court did not consider whether Fun World had appropriated the specific novel features of Sun Hill's claimed design. The trial court instead asserted that "the essence of the product's design" controls. *Id.* at 1035. The trial court then concluded that "if a product has some function which, combined with its [overall] design, justifies its protection, that may be its point of novelty." *Id.*

> Both steps in the trial court's reasoning are flawed. First, *Litton* and *Shelcore* establish that the fact finder must consider both the claimed overall design and the point of novelty in assessing infringement. This the trial court failed to do. Second, the trial court cannot evade the point of novelty test by relying on the claimed overall design as the point of novelty:

>> To consider the overall appearance of a design without regard to prior art would eviscerate the purpose of the "point of novelty" approach, which is to focus on those aspects of a design which render the design different from prior art designs. *Litton*, 728 F.2d at 1444, 221 U.S.P.Q. (BNA) at 109-110.

*Winner Int'l Corp. v. Wolo Mfg. Corp.*, 905 F.2d 375, 376, 15 U.S.P.Q.2D (BNA) 1076, 1077 (Fed. Cir. 1990). The trial court's choice of the overall design as the

- 21 -

point of novelty, and its consequent collapsing of the point of novelty test into the substantial similarity test, constitute legal error.

Following the above quoted language, the Federal Circuit in *Sun Hill* made its statement partially quoted by the court in *In re Plastics Research* that "[t]his court need not, however, remand for an infringement assessment under the correct legal standard, because 'nothing of record warrants a further exercise of the fact-finding function.'" *Sun Hill* at 1197, 1198. The Court went on to support that statement through additional analysis as follows:

> The record demonstrates that Fun World has not appropriated the point of novelty of Sun Hill's claimed design. The point of novelty of Sun Hill's claimed design is narrow. The trial court identified the claimed features in its description of the patent:
>
>> The drawings that make up the '023 patent show six views of the same ornamental object which has facial features on both sides, a [bottom] closure, and a shiny surface as demonstrated by the shading; nothing in the patent mentions color or size or material.
>
> *Sun Hill*, 831 F. Supp. at 1027-28. The facial features consist of vertical stripes and contrasting jack-o-lantern faces.
>
> The Noteworthy bag discloses several of these claimed features. The illustration on the Noteworthy bag, reproduced above, teaches stuffing the bag with paper and tying it at the top. The resulting "decorative pumpkin" has vertical stripes and opposing identical happy jack-o-lantern faces. The record does not show whether the plastic used in the Noteworthy bag has a shiny surface.
>
> The only differences between the trial court's description of Sun Hill's claimed design and the Noteworthy bags are the contrasting jack-o-lantern faces, the bottom closure, the specific features of the jack-o-lantern faces, and the shiny surface. The point of novelty therefore consists at most of these four features. This court assumes, without deciding, that none of these features are functional, and therefore all qualify as valid points of novelty of the claimed ornamental design. *Cf. Lee*, 838 F.2d at 1188 ("it is the non-functional, design aspects that are pertinent to determinations of infringement").
> ....
>
> As mentioned above, Sun Hill's claimed design has at most four points of novelty. The accused Fun World products have none of these features. As the parties stipulated, and the trial court recognized, *id.* at 1028, each Fun World bag has a jack-o-lantern face on only one side and has a different bottom closure. The trial

- 22 -

court concluded on summary judgment, furthermore, that Fun World has not usurped the specific facial features Sun Hill claims. *Id.* at 1026. Finally, neither the trial court nor the record indicates that the accused Fun World bags have a shiny surface.

Because Fun World has not appropriated any of the features that make up the point of novelty of Sun Hill's claimed design, Fun World cannot, as a matter of law, infringe.

It is clear after analyzing the above case that the Federal Circuit treated the point of novelty issue as a question of law not because it was part of claim construction, but because the evidence was so clear and uncontroverted that the point of novelty could be determined as a matter of law on appeal after the correct legal standards were applied. *Sun Hill* no doubt is correct in holding that the point of novelty issue is not immune from being decided as a matter of law on appropriate evidence and in appropriate circumstances, *e.g.*, on motion for summary judgment, on motion for J.M.O.L, or on appeal. However, simply because point of novelty can be determined as a matter of law due to the particular evidence in a particular case, that is no reason to conclude that it also should become part of the claim construction process. As discussed earlier, it should not because it would improperly merge the ordinary observer and point of novelty tests in the infringement determination.

Two district court cases hold that points of novelty should not be determined by the court during claim construction: *Minka Lighting, Inc. v. Craftmade Intern., Inc.*, 2001 U.S. Dist. LEXIS 14199, 2001 WL 1012685, *7 (N.D. Tex. 2001) and *Lamps Plus, Inc. v. Dolan*, 2003 U.S. Dist. LEXIS 19578 (N.D. Tex. 2003). In *Lamps Plus*, Judge Kinkeade wrote that "[b]ecause determining what distinguishes a patented design from the prior art is and has historically been an issue for the jury, the issue of what constitutes a point or points of novelty of a design patent falls into the realm of fact issues for the jury to decide." (citing *Minka Lighting*). That statement is correct, and it is a powerful reason that the court should be reluctant to

- 23 -

determine points of novelty as a matter of law during claim construction.

Finally, plaintiff anticipates that defendants will seek to support their argument with dictum from an unpublished Federal Circuit opinion. In *Minka Lighting, Inc. v. Craftmade International, Inc.*, 2004 U.S. App. LEXIS 770 (Fed. Cir. 2004) (unpublished), the Federal Circuit stated as follows:

> However, a district court need not always verbally construe at length a design patent's drawings. The infringement analysis essentially involves comparing the drawings to an accused device; a verbal description of the drawings does not necessarily aid such a comparison. But an extensive verbal claim construction may be helpful particularly if the drawings contain features that are not part of the patented design, e.g., if the drawings contain functional features or if there is a point of novelty issue to consider. *See, e.g., OddzOn Prods.*, 122 F.3d at 1405. Here, the district court chose to verbally construe the claims. This court discerns no error in that construction.

The only authority cited for the statement is *OddzOn Prods. v. Just Toys*, 122 F.3d 1396, 1405 (Fed. Cir. 1997). However, in *OddzOn*, the Federal Circuit only mentioned functionality and never mentioned point of novelty in its discussion concerning claim construction. The Court stated as follows on page 1405:

> In *Gorham,* the claimed elements were purely ornamental, being limited to the scroll work on the handle portion of flatware. If, on the other hand, a design contains both functional and ornamental features, the patentee must show that the perceived similarity is based on the ornamental features of the design. The patentee "must establish that an ordinary person would be deceived by reason of the common features in the claimed and accused designs which are ornamental." *Read Corp. v. Portec, Inc.,* 970 F.2d 816, 825, 23 U.S.P.Q.2D (BNA) 1426, 1434 (Fed. Cir. 1992). Design patent infringement is a question of fact, which a patentee must prove by a preponderance of the evidence. *L.A. Gear, Inc. v. Thom McAn Shoe Co.,* 988 F.2d 1117, 1124, 25 U.S.P.Q.2D (BNA) 1913, 1918 (Fed. Cir. 1993).
>
> In construing the claim of OddzOn's patent, the district court carefully noted the ornamental features that produced the overall "rocket-like" appearance of the design. We agree with the district court's claim construction, which properly limits the scope of the patent to its overall ornamental visual impression, rather than to the broader general design concept of a rocket-like tossing ball. *See Durling v. Spectrum Furniture Co.,* 101 F.3d 100, 104, 40 U.S.P.Q.2D (BNA)

- 24 -

1788, 1791 (Fed. Cir. 1996) ("A proper interpretation of [the patentee's] claimed design focuses on the visual impression it creates."). We therefore reject OddzOn's contention that overall similarity of the "rocket-like" appearance is sufficient to show infringement.

It is not clear what Judge Radar was referring to in *Minka Lighting* when he stated "or if there is a point of novelty issue to consider." It is not mentioned in his cited authority, *OddzOn*. To the extent the dictum is read as inferring that features not deemed to be points of novelty are not part of the claimed design and should not be considered in the infringement analysis, such an inference would be in conflict with established and well reasoned Federal Circuit authority to the contrary. See *Unidynamics Corp, supra, at 1323*. (It is reversible error not to consider features in "ordinary observer" portion of infringement test even though features were not considered points of novelty.). In any event, *Minka Lighting* does not contain analysis on the issue, does not consider the argument being made by plaintiff, and is unreported and non-precedential. It should not be considered as either controlling or persuasive by this Court.

In sum, claim construction in a design patent case should not include determining points of novelty because such an approach would improperly merge the ordinary observer and point of novelty tests. The determination of points of novelty should be confined to the determination of infringement. *See Litton Systems, Inc. v. Whirlpool Corp.*, 728 F.2d 1423, 1443 (Fed. Cir. 1984) ("This 'point of novelty' approach applies only to a determination of infringement.")

5.    Points of Novelty in the Subject Patent

Plaintiff anticipates that Defendants will argue there is just one point of novelty in the subject patent – the addition of a fourth side without an abrasive surface. Defendants' strategy is to argue that the a single feature of the subject patent not present in their overall similar design is the only point of novelty to be compared in the infringement comparison, which according to defendants would lead to no infringement as a matter of law. There are at least two fundamental

- 25 -

things wrong with defendants' approach. First, as explained above, it is improper to compare only points of novelty in the infringement test. While the comparison must include points of novelty, the ordinary observer portion of the test requires that the overall visual impression made by <u>all</u> ornamental features (and not just novel ones) must be compared for substantial similarity. See *Unidynamics Corp, supra, at 1323.*

Second, defendants' argument incorrectly restricts the point of novelty test to just one prior art reference – the so–called Nailco Patent (U.S. Patent No. D416,648 to Letherby). Points of novelty are not determined by comparing the claimed design against just one reference selected by defendants in an attempt to improperly predetermine the infringement inquiry, but rather by comparing the claimed design against the prior art cited during patent prosecution. *See, e.g., Goodyear Tire & Rubber Co. v. Hercules Tire & Rubber Co.*, 162 F.3d 1113, 1116 (Fed. Cir. 1998) (Court stated "[t]he points of novelty relate to differences from prior designs, and are usually determinable based on the prosecution history" and determined points of novelty by comparing tread design against multiple prior art references); *see also Catalina Lighting, Inc. v. Lamps Plus*, Inc., 295 F.3d 1277, 1286-1287 (Fed. Cir. 2002) ("According to the "point of novelty" test, the fact-finder must determine whether the accused design appropriates the points of novelty that distinguish the patented design from the prior art.").

The "References Cited" section of the subject patent lists 21 patents. The patents include Design Patent No. 416,648 to Letherby and Utility Patent No. 2,911,769 to Trussell. Patent No. 416,648 to Letherby includes an illustration of an open hollow tube, triangular in cross section and rectangular in length, with raised rectangular abrasive surfaces mounted on the sides. The raised abrasive surfaces do not cover the corners of the open, hollow, triangular tube. Patent No. 2,911,769 to Trussell includes illustrations of an open hollow tube, square in cross section and

rectangular in length, which contains an abrasive surface on the exterior. The abrasive surfaces are not significantly raised and do cover the corners of the hollow, open, square tube.

From the illustrations in these two prior art patents, it can be seen that two significant points of novelty of the subject patent are that (1) the open hollow tube is *square* in cross section (rather than *triangular* in cross section as in the Letherby patent) and (2) the abrasive pads are raised and do not cover the corners of the tube (unlike the Trussell patent where the abrasive surfaces are not significantly raised and do cover the corners of the underlying tube). This novel combination[2] of an open hollow tube, square in cross section and rectangular in length, with raised abrasive pads that do not cover the corners of the tube, is found no where in the prior art.

Although the above points of novelty are two significant points of novelty, they are not the only points of novelty that distinguish the subject patent from the prior art. For example, Design Patent No. 369,438 to Resler contains an illustration of a nail file, square in cross section and rectangular in length, with rectangular abrasive pads that do not cover the corners of the underlying square body. However, in Resler the square body is not hollow or open. In addition to the features mentioned above, other features and/or combinations of features of the subject patent are points of novelty. At the appropriate time, plaintiff will provide the Court and/or jury

---

[2] A combination of features may be asserted as a point of novelty. *See L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1124 (Fed. Cir. 1993) (no error in district court's finding "that 'the placement of all the major design elements is the same, creating the same distinctive overall look', and [recognition] that the novelty resided in the overall appearance of the combination."); *see also Hosley Int'l Trading Corp. v. K Mart Corp.*, 237 F. Supp. 2d 907, 913 (N.D. Ill. 2002) ("In appropriate circumstances, a combination of known elements may constitute a point of novelty."); *Bush Indus., Inc. v. O'Sullivan Indus., Inc.*, 772 F. Supp. 1442, 1452 (D. Del. 1991) ("A design's point of novelty need not be one individual newly developed feature, and may instead be a specific combination of elements not found in the prior art.); *Rockport Co., Inc. v. Deer Stags, Inc.*, 65 F. Supp. 2d 189, 195 (S.D.N.Y. 1999) ("A unique combination of known elements can satisfy the point of novelty requirement."); *Jack Schwartz Shoes v. Skechers U.S.A.*, 2002 U.S. Dist. LEXIS 25699, *42 (S.D.N.Y. 2002) (design distinguished from prior art based on combination of elements).

with a full analysis concerning the appropriate points of novelty.

6.    Conclusion

Since none of the features of the subject design patent are functional, this Court need not construe the subject design patent in words. Rather, after properly charging the jury on the law of design patent infringement, the Court should allow the jury to compare the accused nail buffer against the subject design patent.

Respectfully submitted,

By: _____
Robert G. Oake, Jr.
Texas State Bar No. 15154300
Law Office Of Robert G. Oake, Jr.
101 W. McDermott, Suite 109
Allen, Texas 75013
972-727-7490
972-727-7496 (Fax)

Rudolf O. Siegesmund
Texas State Bar No. 18324570
4627 N. Central Expressway, Ste. 2000
Dallas, Texas 75205-4017
214.528.2407
214.528.2434 (fax)

ATTORNEYS FOR PLAINTIFF EGYPTIAN
GODDESS, INC. and THIRD PARTY
DEFENDANT ADI TORKIYA

## CERTIFICATE OF SERVICE

I certify that on July 19, 2004, a true and correct copy of the foregoing was served under the Federal Rules of Civil Procedure to the following:

Frederick L. Medlin
KIRKPATRICK & LOCKHART LLP
2828 North Harwood Street, Suite 1800
Dallas, Texas 75201
Attorneys for Defendant

Robert G. Oake, Jr.

2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| **EGYPTIAN GODDESS, INC.,** §<br>§<br>    **Plaintiff and Counter-Defendant,** §<br>§<br>**VS.** §<br>§<br>§<br>**SWISA, INC. and DROR SWISA,** §<br>**INDIVIDUALLY,** §<br>§<br>    **Defendants, Counter-Plaintiffs and** §<br>    **Third-Party Plaintiffs,** §<br>§<br>**VS.** §<br>§<br>**ADI TORKIYA,** §<br>§<br>    **Third-Party Defendant.** § | **CIVIL ACTION NO. 3-03-CV-0594-N** |

**SWISA'S BRIEF IN SUPPORT OF ITS RESPONSE TO**
**PLAINTIFF'S MOTION FOR CLAIM CONSTRUCTION**

Michael D. Napoli
State Bar No. 14803400
Linda G. Moore
State Bar No. 14359500
Frederick L. Medlin
State Bar No. 13895930

KIRKPATRICK & LOCKHART LLP
2828 North Harwood Street, Suite 1800
Dallas, Texas 75201
Telephone:   (214) 939-4900
Facsimile:   (214) 939-4949

ATTORNEYS FOR DEFENDANTS

## TABLE OF CONTENTS

**Page No.**

TABLE OF CONTENTS ............................................................................................ i

TABLE OF AUTHORITIES ................................................................................... iii

INTRODUCTION ..................................................................................................... 1

FACTUAL BACKGROUND RELEVANT TO CLAIM CONSTRUCTION
ISSUES ...................................................................................................................... 5

ARGUMENT AND AUTHORITIES ...................................................................... 9

I.     Claim Construction of a Design Patent Requires Determination of
Points of Novelty .......................................................................................... 9

     A.     Claim Construction Determines the Scope of a Design
Patent's Protection, Which Extends Only to Novel and
Ornamental Aspects, So That Claim Construction Must
Identify the Patented Design's Points of Novelty ......................... 9

     B.     Determining Points of Novelty During the Claim
Construction in No Way Merges the Ordinary Observer and
Point of Novelty Tests ................................................................ 13

     C.     Both Functionality and Points of Novelty Are Historically
Jury Issues *in the Invalidity Context*, but, after *Markman*,
Both Are Also Claim Construction Issues, as Five District
Courts Recognized Even Prior to *Minka* .................................. 15

II.     The '389 Design Practically Vanishes When the Point of Novelty
is Construed ................................................................................................ 18

III.     The Proper Functionality Analysis is Whether the Feature of Four-
Sidedness, in Itself, is the Best Design for a Small Buffer with
Four Different Abrasive Surfaces on Separate Long Sides ..................... 24

     A.     The Court Should Construe the Functionality of the
Individual Feature, Not the Overall Design ............................... 25

     B.     The Existence of Functionally Inferior Alternatives Does
Not Mean That a Feature is Ornamental ................................... 30

IV.    The '389 Design is a Functional Variant of the Nailco Buffer and
       Falley Buffer Block, and Every Aspect of the Design is Functional....................37

CONCLUSION.................................................................................................................49

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Applied Arts Corp. v. Grand Rapids Metalcraft Corp.,*
67 F.2d 428 (6th Cir. 1933) ................................................................................25

*Avia Group International, Inc. v. L.A. Gear California, Inc.,*
853 F.2d 1557 (Fed. Cir. 1988).............................................................................31

*Bentley v. Sunset House Distributing Corp.,*
359 F.2d 140 (9th Cir. 1966) ..............................................................................42

*Berry Sterling Corp. v. Pescor Plastics, Inc.,*
122 F.3d 1452 (Fed. Cir. 1997)...........................................................31-33, 35, 41

*Berry Sterling Corp. v. Pescor Plastics, Inc.,*
1999 WL 674514 (Fed. Cir. 1999)..........................................................................33

*Black & Decker (U.S.) Inc. v. Pro-Technology Power Inc.,*
47 U.S.P.Q.2d 1843 (E.D. Va. 1998).....................................................................17

*In re Carletti*, 328 F.2d 1020 (C.C.P.A. 1964) .........................................33-35, 42

*Child Craft Industrial Inc. v. Simmons Juvenile Products Co., Inc.,*
990 F. Supp. 638 (S.D. Ind. 1998).....................................................................16, 18

*Contessa Food Products, Inc. v. Conagra, Inc.,*
282 F.3d 1370 (Fed. Cir. 2002).............................................................................22

*Cybor Corporation v. FAS Technologies, Inc.,*
138 F.3d 1448 (Fed. Cir. 1998)....................................................................10-12, 14-16

*Goodyear Tire & Rubber Co. v. Hercules Tire & Rubber Co., Inc.,*
162 F.3d 1113 (Fed. Cir. 1998)..............................................................................10

*Gorham Manufacturing Co. v. White*, 81 U.S. (14 Wall.) 511 (1871) ..............................9

*Hosely Intern. Trading Corp. v. K Mart Corp.,*
237 F.Supp.2d 907 (N.D. Ill. 2002) .................................................................16, 18

*Hsin Ten Enterprise USA, Inc. v. Clark Enterprises,*
149 F.Supp.2d 60 (S.D.N.Y. 2001) ...................................................................16, 18

*Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844 (1982)..................................36

*Jack Schwartz Shoes, Inc. v. Sketchers, U.S.A., Inc.,*
    233 F.Supp.2d 512 (S.D.N.Y. 2002)......................................................................23

*KeyStone Retaining Wall System, Inc. v. Westrock, Inc.,*
    997 F.2d 1444 (Fed. Cir. 1993)............................................................................12

*L.A. Gear, Inc. v. Thom McAn Shoe Co.,*
    988 F.2d 1117 (Fed. Cir. 1993).......................................................22, 23, 31, 33

*Lamps Plus, Inc. v. Dolan,* 2003 WL 22435702 (N.D. Tex).........................................18

*Lee v. Dayton-Hudson Corp.,*
    838 F.2d 1186 (Fed. Cir. 1988)..........................................9, 12, 24-26, 29, 41

*Metrokane, Inc. v. Wine Enthusiast,*
    185 F.Supp.2d 321 (E.D.N.Y. 2002) ................................................11, 13, 16, 18

*Minka Lighting, Inc. v. Craftmade Int'l, Inc.,*
    2001 WL 1012685 (N.D. Tex)...........................................................................17, 18

*Minka Lighting, Inc. v. Craftmade Int'l, Inc.,*
    2002 WL 1331883 (N.D. Tex.) *aff'd* 2004
    WL 506587 (Fed. Cir. (unpublished opinion) ...................................................17

*Minka Lighting, Inc. v. Craftmade International, Inc.,*
    2004 WL 506587 (Fed. Cir. 2004).......................................11, 12, 15, 16, 17

*OddzOn Products Inc. v. Just Toys, Inc.,*
    122 F.2d 1396 (Fed. Cir. 1997)........................... 10-15, 26, 27, 30, 39, 48

*In re Plastics Research Corp. Litigation,*
    63 U.S.P.Q.2d 1924, 2002 WL 1000450 (E.D. Mich. 2002)....................... 15-18

*Power Controls v. Hybrinetics, Inc.,* 806 F.2d 234 (Fed. Cir. 1986).......................34, 35

*Qualitex Co. v. Jacobson Products Co., Inc.,* 514 U.S. 159 (1995) .............................36

*Spotless Enterprises, Inc. v. A & E Products Group L.P.,*
    294 F.Supp.2d 322 (E.D.N.Y. 2003) ...................................................................26

*Sun Hill Industrial v. Easter Unlimited,*
    831 F.Supp.1024 (E.D.N.Y. 1993), *aff'd in part, rev'd in part,*
    48 F.3d 1193 (Fed. Cir. 1995)..................................................... 9, 16, 20-22

*Sunbeam Products, Inc. v. Wing Shing Products (BVI) Ltd.,*
    311 B.R.378 (S.D.N.Y. 2004).......................................................................32, 33

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **EGYPTIAN GODDESS, INC.,** | § | |
| | § | |
| **Plaintiff and Counter-Defendant,** | § | |
| | § | |
| **VS.** | § | |
| | § | |
| | § | |
| **SWISA, INC. and DROR SWISA,** | § | |
| **INDIVIDUALLY,** | § | |
| | § | **CIVIL ACTION NO. 3-03-CV-0594-N** |
| **Defendants, Counter-Plaintiffs and** | § | |
| **Third-Party Plaintiffs,** | § | |
| | § | |
| **VS.** | § | |
| | § | |
| **ADI TORKIYA,** | § | |
| | § | |
| **Third-Party Defendant.** | § | |

## SWISA'S BRIEF IN SUPPORT OF ITS RESPONSE TO
## PLAINTIFF'S MOTION FOR CLAIM CONSTRUCTION

Swisa, Inc. and Dror Swisa (collectively, "Swisa") hereby file Defendants' Response

Brief Regarding Claim Construction.

## INTRODUCTION

Claim construction in this case turns upon a simple issue. This Court should first

determine what is "novel" in the design of United States Patent D467,389 ("the'389 Patent").

This is made easy by the close similarity between the '389 and a prior art patent, United States

Patent No. D416, 648 (the "Nailco Patent"). Adi Torkiya, patentee of the '389, was selling a

buffer covered by the Nailco Patent at the time he originally filed for patent protection of the

'389 design. Relevant drawings from both patents are shown below.




*The Nailco Patent*                    *The '389 Patent*

App. 50-51, 73-74. The only difference between the '389 design and that of the Nailco Patent is the addition of a fourth side that does not have a rectangular attachment with an abrasive surface on it. The accused device in this suit, the Swisa Buffer, shown below, is also the design of the Nailco Patent with a fourth side added, although the Swisa buffer adds a rectangular attachment with an abrasive surface to that fourth side. Next to the Swisa Buffer is shown another buffer on the market, a Korean-made buffer distributed by W.M.S. Trade Group, Inc. of Hawley, Pennsylvania" (the "W.M.S. Buffer."). It is virtually identical to the Swisa Buffer.




*The Swisa Buffer*                    *The W.M.S. Buffer*

App. 57, 155. The inherent obviousness of adding a fourth side to the Nailco Buffer—especially in light of prior art which Torkiya failed to disclose to the Patent Office—is a subject for another day, should this action proceed.

Nail buffers with three different abrasive surfaces, each on its own long side, are common, as are buffers with four different abrasive surfaces, each with its own long side. Because the drawing for the '389 patent shows no abrasive surface on the fourth side, the '389

2

design, like that of the Nailco Patent, is suitable for a "three-way buffer"—that is, a buffer with three different abrasive surfaces. But the addition of a fourth side to the prior art Nailco Buffer creates the capacity for a buffer with four different abrasive surfaces, each mounted on its own long side. The Swisa Buffer and the W.M.S. Buffer are four-way buffers that realize that capacity. If the addition of a fourth side is functional, Swisa cannot be found to be infringing based on it. But Egyptian Goddess argues that it can monopolize the functional feature of a four-sided hollow tube by simply not including an abrasive surface on that fourth side in its design patent, so that the design seems less functional, but then suing Swisa for patent infringement although the Swisa Buffer does employ the functionality of the fourth side.

The nature of the infringement analysis is such that Egyptian Goddess' strategy cannot succeed. In order to be found infringing, an accused device must be shown to incorporate a non-functional point of novelty under the "point of novelty test." In the course of this claim construction hearing, this Court should determine that the '389's sole point of novelty is either: (1) the addition of a fourth side **or** (2) the addition of a fourth side without an abrasive surface. The presence of a fourth side by itself, because it creates the capacity for adding a fourth abrasive surface, is a functional feature. If the sole point of novelty of the '389 incorporated by the Swisa Buffer is a functional feature, then there can be no infringement under the "point of novelty" test for infringement. On the other hand, if the Court determines that the point of novelty is "the addition of a fourth side that does not have an abrasive surface on it," the Swisa Buffer does not incorporate that point of novelty, so it cannot be infringing under the point of novelty test. Thus design patent law guards against design patentee's monopolizing potentially functional features by obtaining a design patent on a design in which the functional capacity of

3

an element remains unrealized, but then suing for infringement those that employ the functionality of the feature.

The preceding paragraphs distill the essence of this basically simple case. Given the simplicity of the controversy, the Court may well wonder at the extent of the claim construction briefing to which it is being subjected. This results in great part from legal arguments that Egyptian Goddess raises in hope of enabling its suit to survive this claim construction hearing. Because determination of the point of novelty in the '389 design—so easily done given the '389's closeness to the prior art Nailco Patent—must be disastrous for its case, Egyptian Goddess tries to persuade this Court **not** to determine the point of novelty. As will be seen, to argue this Egyptian Goddess must try to explain away the language of a recent unpublished Federal Court decision, and mount a wholly spurious argument as to why the Federal Circuit could not have meant what it said in that case. It must also explain why five district courts were supposedly wrong on this issue.

Egyptian Goddess must also avoid a determination that the addition of the fourth side is functional. It has a two-fold strategy for this. It tries to confuse the analysis for functionality in the patent invalidity context with the analysis for functionality in the claim construction context. More surprisingly, in portraying both tests, Egyptian Goddess argues that a controlling Federal Circuit precedent, although never overruled or even criticized in any subsequent opinion or commentary, and still relied upon by courts, has really been "abandoned."

The underlying simplicity of the actual claim construction issues in this case is the fundamental obstacle that all of Egyptian Goddess' arguments face. As will be seen, that simplicity arises in great part from the history of the '389 design, and its immediate parents.

4

## FACTUAL BACKGROUND RELEVANT TO CLAIM CONSTRUCTION ISSUES

In 1985, a nail buffer manufacturer named Michael Falley created a buffer in the shape of a nail file that had on it four different abrasive surfaces. Three of the surfaces were abrasive of progressively finer grit, to be used in a three-step nail buffing process. The fourth abrasive surface was for shortening and shaping the nail. This buffer was called a "four-way" buffer because of its four different abrasive surfaces. App. 2.

In 1987, Falley had the idea of putting the four different surfaces on the four long sides of a rectangular foam block with square ends. The company of which Falley has been CEO since 1984, Realys Inc. ("Realys") has been making and selling this four-way buffer block ("Falley's Buffer Block") since 1987, and it has been continuously advertised since that date in the Realys' brochure. App. 2-3, 19-20. Falley's Buffer Block is pictured below:



App. 20, 37. The abrasive surfaces on the buffer block do not touch each other along the buffer's long sides. A gap—a "cuticle protection edge"—is left so that during the nail buffing process the adjacent abrasive surface will not make contact with the cuticle. App. 86-87. Realys' brochure, printed in 1987 and in use ever since, described the buffer as "Block shaped for easier handling, cuticle protection edge for safety." App. 3.

Since 1987, Realys has also manufactured for Tammy Taylor a version of the buffer block that has abrasive surfaces added on only three sides (the "Tammy Taylor buffer"). App. 3-

5

4. In imitation of the Falley product, various other foreign and domestic manufacturers make and sell "four-way" and "three-way" buffer blocks. App. 3, 20, 24-26, 58-72.

Falley was also instrumental in developing another three-way buffer which Realys manufactures for Nailco, Inc. ("Nailco"). App. 4-5. This three-sided hollow buffer ("the Nailco Buffer"), is covered by Design Patent D416,648 (previously defined as the "Nailco Patent") and by Utility Patent No. 5,899,210. App. 5, 50-56. A drawing from the design patent is shown below, alongside an image of the actual Nailco Buffer manufactured by Realys:



App. 50-51 (patent drawing). The underlying form of the Nailco Buffer consists of a hollow tube of extruded plastic with triangular ends. Between the abrasive surfaces and the underlying plastic form are intermediate layers of foam. The foam layers, like the underlying foam block in Falley's Buffer Blocks, serve the purpose of dissipating the heat produced by the friction of the nail buffing process, as well as serving as a double-sided adhesive. Also as in the Falley Buffer Blocks, the foam layers do not touch each other along the sides of the buffer, but rather a gap is left to provide a cuticle protection edge. Thus the corners of the plastic form are left exposed, giving the abrasive surfaces a "raised" look. It was Falley who suggested the intermediate foam layers, making the underlying form out of a tube of extruded plastic, and the cuticle protection edges. App. 4-5, 10.

Both Falley's buffer block and the Nailco buffer, when in use, present a risk to the manicurist. While she is rapidly moving the buffing surface back and forth over the nails she is buffing, her own nails are in danger of coming in contact with the nails being buffed. One way to solve this problem is to extend the underlying block out beyond the four abrasive surfaces at one end, as the product below illustrates:



App. 8-9. This buffer is similar to the form of the nail file covered by United States Patent No. D369, 438 (the "Resler Patent"). App. 46-48. Realys also used to manufacture the nail file that Resler patented. App. 4.

In July 2001, Falley decided to make a hollow version of his four-sided buffer block that a manicurist could hold in a different manner by inserting her index finger inside the buffer so that her own manicure would be protected. App. 6. The resulting design can be seen as a Nailco Buffer with squares rather than triangles at either end—the squares allowing a manicurist to insert a finger, which the triangles did not allow. App. 7. This solves the problem of protecting the manicurists' own manicure in a different way than extending the underlying structure of the block beyond the abrasive surfaces, as Michael Falley explains:

> One could make a nail buffer using the design of the Resler Patent or something similar . . . With such a nail buffer, the manicurist would have her hand protected, but she would not have the same degree of control over the buffer as with a Swisa Buffer. With the hollow Swisa buffer, the manicurist can put her finger inside and she has control over the buffer from the inside. The same would

7

> be true with a buffer manufactured to match the design of the '389
> patent.   But with a nail buffer using the Resler design, the
> manicurist would be trying to control the buffer with an extension,
> which would give her less control.

App. 8-9.  In addition to allowing the manicurist to hold the buffer by inserting one finger inside,

the open square sides allow the manicurist to hold the buffer between thumb and a finger, with

the fingernail inserted.  The desirability of having something other than a solid surface at the

ends of the buffer is illustrated by another Egyptian Goddess product, a three-sided buffer block

with round depressions at either end of a solid wooden block.  App. 14-15.

In July 2001, when Falley conceived of the Swisa Buffer and told Dror Swisa he would

make it exclusively for Swisa, Adi Torkiya's company Egyptian Goddess was selling the Nailco

Buffer.  Realys was manufacturing a version of that buffer for Nailco for sale to Torkiya, with

the name "Egyptian Goddess" printed on it.  App. 5.

Unknown to Falley, in October 2001 Adi Torkiya filed an application for a design patent

on what was essentially a four-sided version of the Nailco Patent, with abrasive on only three of

the four sides.  This design was obvious in light of the Nailco Buffer and the Falley Buffer

Blocks, but Torkiya did not disclose to the Patent Office any of Falley's buffer blocks or any of

the many other buffer blocks on the market.  App. 17, 12-14, 107, 116.

After Falley's Swisa Buffer appeared on the market, Torkiya granted his company

Egyptian Goddess an exclusive license to the '389 and the next day Egyptian Goddess brought

this lawsuit against Swisa alleging infringement.

## ARGUMENT AND AUTHORITIES

I.      **Claim Construction of a Design Patent Requires Determination of Points of Novelty.**

   A.      **Claim Construction Determines the Scope of a Design Patent's Protection, Which Extends Only to Novel and Ornamental Aspects, So That Claim Construction Must Identify the Patented Design's Points of Novelty.**

A design patent has a single claim: the drawing. Determination of whether an accused product infringes a design patent involves a two-step process. In the first step, the court construes the design patent to determine what features of the drawing are protected: that is, which features can be copied without infringing the patent. In the second step, the protected aspects of the patent are compared to the accused device, applying two different tests: The "ordinary observer" test of *Gorham Mfg. Co. v. White,* 81 U.S. (14 Wall.) 511, 528 (1871), and the "point of novelty test." The ordinary observer test looks to whether the patented design and the accused device are similar in overall appearance. Under the point of novelty test, "the accused device must appropriate the novelty in the patented device which distinguishes it from the prior art." *Unidynamics Corp. v. Automatic Products International, Ltd.*, 157 F.3d 1311, 1323 (Fed. Cir. 1998). In order to establish infringement, the plaintiff "must prove both substantial similarity [under the ordinary observer test] and appropriation of the 'point of novelty.'" *Sun Hill Indus., Inc. v. Easter Unlimited, Inc.*, 48 F.3d 1193, 1197 (Fed. Cir. 1995).

Both the ordinary observer test and the point of novelty test require claim construction prior to the second step. If the overall similarity under the ordinary observer test results from the similarity of functional features, then there is no infringement, because "such designs must be equivalent in their ornamental, not functional, aspects." *Lee v. Dayton-Hudson Corp.*, 838 F.2d 1186, 1190 (Fed. Cir. 1988). This is because "[d]esign patents do not and cannot include claims to the structural or functional aspects of the article." *Id.*, 838 F.2d at 1188. To be a valid point of novelty, an aspect cannot be a functional feature. *Sun Hill, supra*, 48 F.3d at 1198 ("This

9

court assumes, without deciding, that none of these features are functional, and therefore all qualify as valid points of novelty.")

Despite the readily apparent need for claim construction to include a determination of both functional features and points of novelty, Egyptian Goddess argues—as it must if its case is to survive—that this Court should not determine points of novelty as part of claim construction. Yet Federal Circuit decisions demonstrate the need to do so.

"The requirement that the court construe disputed claim language, as applied to design patents, must be adapted to the practice that a patented design is claimed as shown in its drawing." *Goodyear Tire & Rubber Co. v. Hercules Tire & Rubber Co., Inc.*, 162 F.3d 1113, 1116 (Fed. Cir. 1998). The scope of protection provided by a design patent is limited to those aspects that are ornamental and novel. *OddzOn Products Inc. v. Just Toys, Inc.*, 122 F.2d 1396, 1405 (Fed. Cir. 1997) ("A design patent only protects the novel, ornamental features of the patented design"); *UniDynamics, supra,* 157 F.3d at 1323 (quoting same language from *OddzOn*). The Federal Circuit has explained that the claim construction process requires a court to determine the "scope and meaning" of the patent claim asserted:

> An infringement analysis involves two steps. First, the court determines the scope and meaning of the patent claims asserted, see *Markman II* . . . and then the properly construed claims are compared to the allegedly infringing device . . .

*Cybor Corporation v. FAS Technologies, Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998). *Accord, OddzOn*, 22 F.3d at 1404 ("*OddzOn* argues that 'the scope of a design patent is effectively determined by deciding infringement, rather than by construing the claim. We do not agree.") It follows from the propositions that the scope of protection of a design patent is limited to ornamental and novel aspects of the drawing, and that the scope of the patent claim is determined during claim construction, that in a claim construction hearing the court should determine the

10

novel aspects of the design just as it should determine which features are ornamental. **"Because a design patent only protects the novel, ornamental aspects of the design as shown in the patent . . . a court must identify these aspects in order to construe the scope of protection of the patent."** *Metrokane, Inc. v. Wine Enthusiast*, 185 F. Supp.2d 321, 326-327 (E.D.N.Y. 2002) (emphasis added).

The proposition unambiguously set out in *Metrokane* follows necessarily from the published Federal Circuit opinions in *OddzOn, supra, Unidynamics, supra,* and *Cybor, supra,* although the Federal Circuit has not made quite such an explicit statement of the principle in a published opinion. But in a recent unpublished affirmance of a case coming up from the Northern District of Texas, the Federal Circuit, relying on *OddzOn*, indicated that claim construction of a design patent may require determination of the points of novelty. Such identification may be necessary to determine the patent's scope by ruling out features that are included in the drawing but, **because they are not novel, are not protected by the patent:**

> But an extensive verbal claim construction may be helpful particularly if the drawings contain **features that are not part of the patented design,** *e.g.,* if the drawings contain functional features or **if there is a point of novelty issue to consider."** *See e.g. OddzOn Prods.*, 122 F.3d at 1405.

*Minka Lighting, Inc. v. Craftmade International, Inc.*, 2004 WL 506587, at *2 (Fed. Cir. 2004) (not selected for publication) (emphasis added).[1] This decision states it has no precedential value. But *Minka* should be seen as persuasive authority to the extent that it confirms that

---

[1] A copy of the opinion, which is also discussed in Egyptian Goddess Brief, is attached at App. 138-140. Fifth Circuit Local Rule 47.5.4 allows citation of unpublished opinions handed down after January 1, 1996. "The Federal Circuit . . . is silent on the question of what courts and what proceedings are covered by its ban on the citation of nonbinding holdings . . . ." " William T. Hangley, *Opinions Hidden, Citations Forbidden: Report and Recommendations of the American College of Trial Lawyers on the Publication and Citation of Nonbinding Federal Circuit Court Opinions*, 208 F.R.D. 659 (2002). The issue of citation of Federal Circuit decisions is also discussed at 208 F.R.D. at 661, 680.

identification of the points of novelty, like identification of the functional features, is appropriate

for a *Markman* hearing in a design patent case.

Egyptian Goddess argues that this Court should ignore the quoted language from *Minka*.

It notes that the only cited authority is *OddzOn,* and Egyptian Goddess represents to this Court

that *OddzOn* "only mentions functionality and never mentioned point of novelty in its discussion

concerning claim construction." Plaintiff's Brief at p. 24. In actual fact, at the top of the page of

*OddzOn* cited in *Minka*, the Federal Circuit, as part of the claim construction discussion, states

that design patents only protect novel features of the design. The proper quote from the page

cited in *Minka* is **not** the one that Egyptian Goddess lays out at length at page 24-25 of its brief,

but rather the following language, which begins on the prior page:

> Whether a design patent is infringed is determined by first
> construing the claim to the design, when appropriate, and then
> comparing it to the design of the accused device [citation omitted,
> end of page 1404]. **A design patent only protects the novel,**
> **ornamental features of the patented design.** *See KeyStone*
> *Retaining Wall Sys., Inc. v. Westrock, Inc.,* 997 F2d 1444, 1450
> (Fed.Cir. 1993); *Lee v. Dayton-Hudson Corp.,* 838 F.2d 1186 (Fed.
> Cir. 1988) ("[I]t is the non-functional, design aspects that are
> pertinent to determinations of infringement) (footnote omitted).
> Where a design contains both functional and nonfunctional
> elements, the scope of the claim must be construed in order to
> identify the non-functional aspects of the design as shown in the
> patent.) *Lee,* 838 F.2d at 1188.

*OddzOn,* 122 F.3d at 1403-1404 (parallel citations to U.S.P.Q.2d omitted).

Thus, at the very beginning of the cited page in *OddzOn*, the Federal Circuit notes that a

design patent protects only the "novel, ornamental" features. No leap is required from this

proposition to the conclusion that in a claim construction a court should determine both the

functional and novel aspects of the design, because claim construction involves determining "the

scope and meaning of the patent claims asserted . . .." *Cybor, supra,* 138 F.3d at 1454. As

pointed out above, this is the exact chain of reasoning that the court explicitly made in *Metrokane,* 185 F. Supp.2d at 326-327: "Because a design patent only protects the novel, ornamental aspects of the design as shown in the patent . . . a court must identify these aspects in order to construe the scope of protection of the patent."

**B.      Determining Points of Novelty During the Claim Construction in No Way Merges the Ordinary Observer and Point of Novelty Tests.**

Egyptian Goddess further argues that *Minka* cannot mean what it says, because if a court determined the points of novelty in the claim construction phase, that would somehow "merge" the two tests of the comparison phase:  the ordinary observer test and the point of novelty test. Egyptian Goddess bases this argument on *UniDynamics, supra.*  In *Unidynamics,* the Federal Circuit ruled that the district court had erred in granting summary judgment that there was infringement, because the district court had considered only the points of novelty in applying the ordinary observer test during infringement analysis, without using non-novel features.  The argument that *Unidynamics* supports the proposition that a court cannot determine points of novelty during claim construction requires two attempted sleights of hand.

- **Improperly equating what can <u>rule out infringement</u> with what it takes to <u>establish infringement</u>.**

In relying upon *Unidynamics,* Egyptian Goddess tries to exploit a confusion of what, on the one hand, can **rule out a finding of infringement** (the issue in *Unidynamics*), and what, on the other hand, it takes to **establish infringement.**  Features that do not constitute "points of novelty" can still make two designs look different to the ordinary observer, so that there will be no infringement under the ordinary observer test.  Similarly, functional aspects can make two designs look different to the ordinary observer.  Thus any features, novel or non-novel, functional or ornamental, can lead to a finding of non-infringement under the ordinary observer test.  "There can be no infringement based on the similarity of specific features if the overall

13

appearance of the designs are dissimilar." *OddzOn*, 122 F.3d at 1405. The situation is quite different with regard to **finding infringement** under the ordinary observer test, however. "In determining this overall similarity of design, the ordinary observer must be deceived by the features common to the claimed and accused designs that are ornamental, not functional." *Unidynamics, supra*, 157 F.3d at 1323.

Whether the deceiving features for purposes of the ordinary observer test must also be novel is not an issue even addressed by *Unidynamics*. All *Unidynamics* demonstrates is that non-novel features can nevertheless result in a finding of **non-infringement** under the ordinary observer test. To the extent that novel features must be incorporated in the accused design in order to **find infringement**, that requirement would seem to be addressed by the other prong of the infringement analysis, the point of novelty test.

Egyptian Goddess' misuse of *Unidynamics* involves a second incorrect conflation: that of the claim construction phase with the comparison phase of the infringement analysis.

- **Conflating claim construction with deciding infringement by the two tests.**

As previously noted, a design patent's "scope" is determined in the claim construction stage. *Cybor, supra*, 138 F.3d at 1454. The application of the two tests to decide infringement is **not** where the scope of the patent is determined.

> . . . OddzOn argues that 'the scope of a design patent is effectively determined by deciding infringement, rather than by construing the claim. **We do not agree.**

*OddzO*n, 22 F.3d at 1404. In the claim construction stage it is necessary to determine what is "functional" for purposes of both the ordinary observer test and the point of novelty test. But it is also necessary to determine the points of novelty for the "point of novelty" infringement test. A court is in no way "merging" the ordinary observer test and the point of novelty test by

14

determining, **at the claim construction phase**, what the points of novelty are, because during the next phase, the ordinary observer test could be conducted without limiting that analysis to points of novelty. Such a determination of points of novelty in no way conflicts with the holding in *UniDynamics Corp.* Rather *UniDynammics* stands for the proposition that to determine infringement, **at the infringement analysis phase**, based on nothing but a conclusion that the accused device incorporates the point of novelty, is error because such an analysis ignores the ordinary observer test and in effect uses only the point of novelty test.

Ironically, Egyptian Goddess argues that Swisa's "reasoning is flawed because it confuses the scope of protection afforded under the two-pronged design patent infringement test with the scope of the design patent itself." Plaintiff's Brief at p. 18. Yet *Cybor* and *OddzOn* make plain that the scope of the patent's protection is determined during claim construction.

**C.    Both Functionality and Points of Novelty Are Historically Jury Issues *in the Invalidity Context*, but, after *Markman*, Both Are Also Claim Construction Issues, as Five District Courts Recognized Even Prior to *Minka*.**

There is a reason why Egyptian Goddess, on this round of briefing, has mounted its tortured argument that so misapplies *Unidynamics*. No court has used *Unidynamics* in the way that Egyptian Goddess does here, but prior to *Minka*, two decisions of the federal district court for the Northern District of Texas did, under a quite different rationale, hold that determining points of novelty was for the jury. Egyptian Goddess must seek a different rationale from those cases, because that rationale fails. Its failure, and the nature of the controversy prior to *Minka*, is illustrated by an examination of district court opinions pre-dating *Minka*.

The court in *In re Plastics Research Corp. Litigation*, 63 U.S.P.Q.2d 1924, 1925, 2002 WL 1000450, at * 1 (E.D. Mich.), addressed whether it should determine points of novelty as part of claim construction. During the *Markman* hearing, and in the preceding briefs, all of the parties had "assumed that ascertaining the point of novelty [was] within the province of the

15

court." *Id.* "None of the parties, however, [had] supported this conclusion with any analysis or authority." *Id.* The court had "questioned the parties' assumption on the bases that (1) the point of novelty derives from the scope and content of the prior art and (2) a number of cases addressing obviousness [had] treated the scope and content of the prior art as a question for the jury." *Id.* But after full briefing, the court was satisfied that it should determine the points of novelty.

> The parties have fully briefed the issue, with Defendants maintaining that the point of novelty is for the judge and Plaintiff now arguing that it is reserved for the jury.
>
> Having more fully reviewed the implications of the Supreme Court's decision in *Markman* . . . and the Federal Circuit's subsequent opinion in *Cybor Corporation v. FAS Technologies, Inc.*, 138 F.3d 1448 (Fed. Cir. 1998), the court is persuaded that the point of novelty is a question of law to be resolved by the judge. *See also Sun Hill Indus. Inc. v. Easter Unlimited, Inc.*, 48 F.3d 1193, 1197-98 (Fed. Cir. 1995) (treating point of novelty as a question of law that did not warrant 'exercise of the fact-finding function'). It is so determined in this case, and the court next turns to determining the point of novelty.

*Id.*

Prior to *Minka*, other district courts besides *Metrokane* and *Plastics Research* recognized that claim construction of a design patent involved determination of the points of novelty. *See, e.g. Hosely Intern. Trading Corp. v. K Mart Corp.*, 237 F. Supp.2d 907, 912 fn. 4 (N.D. Ill. 2002) ("Because the court concludes that the intrinsic evidence, specifically the patent and prosecution history, is sufficient to construe the point of novelty of the '369 patent, the court need not rely on extrinsic evidence in this case."); *Hsin Ten Enterprise USA, Inc. v. Clark Enterprises*, 149 F.Supp.2d 60, 66-67 (S.D.N.Y. 2001) (identifying points of novelty as part of claim construction); *Child Craft Indus. Inc. v. Simmons Juvenile Products Co., Inc.*, 990 F. Supp. 638, 640 (S.D. Ind. 1998) ("In construing the claim of a patent, the Court may consider

16

same form in the Nailco Buffer, from which they were copied. The hollow form of the buffer should be subtracted—that too was copied from the Nailco Buffer. What is left? **At most**, what is left as a novel feature is four sidedness with square ends, with no abrasive on one of the four sides.

This feature is also not novel. This is readily apparent if one goes beyond the single prior art reference of the Nailco patent. Four sidedness with square ends is basic to the Falley Buffer Block, the prototypical example of the small buffer designed to have different abrasives on different long-sides. Some Falley buffer blocks, and some imitations of them, only put abrasive on three of the four sides. Approached this way, the '389 design simply disappears if all that the design patent protects is what is novel. This is as it should be, because the '389 was never more than an obvious modification of the Nailco Buffer that Torkiya, the "inventor" of the '389, was previously selling. App. 5. That modification was obvious in light of the Falley buffer blocks and other buffer blocks that Torkiya did not disclose in his patent application. To simplify the claim construction process, only the single prior art reference of the Nailco Patent is utilized here in isolating what is **at most** the point of novelty: the addition of a fourth side without an abrasive surface, or the functional, and therefore invalid point of novelty of four sidedness itself.

When cornered on the point of novelty issue, Egyptian Goddess stoops to legal arguments that reflect desperation, as it makes assertions that blatantly contradict fundamental principals of design patent law. Beginning at page 25 of its brief, Egyptian Goddess asserts:

> Defendants' strategy is to argue that the a [sic] single feature of the subject patent not present in their overall similar design is the only point of novelty to be compared in the infringement comparison, which according to defendants would lead to no infringement as a matter of law. There are at least two fundamental things wrong with defendants' approach. First, as explained above, it is improper to compare only points of novelty in the infringement test. While the comparison must include points

19

> The only differences between the trial court's description of Sun Hill's claimed design and the Noteworthy bags are the contrasting jack-o-lantern faces, the bottom closure, the specific features of the jack-o-lantern faces, and the shiny surface. **The point of novelty therefore consists at most of these four features.**

*Sun Hill, supra,* 48 F. 3d at 1198 (emphasis added). If one were willing to embrace the reasoning of the argument contained in Plaintiff's Brief at pp. 26-27, however, the Sun Hill bags might have many other points of novelty, because one would have to include the bag's points of novelty over other, less closely related bags.[3]

There is a marvelous irony in this argument that a design patent can claim as points of novelty features that are nonetheless present in the closest prior art, as long as they are absent from other prior art references. As noted above, if one actually does look beyond the closest prior art of the Nailco Patent to the undisclosed prior art of the Falley buffer blocks—which unlike Egyptian Goddess suggested procedure would be permissible—then there are no points of novelty in the '389 design, because the feature of four-sidedness with no abrasive on the fourth side is quickly found in the undisclosed ancestors of the '389 design, the Falley Buffer Blocks.

The classic way to evade the point of novelty test is not by trying to reformulate the fundamental process of establishing points of novelty as Egyptian Goddess urges, but rather for a plaintiff to claim that it is the "combination of elements" that is novel, rather than any one element. Indeed, that was the very approach of the plaintiff in *Sun Hill,* and it worked in the district court, which found that "it is that whole—the ornamental gestalt—that is new, unique, and therefore worthy of protection." *Sun Hill Indus. v. Easter Unlimited,* 831 F.Supp.1024, 1029-1036 (E.D.N.Y. 1993), *aff'd in part, rev'd in part,* 48 F.3d 1193 (Fed. Cir. 1995). The

---

[3] For discussion of the various other prior art references that were not as close as the "Noteworthy" reference, *see Sun Hill Indus. v. Easter Unlimited,* 831 F.Supp.1024, 1029-1030 (E.D.N.Y. 1993), *aff'd in part, rev'd in part,* , 48 F.3d 1193 (Fed. Cir. 1995).

Federal Circuit reversed on this point, holding that the "trial court cannot evade the point of novelty test by relying on the claimed overall design as the point of novelty." 48 F.3d at 1197. The *Sun Hill* court quoted an earlier decision:

> To consider the overall appearance of a design without regard to prior art would eviscerate the purpose of the 'point of novelty' approach, which is to focus on those aspects of a design which render the design different from prior art designs.

48 F.3d at 1197, quoting *Winner Int'l Corp. v. Wolo Mfg. Corp.*, 905 F.2d 375, 376 (Fed. Cir. 1990). *Accord, Contessa Food Products, Inc. v. Conagra, Inc.*, 282 F.3d 1370, 1377 (Fed. Cir. 2002) ("[I]t is legal error to merge the two tests, for example by relying on the claimed overall design as the point of novelty.")

Plaintiff's Brief includes the "combination of elements" argument in a footnote at p. 27. In the past Egyptian Goddess has been much more aggressive in its attempt to use this discredited strategy. In responses to Interrogatories, it has claimed that the '389 design has fully twelve points of novelty, a figure that it arrived at essentially by claiming that the combination of the four-sidedness of the design with each separate other element constituted its own point of novelty. App. 134-135. For example, it was allegedly a point of novelty that each of the four interior edges of a square hollow tube was rounded, and yet another point of novelty that the exterior edges were rounded, although both the interior and exterior tubes of the Nailco Buffer were also rounded. (The rounding of these edges is a functional feature, required because the tubes come out of the extrusion process in that form. App.10.) Falley debunks these twelve alleged points of novelty in detail in his Declaration. App. 7-14.

Although this approach is a transparent attempt to evade the point of novelty test, it may yet reappear in Plaintiff's Reply Brief. It is therefore in order to look at the Federal Circuit decision relied upon in the footnote, *L.A. Gear, Inc. v. Thom McAnn Shoe Co.*, 988 F.2d 1117

22

(Fed. Cir. 1993). There the court, considering novelty in the invalidity context, held that "[w]hen the patented design is a combination of selected elements in the prior art, a holding of obviousness requires that there be some teaching or suggestion whereby it would have been obvious to a designer of ordinary skill to make the particular selection and combination made by the patentee." 988 F2d. at 1123. There had to be some suggestion in the prior art of combining the elements to reach a holding of invalidity due to obviousness. "A reconstruction of known elements does not invalidate a design patent, absent some basis whereby a designer of ordinary skill would be led to create this particular design." *Id.* It was in this context that the Federal Circuit found no error in the district court's conclusion that "there was no teaching or suggestion in the prior art of the appearance of the claimed design as a visual whole." *Id.* Here, the situation is quite different: every element but one is in a single prior art reference, the *Nailco* patent, and that element: addition of a fourth side, is taught or suggested by the undisclosed Falley buffer blocks. That the '389 is invalid as obvious is therefore only highlighted by invalidity cases such as *L.A. Gear* or *Jack Schwartz Shoes, Inc. v. Sketchers, U.S.A., Inc.*, 233 F.Supp.2d 512, 514 (S.D.N.Y. 2002) (design patent not invalid as obvious because, although other shoe products might have demonstrated the existence of the various elements, they did not "suggest the combination of the elements into a single shoe.").

These cases offer Egyptian Goddess no escape from the readily discernable fact that Torkiya did nothing but add a fourth side to the Nailco Buffer. If the Court finds that the point of novelty is the addition of the fourth side without an abrasive surface, the case is effectively over because the Swisa Buffer does not have that feature. If the Court finds that the point of novelty was the addition of the structural element of four-sidedness itself, then the question becomes whether that element is structural or functional, because "[d]esign patents do not and

23

cannot include claims to the structural or functional aspects of the article." *Lee v. Dayton-Hudson*, 838 F.2d at 1188. Thus it is time to look at whether, in a buffer designed to accommodate different abrasive surfaces, each on a single side, four-sidedness is an ornamental or functional aspect.

### III.   The Proper Functionality Analysis is Whether the Feature of Four-Sidedness, in Itself, is the Best Design for a Small Buffer with Four Different Abrasive Surfaces on Separate Long Sides.

As previously discussed, Realys and its many imitators have for years been making four-way buffers with three or four different abrasive surfaces, each on a separate long side of a block. This alone would immediately suggest that there is a functional aspect to four-sidedness in that it presents the capacity to mount a fourth abrasive surface, as do Swisa Buffer and the W.M.S. Buffer.    Moreover, there is something distinctly "structural or functional" about something so simple, symmetrical, and ubiquitous as a four-sided hollow tube. The hollowness of the tube is indisputably not novel, but rather an attribute of the Nailco Buffer, where it is also a functional, structural element, but it is worth noting that the Nailco Utility Patent makes a point of stating that "the tube is hollow which helps reduce weight." App. 53. But assume, *arguendo*, that the four-sidedness of the '389 design is novel in itself. The question then arises, is it functional or ornamental?  Is such four-sidedness "a general configuration made necessary by function" so that to give the "patented design such breadth as to include everything of similar configuration would be to subvert the purpose of the law, which is to promote decorative arts?" The Federal Circuit has made plain that design patents do not protect such general configurations:

> The patented design is comparatively simple, and without ornamentation.  In the main its configuration is made imperative by the elements which it combines and by the utilitarian purpose of the device . . . **To hold that general configuration made necessary by function must give a patented design such**

24

> breadth as to include everything of similar configuration, would be to subvert the purpose of the law, which is to promote the decorative arts ....

*Lee v. Dayton-Hudson, supra,* 838 F.2d at 1188, quoting *Applied Arts Corp. v. Grand Rapids Metalcraft Corp.,* 67 F.2d 428, 430 (6th Cir. 1933) (emphasis added).

The structural, functional nature of a four-sided hollow tube—a "general configuration made necessary by function"—forces Egyptian Goddess into a two step attempt to twist the functionality test into a form where neither four-sidedness, nor any other functional feature of the buffer, could qualify as "functional." First, Egyptian Goddess must divert focus from the functionality of the feature itself to the overall functionality of the design, and second, it must rewrite the test of functionality.

Put differently, Egyptian Goddess presents the question of whether a feature is functional as a question of whether alternatives exist, and then manipulates that question in two ways: (a) by confusing the issue of "alternatives to what?" by looking to other overall designs instead of alternative features, and (b) by distorting what constitutes an "alternative" for purposes of design patent law.

## A. The Court Should Construe the Functionality of the Individual Feature, Not the Overall Design.

The issue of "functionality" arises in two different contexts. A defendant may raise the affirmative defense that a design patent is invalid because the design as a whole is functional, in which case the defendant has the burden of proving such functionality by clear and convincing evidence. As previously noted, determination of this issue, which is not part of a *Markman* claim construction, has historically been a question for the fact finder. Although Swisa has raised the affirmative defense that the patent is invalid based on functionality, that question is not presently before the Court.

25

The question of functionality also arises in the claim construction process, where the issue is not whether the entire design is dictated by primarily functional concerns, but whether one or more individual features are dictated by primarily functional concerns, and thus not protected by the design patent. There is no burden of proof by clear and convincing evidence.

*Spotless Enterprises, Inc. v. A & E Products Group L.P.*, 294 F. Supp.2d 322, 345 (E.D.N.Y. 2003) explains the difference in the two contexts. The plaintiff, in arguments rejected by the court, asserted that "in distinguishing between the functional and ornamental features" in construing the claim as part of the infringement analysis, "the test should be the same as that used in determining the affirmative defense of invalidity based on functionality." 294 F. Supp.2d at 344. The *Spotless* court explained the fallacy in this:

> Spotless argues that only the solely functional features—those that cannot be achieved with an alternative design—are excluded from the infringement comparison. However, the process of distinguishing the ornamental features is merely a form of claim construction and is distinct from the functionality analysis of invalidity. A design patent can be primarily ornamental, yet have swathes of features that are not infringed if copied. *See Lee v. Dayton Hudson*, 838 F.2d 1186, 1188-89 (Fed. Cir. 1988) ("A device that copies the utilitarian or functional features of a patented design is not an infringement unless the ornamental aspects are also copied.") As was the case in *OddzOn Prods.* [*Inc. v. Just Toys, Inc.*, 122 F.2d 1396, 1406 (Fed. Cir. 1997)], the functional characteristics, while "not invalidat[ing] the design patent . . . merely limit the scope of protected subject matter." 122 F.3d at 1406. **Accordingly, even elements that are not solely dictated by function are not included in the comparison to the extent they are functional.**

294 F. Supp. at 345 (emphasis added). The *Spotless* court also noted that "[of] course, the burden of proof is quite different in an invalidity context because the party raising the affirmative defense of invalidity must do so by 'clear and convincing evidence.'" *Id.* at fn. 19.

The *Spotless* court based its distinction between functionality in the two contexts on *OddzOn*. The similar features between the patent design and the accused device in *OddzOn* were

26

functional features, just as the similarities between the '389 design and the Swisa Buffer are

functional features. Just as Egyptian Goddess argues that you can design a nail buffer without

the particular features at issue in this case, the plaintiff in *OddzOn* tried to argue that the

individual features were not functional, because you could design a "tossing ball" without them.

The Federal Circuit rejected this attempt to place the design in an overly broad class, recognizing

that the design was not for a "tossing ball" but rather for a specific kind of ball to be thrown like

a football yet able to be thrown farther than the traditional foam football.

> **While OddzOn correctly states that there are many ways of
> designing 'tossing balls,' it is undisputed that the ball in
> question is specifically designed to be thrown like a football,
> yet travel farther than a traditional foam football.** It is the
> football shape combined with fins on a tail that give the design
> these functional qualities. The tail and fins on OddzOn's design
> add stability in the same manner as do the tail and fins found on
> darts or rockets. They are no less functional simply because
> 'tossing balls' can be designed without them. **On the other hand,
> contrary to Just Toys' arguments in its cross-appeal, these
> functional characteristics do not invalidate the design patent,
> but merely limit the scope of the protected subject matter.**

22 F.3d at 1406 (emphasis added).

One way of interpreting the reasoning of *OddzOn* is to say that the Federal Circuit was

rejecting an attempt to place the ball in question in an overly broad class for purposes of

evaluating alternatives. So too Egyptian Goddess tries to put the '389 design and the Swisa

buffer in the overly-broad category of "nail buffers," rather than in the category of small buffers

with a separate long side for each of several different abrasive surfaces. Put differently, the

*OddzOn* court framed the question not as, are there alternatives to this tossing ball as a whole,

but rather as, in the context of a tossing ball designed to have these particular characteristics, is

this specific feature functional? Or in the language of this case, in a small buffer with a separate

long side for each of several different abrasive surfaces, is having a fourth side functional?

27

Once the distinction between functionality of individual features in the claim construction context and functionality of an overall design in the invalidity context is understood, it becomes apparent that Egyptian Goddess misses the point when it argues that "there are many other ways to design a nail buffer."

> A nail buffer can have one or more different abrasive surfaces. It can be in many different shapes. For example, a nail buffer can be the shape of a stick or board that is straight or curved, a solid block that is square, rectangular, triangular, pie-shaped, or oval, or be hollow and in the shape of a triangle, square, or star. The abrasive surfaces and underlying pads can be thin or thick, continuous or broken, and can reach all the way to the edge of the buffer or stop short of it.

Plaintiff's Brief at p. 7. This argument does not even address whether the individual feature is functional in the context of a buffer designed to have separate abrasive surfaces on different long sides. This would be the issue for claim construction purposes even if there were other non-functional, novel aspects to the '389 design. But the focus on the individual feature is necessarily sharpened here, where the single point of novelty is, if not the addition of a fourth side without an abrasive on it, the addition of a fourth side itself. It is no answer to the question of whether or not that single new feature is functional for Egyptian Goddess to claim that, in some entirely different design for a buffer, one would not need that particular feature.

In the context of a small, easily handled buffer with several different abrasives, each on a separate long side, the addition of a fourth side is a matter of "general configuration" that adds the capacity for accommodating a fourth abrasive surface, as do the Swisa Buffer and the W.M.S. Buffer. Egyptian Goddess points out that the '389 design does not mount abrasive on the fourth side. But the functionality is still there, whether or not Egyptian Goddess exploits this aspect of it. Again, "'[t]o hold that general configuration made necessary by function must give a patented design such breadth as to include everything of similar configuration would be to

28

subvert the purpose of the law, which is to promote the decorative arts . . .." *Lee v. Dayton-Hudson,* 838 F.2d at 1188.

There is another aspect to four-sidedness that is functional. The reason Falley originally made the buffer the way he did was so that a manicurist could insert her finger into the buffer. App. 6. Torkiya is not, like Falley, the creator of numerous buffers and most of the aspects of the very Nailco Buffer that Torkiya modified to "create" the '389 design. So Torkiya genuinely may not have comprehended this functional aspect of the design. But that aspect remains functional, whether or not it was intended by Torkiya or subsequently promoted by Swisa once it was selling the Swisa Buffer. Egyptian Goddess seeks to make the primary question regarding functionality whether or not manicurists need to be able to put their fingers inside of nail buffers, and calls Falley a liar for claiming that there was any problem to be solved by creating a buffer into which a manicurist could insert her finger. Plaintiffs Brief at 11.[4] The ability to place one's finger inside the buffer is functional, but that aspect of functionality is in no way critical to a finding that so basic and elemental a structural aspect as four-sidedness is functional in a nail buffer designed to accommodate different abrasive surfaces on separate sides.

**B.    The Existence of Functionally Inferior Alternatives Does Not Mean That a Feature Is Ornamental.**

There is no good alternative to the feature of four-sidedness in a small four-way buffer designed to have different abrasive surfaces on separate sides. One could defeat the whole purpose of such a buffer by putting more than one different abrasive surface on a single side—and Egyptian Goddess argues that "[t]here is no direct correlation between the number of buffer surfaces and the number of abrasive surfaces." Plaintiff's Brief at p. 14. But, as the inventor of

---

[4] There is again irony in Egyptian Goddess challenging Michael Falley's recognition of that functionality, given that the '389 incorporates so many functional features that Falley developed. This is similar to Egyptian Goddess' denial that Falley's cuticle protection edge, which Torkiya lifted unchanged from the Nailco Buffer, is functional, despite Falley having advertised the "cuticle protection edge for safety" since 1987.

the buffer block has explained: "The whole point of the buffer block or a buffer like the Swisa Buffer is to have a single different surface on each side." App. 145. It is no coincidence that the over one and one-half million buffer blocks sold by Realys all have four sides with at most a single abrasive on each side, as do the many imitations of the Falley Buffer Block on the market.

As previously discussed, one way for Egyptian Goddess to try to avoid the problem is to say that any buffer design will do as an alternative, rather than ask about the functionality of the feature in the context of the particular type of buffer. But *OddzOn* dooms this approach. The second way to try to deal with the problem is to claim that it does not matter what the **best design** is from the standpoint of functionality. Egyptian Goddess is therefore forced to argue that the existence of any alternatives, however inferior from a functionality standpoint, renders a feature ornamental rather than functional. Put differently, Egyptian Goddess argues that functionality has nothing to do with the best or most practical design, but is rather synonymous with being the only way a function can be achieved.

This is not and never has been the law.

If there is absolutely no alternative to a particular feature to achieve a particular function, the design is functional. But the converse is not true. The fact that other alternatives exist does not mean that a design is not still primarily functional. It still matters whether the way the feature achieves the function is the best way, or the most direct or inexpensive way—because these are all functional considerations.

Consider a forty-sided polygon. If two such polygons, close to the shape of a circle, were mounted on an axle, the axle would roll, albeit in a jerky fashion. But this does not mean that the circular shape of a wheel is susceptible to design patent protection, for the circular shape of the wheel is no less "dictated by functional considerations" simply because forty-sided polygons

30

might also "roll." Functional considerations, rather than a desire to ornament, still compel the circular shape of the wheel, because that shape is the best of the alternative shapes that can achieve the function.

The Federal Circuit explained this principle most clearly in *Berry Sterling Corp. v. Pescor Plastics, Inc.*, 122 F.3d 1452, 1455-56 (Fed. Cir. 1997). The plaintiff there had argued that because alternative designs existed, the district court should not have found a design patent invalid as functional. The plaintiff, like Egyptian Goddess in this case, based its argument on language from *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1123 (Fed. Cir. 1993):

> We have held that '[w]hen there are several ways to achieve the function of an article of manufacture, the design of the article is more likely to serve a primarily ornamental purpose.' [*L.A. Gear*, 988 F.2d at 1123] Berry argues that this language from L.A. Gear, and similar language from *Avia Group Int'l, Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1563 . . . (Fed.Cir. 1988), coupled with the existence of the alternative designs, save the '368 patent from the functionality challenge, and that the district court erred in not giving such effect to the alternative designs.

122 F.3d at 1455-1456. With *L.A. Gear* plainly in mind, the Federal Circuit held that the presence of alternative designs might **or might not** assist in determining whether functional considerations had dictated a challenged design.

> The presence of alternative designs may or may not assist in determining whether the challenged design can overcome a functionality challenge. Consideration of alternative designs, if present, is a useful tool that may allow a court to conclude that a challenged design is not invalid for functionality. **As such, alternative designs join the list of other appropriate considerations for assessing whether the patented design as a whole—its overall appearance—was dictated by functional considerations.**

122 F.3d at 1456 (emphasis added). The court then listed other possible considerations that might be employed in determining whether functional considerations had dictated a design.

> Other appropriate considerations might include:   whether the

31

> protected design represents the best design, whether alternative
> designs would adversely affect the utility of the specified article;
> whether there are any concomitant utility patents; whether the
> advertising touts particular features of the design as having specific
> utility; and whether there are any elements in the design or an
> overall appearance clearly not dictated by function.

122 F.3d at 1456 (emphasis added).

This is the only reasonable approach to determining whether functional considerations

dictate a design. It would make little sense to claim that features were always merely

"ornamental" because "alternatives" were available, even though those alternatives were less

practical designs. Yet, that is the argument that Egyptian Goddess must make in order to argue

that four-sidedness is not a functional feature. To make the argument, it faces the formidable

task of getting around the express language and holding of *Berry Sterling*, which has never been

overturned or even criticized as mistaken in any subsequent opinion or commentary. It was

relied upon for the very point in an opinion just handed down on July 1, 2004 by the federal

district court for the Southern District of New York:

> The fact that there may be 'other ways to achieve the function
> provided by the feature' is not dispositive as to whether a feature is
> functional or ornamental. *See Berry Sterling Corp. v. Pescor
> Plastics, Inc.*, 122 F.3d 1452, 1456 (Fed. Cir. 1997). For example,
> a court may also consider if the feature was the best way to achieve
> the function, *see id.*, thus making the feature functional even
> though there might be other ways to achieve that function.

*Sunbeam Products, Inc. v. Wing Shing Products (BVI) Ltd.*, 311 B.R.378, 389 fn. 7 (S.D.N.Y.

2004) (decided July 1, 2004).

Egyptian Goddess nonetheless asserts that the supposedly "different and broader

functionality test" (Plaintiff's Brief at p. 5) set forth by Justice Rich in *Berry Sterling* was

immediately abandoned after Justice Rich's death. Egyptian Goddess cites as authority for this

supposed "abandonment" language from an unreported subsequent opinion in the same case that

32

actually in no way contradicts Justice Rich's prior opinion, or suggests that the earlier opinion

was in error.  The supposedly contradictory language, set out more fully on page 5 of Egyptian

Goddess' brief, reads in part as follows:

> The proper inquiry for determining functionality of a design is
> whether the overall appearance of the design is dictated by
> utilitarian or ornamental purpose.  *Id.*  Such a distinction makes it
> possible to obtain both a utility patent and a design patent on the
> same article.  'When there are several ways to achieve the function
> of an article of manufacture, the design of the article is more likely
> to serve a primarily ornamental purpose.  *L.A. Gear [Inc. v. Thom
> McAn Shoe Co.*, 988 F.2d 1117, 1123 (Fed. Cir. 1993).]

*Berry Sterling Corp. v. Pescor Plastics, Inc.,* 1999 WL 674514, at * 5 (Fed. Cir. 1999)

(unpublished) (hereafter, *Berry Sterling 1999*, while simply "*Berry Sterling*" shall refer to the

1997 published opinion by Justice Rich.).  Egyptian Goddess apparently hopes that this Court

will believe that some exists conflict between *Berry Sterling* and the principle set out in the

quotation from *L. A. Gear*—that Justice Rich quoted in *Berry Sterling*—that "[w]hen there are

several ways to achieve the function of an article of manufacture, the design of the article **is**

**more likely** to serve a primarily ornamental purpose."  There is no contradiction: if there are

several ways to achieve the same function it is indeed more likely that the patented feature is not

dictated by functional considerations.  The idea embodied in the *L.A. Gear* language has long

coexisted with the compatible principle that the existence of an alternative means of achieving

the function is not dispositive as to whether functional considerations dictated the design.

    *Berry Sterling* is precisely consistent with *In re Carletti*, 328 F.2d 1020, 1022 (C.C.P.A.

1964), a landmark decision in design patent law handed down by the United States Court of

Customs and Patent Appeals, a predecessor to the Federal Circuit.  In *Carletti*, Justice Rich

addressed the interplay between the functionality doctrine and design patent protection—the

same issue he would treat over thirty years later in *Berry Sterling*.  *Carletti* concerned a gasket,

33

which differed from prior art gaskets essentially only because it had a plurality of concentric annular ribs and a recessed groove. The court evaluated these elements as individual "features" and found that they had been added "essentially for purely functional purposes." 328 F.2d at 1096. The existence of inferior alternatives—involving unequal spacing—did not matter.

> **Neither does it suffice to argue, as appellants do, that the ribs and grooves could have been less gracefully arranged than they are in their actual 'balanced relationship.'** If obviousness enters into this case it is at this point. If it is desired to employ a groove for flexibility and three concentric ribs to make a good seal on a flat drum head, what is more obvious than to arrange them with approximately equal spacing, as was done? But it was done without thought of ornament. The creation or origination of an ornamental design does not reside in the mere avoidance of dissymmetry.

328 F.2d at 1022 (emphasis added). This language is particularly apropos when one considers the symmetrical nature of both the '389 design and the Swisa buffer, and the argument by Egyptian Goddess that "the profile of a four-sided buffer need not be square (it can be a rectangle, trapezoid, parallelogram, or any other four sided shape . . .." (Plaintiff's Brief at p. 14).

*Power Controls v. Hybrinetics, Inc.,* 806 F.2d 234, 239 (Fed. Cir. 1986) further illustrates the groundlessness of Egyptian Goddess' argument. *Power Controls* concerned the design patent on a type of plastic, "clam shell" package for electrical rotary dimmer switches. Many kinds of packaging could be used to encase an electrical rotary dimmer switch. One could put it in a box. One could vary the shape of the plastic so that it did not cling to the rotary switch. One could put the hole for hanging the package on a peg through both sides of the clam shell, rather than just one side. All these were "alternatives"—but none were the "best" design.

The district court below had granted a preliminary injunction, finding among other things that there was a substantial likelihood that the plaintiff would be able to prove that the clam shell packaging was "new, non-obvious and primarily ornamental." A panel of the Federal Circuit

34

that did not include Justice Rich, relying on *Carletti*, concluded "that the record does not support

the finding that the '580 patent design is 'primarily ornamental' and that this finding is clearly

erroneous." 806 F.2d at 239. The Federal Circuit analyzed the question of whether the specific

features of a design were functional without even alluding to the presence or absence of

alternative designs. It summarized the testimony of the inventor of the patent design as follows:

> 1.    The package was made clear so that the product could be viewed by the consumer and so that a paper insert card could be protectively placed inside the plastic package and still be read;
>
> 2.    The recesses in the front and back of the package were designed to fit snugly around the rotary dimmer switch and were placed as they were to balance the package;
>
> 3.    The rounded corners and edges, and the angled surfaces were necessary for the production of a workable mold;
>
> 4.    The rim along the periphery of the package was designed to hold the package rigid and to lock the package together; and
>
> 5.    The hole for hanging the package on a peg was designed to extend only through the back of the package to obviate the need for precise package alignment during molding and assembly.

806 F.2d at 239. The Federal Circuit's conclusion that the design was primarily functional,

based on this testimony, was entirely consistent with *Carletti* and the later decision in *Berry*

*Sterling*, but it cannot be reconciled with the functionality test that Egyptian Goddess puts forth.

    The same approach is found in *Tyco Industries, Inc. v. Tiny Love, Ltd*, 914 F. Supp. 1068

(D.N.J. 1996) (denying preliminary injunction; accused infringer's expert testified that none of

the design elements "could be replaced without an impact on function, cost, or efficiency . . ..").

The *Tyco* court took into account not just the availability of alternatives, but whether those

alternatives could be utilized without an impact on function, cost, or efficiency.

> Mr. Clutton, Tyco Preschool's vice-president of marketing,
> testified that Tyco also explored a number of alternative designs

35

that performed the same functions. **Tyco concluded from this research that the alternative designs did not function as well as a design that was based on overlapping arches connected to the corners of a blanket or were too costly to manufacture.** Mr. Clutton explicitly and persuasively described the defects with the designs that appear in Plaintiffs Ex[hibits]. Mr. Clutton testified that the 'driving force' behind Tyco's using a design for the Cozy Quilt that incorporated overlapping arches attached to a blanket were that it functioned better and cost less than the alternative designs. **In addition, Mr. Conley, who testified as Tyco's expert on toy design, also opined that none of the elements of the Tiny Love product could be replaced without an impact on function, cost, or efficiency.** I find Mr. Clutton's and Mr. Conley's testimony to be persuasive. Thus, I find that Tyco is likely to demonstrate by clear and convincing evidence that the design claimed . . . is primarily functional.

914 F. Supp. at 1077-78 (citations omitted, emphasis added).[5]

IV.  **The '389 Design is a Functional Variant of the Nailco Buffer and Falley Buffer Block, and Every Aspect of the Design is Functional.**

As discussed above, the fact that the only change in the Nailco Buffer that Torkiya made was the addition of a fourth side leaves only two possible findings as to the point of novelty: either it is the addition of a fourth side, or the addition of a fourth side without an abrasive surface on it. If the Court finds it is the addition of a fourth side without an abrasive on it, the case should be effectively over. If the Court finds that the point of novelty is the addition of a fourth side in itself, then the issue will become whether that feature is functional.

---

[5] The related area of the functionality doctrine in the trademark context further illuminates the necessity of looking not merely to the existence of other alternatives to a feature, but whether the feature affects the cost or quality of the article. The United States Supreme Court has repeatedly made clear that "[I]n general terms, a product feature is functional if it is essential to the use or purpose of the article **or if it affects the cost or quality of the article.**" *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 851, fn. 10 (1982) (emphasis added). *Accord, Qualitex Co. v. Jacobson Products Co., Inc.*, 514 U.S. 159, 169 (1995) ("The functionality doctrine, as we have said, forbids the use of a product's feature as a trademark where doing so will put a competitor at a significant disadvantage because the feature is 'essential to the use or purpose of the article' **or 'affects [its] cost or quality.'**"); *Traffix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 33 (2001) ("As explained in *Qualitex, supra,* and *Inwood, supra,* a feature is also functional when it is essential to the use or purpose of the device or when it affects the cost or quality of the device.")

Egyptian Goddess' brief assumes that the Court will be persuaded not to determine the points of novelty. Should that occur, the Court may decide to examine the entire design, determining exhaustively which features are functional. That task is surprisingly easy, because of the '389 design's descent through the Nailco Patent from the Falley Buffer Block. Every feature has a functional aspect, virtually all of which date back to the first Falley Buffer Block. Patent invalidity based on functionality is not the issue in this claim construction, but the '389 design is invalid based on functionality, as well as being invalid based on obviousness.

Critical to this examination of functionality is an appreciation of the precise subset of buffers which includes the '389 design, its immediate parent the Nailco Patent and its grandparent the Falley buffer block. Egyptian Goddess, in arguing that the relevant universe of alternative available designs includes all nail buffer and nail file designs, simply ignores the very specific purpose of the '389 design, the Nailco Buffer and the Falley Buffer Block: all small, easily handled buffers designed to accommodate several different abrasive surfaces, with each different abrasive on a separate long side.

As previously explained, Michael Falley developed the four-way buffer back in 1985.

> In 1985, I created a "four-way" nail buffer in the shape of a
> nail file that had on it four different abrasive surfaces. Three of the
> surfaces were of progressively finer grit, to be used in a three step
> nail buffing process with one surface for removing ridges in the
> nail, another for smoothing the nail, and another for buffing the
> nail to a shine. The fourth abrasive surface was for shortening and
> shaping the nail.

App. 2. In 1987, Falley decided to put the four sides on a block of foam, not for any ornamental reason, but for easier handling. App. 143. Realys has been making this extensively copied buffer block ever since.

> In 1987, I had the idea of putting the four different surfaces on the
> four long sides of a rectangular buffer block with square ends, with

37

> instructions printed in the same technique for printing on abrasive that I had pioneered. I believe that I was the first to make and sell nail buffers in such block form, **and I believe that the block shape makes the buffer easier to handle**. Realys has been making and selling this four-way buffer block since 1987. Over the years other manufacturers, both in this country and abroad, have made nail buffer blocks. I believe that all of these buffer blocks are derived from, or in a sense copies of, my nail buffer block.

App. 2-3 (emphasis added). Also since 1987, Realys has been making a three-way buffer block

for Tammy Taylor. This buffer has abrasive surfaces on only three out of the four long sides of

the buffer block. App. 3-4, 39. Including both three-way and four-way buffer blocks, Realys

has sold over one and a half million buffer blocks since 1987. App. 153.

The original 1987 brochure for the Falley four-way buffer block has always explained

that it was block shaped for easier handling, and had a "cuticle protection edge" for safety.

> Exhibit 1 to my original Expert Witness Report is a copy of the Realys brochure. [App. 31-36] Realys had 30,000 copies of this brochure printed in 1987, and has been using it ever since. On the first page of the brochure, the four-way buffer block that I developed is shown. On the surface facing the viewer, it has printed on it "Tropical Shine, Mini 4-Way Buffer." **The brochure notes that it is "Block shaped for easier handling, cuticle protection edge for safety."** It also describes the block as a "1" x 1" x 3" MINI 4-WAY BUFFER BLOCK."

App. 3 (emphasis added). The referenced "cuticle protection edge," as previously explained,

means that a gap is left between the abrasive surfaces, so that during the nail buffing process the

adjacent abrasive surface would not make contact with the cuticle. App. 86-87.

Many other companies, both foreign and domestic, have copied Falley's three-way and

four-way buffer blocks. This is not because there is any product-identifying ornamental

advantage inherent in using a block shape, but because the buffer block is a particular type of

buffer, that handles a specific way. Vital to its function is the fact that it has multiple lengthwise

faces for several *different* abrasive surfaces. A block shape can accommodate four different abrasive surfaces, or it can accommodate three, as in the Tammy Taylor three-way buffer or the "3-Sided Natural Nail Buffer Block" advertised in a 1994 catalogue put out by International Nail Manufacturers. App. 24, 59. Again, with the three-way version as with the four-way version, ease of handling is the draw of a block buffer. As a Nail Emporium catalogue states in advertising a three-way buffer block: "3-Way Buff Block/That good old 3 way Natural Nail Buffing Material **on an easy to use Block Buffer.**" App. 24, 61 (emphasis added).

The Nailco Buffer is essentially a three-sided hollow version of the Falley buffer block, and employs the same functional aspects that Falley developed years before. Like the Falley buffer block, it is a small buffer designed to accomplish three-way buffing with easy handling, and each different abrasive surface is on a different side. As with both three-way and four-way buffer blocks, the multiplicity of lengthwise faces for different abrasive surfaces is a critical aspect of the buffer's nature, just like tail fins were to the particular subset of "tossing balls" in *OddzOn*

Egyptian Goddess professes to recognize no functional difference between having each different abrasive surface on a separate side of a three-dimensional form and having more than one abrasive surface on the same side. Egyptian Goddess argues that "[t]here is no direct correlation between the number of buffer surfaces and the number of abrasive surfaces." Plaintiff's Brief at p. 14. But, as the inventor of the buffer block has explained: "The whole point of the buffer block or a buffer like the Swisa Buffer is to have a single different surface on each side." App. 145. This need of Egyptian Goddess to avoid recognizing any required correlation between the number of sides and the number of different abrasive surfaces helps explain why Egyptian Goddess must argue that any alternatives at all render a functional feature

39

merely "ornamental," even if the supposed alternatives are less desirable in practical terms, or indeed would defeat the whole purpose of the larger design.

As previously noted, it was Falley who introduced into the Nailco Buffer intermediate foam layers between the plastic form and the different abrasive surfaces, to serve the heat-dissipating function of the underlying foam block in his buffer blocks. App. 4. Falley also incorporated his "cuticle protection edge" the Nailco design. App. 4-5.

At the time Torkiya applied for the '389 patent, his company Egyptian Goddess was selling a version of the Nailco Buffers manufactured by Realys, with the name Egyptian Goddess printed on it. App. 5. Torkiya simply added to the Nailco design a fourth side without an abrasive surface. The Swisa Buffer also adds a fourth side—but with an abrasive surface. So too does the W.M.S. Buffer, an apparent imitation of the Swisa Buffer. App. 153, 155. The close family resemblance between the Nailco Buffer, the Swisa Buffer, and the '389 results from shared functional purposes, as Falley explains.

> There is a reason why the Nailco Buffer, the Swisa Buffer, and the '389 design are all three so similar. All three seek to achieve the same practical goals that I first aimed for in my buffer blocks back in 1987.

App. 147. Those functional purposes drastically reduce the available design alternatives.

First of all, for such a buffer as the buffer block, "the number of long sides for different abrasive surfaces is critical." App. 145. In such a buffer "[t]here have to be enough surfaces for the different abrasives, and those surfaces have to be lengthwise to accommodate the buffing process." *Id.* "To put the buffing surfaces on the short sides of a buffer would simply be bad design." As noted above, the whole point of such buffers is that each different abrasive has its own long side, and this sets both a minimum and a maximum number of sides.

There is also a great difference between putting a single

40

abrasive surface on one side, and putting more than one abrasive surface on the same side. The whole point of the buffer block or a buffer like the Swisa Buffer is to have a single different surface on each side. Any four-way buffer needs a minimum of four long sides to optimally function as a four-way buffer, just as a three-way buffer needs a minimum of three long sides. These are the minimum number of long-sides that are required. There is also a limit on the maximum number. Competing functional considerations may make it practical to put three abrasive surfaces on a buffer with four long sides: for example, the four-sided hollow frame of the '389 design for a three-way buffer allows the insertion of a finger, and the use of only three abrasive surfaces on a buffer block with four long sides achieves the ease of handling that such blocks have. But beyond four long sides, addition of further long sides becomes impractical. The buffer can of course also have five long sides, or six, or seven, or a hundred. But if none of these additional sides have an abrasive surface, they are just a waste of material. Or if they simply repeat the same abrasive surfaces on other sides, they are not only a waste of material but even confusing.

App. 145.

It is not the purpose of design patent law to force designers to add unnecessary sides because the functionally-best design has been improperly monopolized by a design patent meant to protect ornamental features. "'To hold that general configuration made necessary by function must give a patented design such breadth as to include everything of similar configuration, would be to subvert the purpose of the law, which is to promote the decorative arts . . .'" *Lee v. Dayton-Hudson*, 838 F.2d at 1188. As *Berry Sterling* makes clear, among the considerations that may be employed in determining whether a design is primarily functional are "whether the protected design represents the best design" and "whether alternative designs would adversely affect the utility of the specified article." 122 F.3d at 1456. There can be no legitimate question that the addition of otherwise superfluous sides in order to avoid infringing a design patent would "affect the utility of the specified article."

41

Just as functional considerations severely limit the number of long sides that a four-way or three-way buffer may have, such considerations also impact on the shape of the end that such buffers should have, limiting them to equilateral triangles or squares:

> I believe that for a four-way buffer block, the best shape for the ends is a square. When I originally created the buffer block, I made the ends square. Having a square at the end means that all four sides have the same usage area, and the buffer is easier to hold. In a buffer like the Swisa Buffer, where there are foam layers under the abrasive surfaces, using a square end also makes all the foam layer parts the same size. That way one die can be used to cut all the foam parts for all four sides. (For the same reason, a triangle with equal sides is the best shape for a three-way buffer with abrasive on three different long sides—as in the Nailco Buffer.) In my buffer blocks square ends were for functional purposes—creating four long sides of equal area and easy handling, as well as simplicity of production.

App. 145-146.

A square is a geometrically pleasing shape, but in the Swisa Buffer, the '389 design and buffer block designs, square ends are dictated primarily by functional purposes—creating four long sides of equal area and easy handling. "Neither does it suffice to argue . . . that the ribs and grooves could have been less gracefully arranged than they are in their actual 'balanced relationship.' . . . The creation or origination of an ornamental design does not reside in the mere avoidance of dissymmetry." *Carletti, supra*, 328 F.2d at 1097. The pleasing aesthetic effect is simply a by-product. "Where the 'design' of a design patent is dictated primarily by functional or mechanical requirements and any pleasing aesthetic effect is only an inadvertent by-product, the design patent is invalid." *Bentley v. Sunset House Distributing Corp.*, 359 F.2d 140, 145 (9th Cir. 1966) ("[W]e must be able to find the design to be the result of invention, not modification, and to be ornamental, 'the product of aesthetic skill and artistic conception.'").

42

Egyptian Goddess might have a better case if it had a design patent on a buffer that had at the ends rectangles of distinctive proportions, and Swisa were copying that design. Although Egyptian Goddess blithely asserts that "the profile of a four-sided buffer need not be square (it can be a rectangle, trapezoid, parallelogram, or any other four sided shape . . .." (Plaintiff's Brief at p. 14), Torkiya chose for his design patent the same functional square end that Falley had been using since 1987 on buffer blocks. Torkiya claims that he chose the square—by far the single most common end shape in the universe of small, easily handled buffers with different abrasives on separate long sides—so that his hollow buffer design could be distinguished, based on its appearance, in the marketplace." Egyptian Goddess Appendix ("E.G. App.") at 156. Presumably Torkiya means that he took the standard end shape of a buffer block and added it to the Nailco Buffer so he could avoid exact duplication of the patented Nailco Buffer he had been selling. But a geometric shape as fundamental and functional as the square cannot be monopolized by means of a design patent under the guise of claiming that it is merely "ornamental" in the context of a nail buffer—especially when there have been square ended buffer blocks on the market since 1987.

A further limitation on the design of such buffers results from the need for cuticle protection edges, or gaps separating the abrasive surfaces along the long sides. App. 146. Torkiya adopted these cuticle protection edges in the exact form they existed in the Nailco Buffer, yet he now testifies that he did not leave an open space between the buffer pads in his design so that a person's cuticles could be protected. E.G. App. 156. It is perhaps possible that, even though Torkiya was selling the Nailco Buffer, he did not realize the functional purpose of its cuticle protection edges when he "borrowed" that feature in exact form from the Nailco

43

Buffer. But his lack of perception in this regard in no way detracts from the functionality of cuticle protection edges, advertised by Realys since 1987.

Falley has previously explained that every aspect of the Swisa Buffer is designed to meet functional purposes. App. 6. To the extent that the '389 is like the Swisa Buffer, its every aspect also meets functional purposes. Falley has described the extent to which functional needs limit the alternatives available to anyone that wanted to achieve all the functions of the Swisa Buffer.

> Again, to achieve the functions of the Swisa Buffer, a buffer would have to have four long sides to accommodate four different abrasive surfaces, it would ideally have square ends, it would have to have cuticle protection edges between the different abrasive surfaces, it would have to allow the manicurist to use it with her finger inserted, and it would have a layer of foam between the abrasive surfaces and the underlying solid form, in order to dissipate heat created by the buffing process.

App. 147.

In stark contrast to the assertion by Egyptian Goddess that there are many different options to accomplish the functions of the '389, there are in fact none—at least as regards four-way buffers—that do not lead to a design that is inferior from a functional standpoint. Or least Michael Falley, the creator of the four-way buffer, knows of none:

> There are no design options that I know of for the Swisa Buffer, given its particular functional requirements, that do not lead to a design that is inferior from a functional standpoint, and does not require the addition of unnecessary features. If I knew of a more functional design for a four-way buffer, Realys would be making it.

App. 147.

Egyptian Goddess, rather than trying to deal with the paucity of actual design alternatives available, simply ignores the various functional requirements. It professes to believe that all nail

44

buffers and even nail files are interchangeable in functional terms, differing only in ornamental aspect:

> The patented design is of a nail buffer . . . there are many ways to design a nail buffer. A nail buffer can have one or more different abrasive surfaces. It can be in many different shapes. For example, a nail buffer can be the shape of a stick or board that is straight or curved, a solid block that is square, rectangular, triangular, pie-shaped, or oval, or be hollow and in shape of a triangle, square, or star. The abrasive surfaces and underlying pads can be thin or thick, continuous or broken, and can reach all the way to the edge of the buffer or stop short of it.

Plaintiff's Brief at 7-8 (citations omitted).

Every sentence of this quotation reveals a willful obliviousness to the functional differences between the nail buffers—not to mention *nail files*—listed above. The paragraph states, "A nail buffer can have one or more different abrasive surfaces," but a three-way or four-way buffer gives a different shine than would one with one or two abrasive surfaces. App. 143. The paragraph goes on to list all manner of shapes that nail buffers are supposedly in—although in fact there are no buffers in many of the listed shapes. Egyptian Goddess, in citing examples of some of these buffer shapes cites to nail files, which are very different from nail buffers in general, let alone three-way and four-way buffers in particular. Similarly, Egyptian Goddess' point that "abrasive surfaces and underlying pads . . . can reach all the way to the edge of the buffer or stop short of it" reads very differently when one realizes that stopping the surfaces and underlying pads short of the edges—as in the Nailco Buffer, '389 design, and the Swisa Buffer— has a functional purpose: the cuticle protection edge.

One aspect of the '389 design that Egyptian Goddess has argued in particular is not functional is the hollow aspect of the buffer design. To the extent that this argument addresses hollowness per se and not the fact that the buffer has square ends, the point should be irrelevant,

because the attribute of being hollow cannot in itself be considered a "point of novelty" after the Nailco Patent. But, because Swisa did not promote as a functional feature the Swisa Buffer's capacity to allow a manicurist to insert her fingernail, Egyptian Goddess apparently believes that it can turn the functionality question into a debate over whether Falley "really" thought he was solving a problem by creating this feature. The precise analogue to this argument is Egyptian Goddess' claim that the cuticle protection edge that Torkiya took from the Nailco Buffer is not functional. After all, Swisa has not promoted the cuticle protection edge in the Swisa Buffer, and Torkiya claims he did not realize it has any function. But neither the capacity to allow insertion of a manicurists' finger nor cuticle protection edges become any less functional because of the sales approach of Swisa or the ignorance of Torkiya.

Falley has explained that this function of being able to insert a finger was intended for professional manicurists, not retail customers, which makes irrelevant much of the evidence that Egyptian Goddess has put in on this issue. This would include the infomercial aimed at retail customers, App. 148, 150-151, and the testimony of one Ms. Ponohu, who used to sell buffers retail out of a cart. App. 150. It is worth noting that Ms Ponohu was willing to go so far as to testify that in her "experience, when purchasing a nail buffer, customers do not know the difference between, or express a preference for, a 'three-way' or 'four way' nail buffer." E.G. App. 1. Presumably she believes that both types have been on the market all these years due to some shared whim of domestic and foreign manufacturers, rather that due to the demands of the market and preferences of customers, as Falley has testified. App. 144.

Egyptian Goddess also presents as an expert witness a professional manicurist, Kathleen Eaton, who, surprisingly, is also willing to testify that in her "experience, when purchasing a nail buffer, customers do not know the difference between, or express a preference for, a 'three-way'

46

or a 'four-way buffer.'" E.G. App. 154. She also testified that, although she did not use the buffer in her practice, and did not think it well suited to professional manicurists, she tried using it with a finger stuck inside and found that using the buffer in this manner was awkward and resulted in a loss of control and a loss of flexibility." E.G. App. 154-155. She also dismissed the utility of cuticle protection edges, claiming that she had used buffers without them and never had a problem. E.G. App. 155.

Against Ms. Eaton's testimony stands the market reality. As Falley has testified:

> Sally Beauty Supply, the largest chain selling professional and retail nail buffers, has been selling both the three-way and four-way buffers continuously since 1987. Realys is a business: it produces what its customers want. The idea that for all these years both products would be on the market, made and sold by multiple domestic and foreign manufacturers, if the customers didn't know the difference or have preferences, is simply ridiculous.

App. 144. Similarly, the idea that the cuticle protection edge has no functional value runs up against Realys having sold over one and one-half million buffer blocks that include it for an advertised functional purpose, the fact that it was incorporated into the Nailco Buffer for a functional purpose—and that Torkiya lifted it outright from the Nailco Buffer for his design.

As for Ms. Eaton's testimony that she found no value in putting her finger in the Swisa Buffer, that is her opinion. Weighed against it is that of Michael Falley. At issue here is not patent invalidity, where there is a burden of proof by clear and convincing evidence as to the functionality of this feature. As discussed before, hollowness is not a novel feature here: four-sidedness is. But to the extent hollowness in itself is a functional feature, Falley, the actual inventor of so-many of the functional features at issue here, is in an extraordinary position to opine as to whether the capacity to insert a finger has any functional utility.

47

Egyptian Goddess goes on to argue that the hollow interior of the buffer need not reflect the outside of the buffer but could be "any shape at all", ignoring the readily-apparent fact that in the Swisa Buffer, any other interior shape would be less functional. Plaintiff's Brief at 7. Again, the interior hollow cannot be "any shape at all," because any shape other than one simply reflecting the four buffer sides would be less easy to use. The shape of the Swisa Buffer and the '389, where a four sided hollow plastic tube is used, is the most practical shape, and that—not an ornamental purpose—is why it exists in both designs. App. 147.

A review of the numerous functional requirements of the '389 design and that of its cousins, the Nailco Buffer and the Swisa Buffer, demonstrates that they are, compared to the larger class of nail buffers in general, every bit as distinct and specialized as the particular foam footballs were compared to the larger class of "tossing balls" discussed by the Federal Circuit in *OddzOn*. As previously noted, the balls in *OddzOn* were "specifically designed to be thrown like a football, yet travel further than a traditional foam football." 22 F.3d at 1406. These "functional qualities" were achieved by combining a football shape with fins on a tail, which added stability just as do the tails and fins on darts or rockets. These features were "no less functional simply because 'tossing balls' can be designed without them." *Id.* So too are the many features of the '389 and the Swisa Buffer no less functional because some other variety of nail buffer can be designed without them. The Court should reject Egyptian Goddess' facile attempt to ignore the "functional qualities" required of buffers like the '389 and the Swisa Buffer, and in its claim construction recognize the functionality of the individual features of such buffers. Again, however, for purposes of this case, what is determinative is only whether the points of novelty of the '389 design over the Nailco Buffer are functional. That point of novelty is simply the addition of a fourth side and square ends. As established above, that feature, which

48

is common to the Falley buffer block and many other buffer blocks, is functional because it allows for easier handling as well as accommodating a fourth abrasive surface. This would be true even if one ignored the further functional advantage that a square end has of allowing the insertion of a finger.

## CONCLUSION

The images of three buffer designs convey all the essentials of this case:

  

*The Falley Buffer Block*          *The Nailco Buffer*          *The '389 Design*

App. at 37, 50-51, 73-74. When Falley developed the features of his buffer block—the multiple long sides to accommodate different abrasive surfaces, one to a side, the cuticle protection edges, the foam to dissipate heat, the square ends—none of these features were ornamental. Nor did they become ornamental when they were incorporated into the Nailco Buffer. These features also did not become ornamental by virtue of Torkiya having "borrowed" them for his buffer design.

Again, the only change that Torkiya made over the prior art of the Nailco Buffer was the addition of a fourth side. This "point of novelty" really simply returned the multi-step buffer to the block shape of Falley's original buffer block—which was made in that shape by Realys and various foreign and domestic imitators because of the ease of handling of the shape, and because it allowed for four long sides on which to place different abrasive surfaces of equal size. Now Torkiya and his company Egyptian Goddess seek to sue one of Falley's customers, Swisa,

49

claiming that a Falley-designed buffer is infringing an imprudently-granted design patent that employs the functional concepts that Falley himself developed. Torkiya, adding insult to injury, claims that these functional concepts, which he has taken from Falley, are not functional at all, but Torkiya's own "ornamental design."

This Court should construe the '389 patent—which can only protect what is novel and non-functional—as having the single point of novelty of the addition of a fourth side without an abrasive surface. A short summary judgment motion can then eliminate this lawsuit, as the Swisa Buffer does not incorporate this feature. Alternatively, the Court should determine that the only way the '389 differs from the single prior art reference of the Nailco Patent is the addition of a fourth side, but since that feature in itself is functional, it cannot be protected by a design patent, and that there is thus nothing that is both novel and ornamental for the '389 patent to protect, and it has no scope whatsoever.

Respectfully submitted,

Michael D. Napoli
State Bar No. 14803400
Linda G. Moore
State Bar No. 14359500
Frederick L. Medlin
State Bar No. 13895930

KIRKPATRICK & LOCKHART LLP
2828 North Harwood Street, Suite 1800
Dallas, Texas 75201
Telephone: (214) 939-4900
Facsimile: (214) 939-4949

ATTORNEYS FOR DEFENDANTS

50

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing Defendants' Response Brief Regarding Claim Construction was forwarded via certified mail, return receipt requested, on this 19th day of August, 2004, to Plaintiff's counsel as follows:

Robert G. Oake, Jr., Esq.
Law Office of Robert G. Oake, Jr.
101 W. McDermott, Suite 109
Allen, Texas 75013

Rudolf O. Siegesmund
4627 N. Central Expressway, Ste. 2000
Dallas, Texas 75205-4017

_____
Frederick L. Medlin



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| EGYPTIAN GODDESS, INC., | § | |
| | § | |
| Plaintiff and Counter-Defendant, | § | |
| | § | |
| VS. | § | |
| | § | |
| SWISA, INC. and DROR SWISA, | § | |
| INDIVIDUALLY, | § | |
| | § | CIVIL ACTION NO. 3-03-CV-0594-N |
| Defendants, Counter-Plaintiffs and | § | |
| Third-Party Plaintiffs, | § | |
| | § | |
| VS. | § | |
| | § | |
| ADI TORKIYA, | § | |
| | § | |
| Third-Party Defendant. | § | |

## PLAINTIFF'S REPLY BRIEF IN SUPPORT OF
## MOTION FOR CLAIM CONSTRUCTION

October 1, 2004

Respectfully submitted,

Robert G. Oake, Jr.
Texas State Bar No. 15154300
Law Office Of Robert G. Oake, Jr.
101 W. McDermott, Suite 109
Allen, Texas 75013

Rudolf O. Siegesmund
Texas State Bar No. 18324570
4627 N. Central Expressway, Ste. 2000
Dallas, Texas 75205-4017

ATTORNEYS FOR PLAINTIFF EGYPTIAN
GODDESS, INC. and THIRD PARTY
DEFENDANT ADI TORKIYA

# TABLE OF CONTENTS

<u>Page</u>

1.  Introduction ................................................................ 1

2.  Preliminary Statement ........................................... 3

3.  Points of Novelty ................................................... 3

4.  Points of Novelty should not be determined as a matter of law ............ 7

5.  Points of Novelty Facts ......................................... 10

6.  Functionality Test ................................................. 14

7.  Functionality Facts ............................................... 19

8.  Conclusion .......................................................... 26



LIST OF AUTHORITIES

<u>CASES</u>                                                                                               <u>Page(s)</u>

*Applied Arts Corp. v. Grand Rapids Metalcraft Corp.,*
    67 F.2d 428 (6th Cir. 1933) .................................................... 16

*Avia Group International, Inc. v. L.A. Gear California, Inc.,*
    853 F.2d 1557 (Fed. Cir. 1988) .............................................. 18, 19

*Bush Industries, Inc. v. O'Sullivan Indus., Inc.,*
    772 F. Supp. 1442 (D. Del. 1991) .......................................... 11, 12

*Catalina Lighting, Inc. v. Lamps Plus, Inc.,*
    295 F.3d 1277 (Fed. Cir. 2002) .............................................. 4, 14

*Door-Master Corp. v. Yorktowne, Inc.,*
    256 F.3d 1308 (Fed. Cir. 2001) .............................................. 14

*Fisher-Price, Inc. v. Safety 1st, Inc.,*
    2004 U.S. App. LEXIS 17110 (Fed. Cir. 2004) .................... 9, 10

*Goodyear Tire & Rubber Co. v. Hercules Tire & Rubber Co.,*
    162 F.3d 1113 (Fed. Cir. 1998) .............................................. 14

*Horwitt v. Longines Wittnauer Watch Co.,*
    388 F. Supp. 1257 (S.D.N.Y. 1975) ...................................... 11

*Hosley Int'l Trading Corp. v. K Mart Corp.,*
    237 F. Supp. 2d 907 (N.D. Ill. 2002) .................................... 11

*Hsin Ten Enter. United States v. Clark Enterprises,*
    149 F. Supp. 2d 60 (D.N.Y. 2001) ........................................ 24

*Hueter v. Compco Corp.,*
    179 F.2d 416 (7TH Cir. 1950) ................................................ 16

*In re Carletti,*
    328 F.2d 1020 (C.C.P.A. 1964) .............................................. 15, 17

*In re Garbo,*
    287 F.2d 192 (C.C.P.A. 1961) ................................................ 16

*In re Plastics Research Corp. Litigation,*
    2002 U.S. Dist. LEXIS 20547 (E.D. Mich. 2002) ................ 8

*Jack Schwartz Shoes v. Skechers U.S.A.*,
  233 F. Supp. 2d 512 (D.N.Y. 2002) ................................ 12, 23

*KeyStone Retaining Wall Systems, Inc. v. Westrock, Inc.*,
  997 F.2d 1444 (Fed. Cir. 1993) ................................ 4, 22

*L.A. Gear, Inc. v. Thom McAn Shoe Co.*,
  988 F.2d 1117 (Fed. Cir. 1993) ................................ 11, 14, 15, 17, 22, 23

*Lee v. Dayton-Hudson Corp.*,
  838 F.2d 1186 (Fed. Cir. 1988) ................................ 4

*Litton Systems, Inc. v. Whirlpool Corp.*,
  728 F.2d 1423 (Fed. Cir. 1984) ................................ 11

*Markman v. Westview Instruments, Inc.*,
  517 U.S. 370 (1996) ........................................ 8

*Medtronic, Inc. v. Cardiac Pacemakers, Inc.*,
  721 F.2d 1563 (Fed. Cir. 1983) ........................................ 11

*Mendenhall v. Cedarapids, Inc.*,
  5 F.3d 1557 (Fed Cir 1993) ........................................ 8

*Monarch Knitting Mach. Corp. v. Sulzer Morat GMBH*,
  139 F.3d 877 (Fed. Cir. 1998)........................................ 8

*Neiman Marcus Group, Inc. v. Philippe Charriol Int'l, Ltd.*,
  2000 U.S. Dist. LEXIS 17590 (D.N.Y., 2000) ........................ 18

*OddzOn Prods. v. Just Toys*,
  122 F.3d 1396 (Fed. Cir. 1997) ........................................ 4, 17, 18

*Power Controls v. Hybrinetics, Inc.*,
  806 F. 2d 234 (Fed Cir. 1986)........................................ 16, 22

*Rockport Co., Inc. v. Deer Stags, Inc.*,
  65 F. Supp. 2d 189 (S.D.N.Y. 1999) ................................ 12, 23

*Rosco, Inc. v. Mirror Lite Co.*,
  304 F.3d 1373 (Fed. Cir. 2002) ........................................ 15

*Rubbermaid Commercial Prods. v. Contico Int'l*,
  836 F. Supp. 1247 (D. Va., 1993) ........................................ 12

*Sears, Roebuck & Co. v. Talge,*
    140 F.2d 395 (8th Cir. 1944)     ..........................................     11

*Tyco Industries, Inc. v. Tiny Love, Ltd.,*
    914 F. Supp. 1068 (D.N.J. 1996)     ..........................................     17, 22

*Unidynamics Corp. v. Automotive Products International, Ltd.,*
    157 F.3d 1311 (Fed. Cir. 1998)     ..........................................     5, 6, 7

*Winner Int'l Corp. v. Wolo Mfg. Corp.,*
    905 F.2d 375 (Fed. Cir. 1990)........................................     11


SECONDARY SOURCE

Walker on Patents, Deller Ed., Sec. 138     ..........................................     16

claim must be construed in order to identify the non-functional aspects of the design as shown in the patent." *OddzOn Prods. v. Just Toys*, 122 F.3d 1396, 1404 (Fed. Cir. 1997). The *OddzOn* opinion does not state that points of novelty should be determined during claim construction. *OddzOn* does state that "[a] design patent only protects the novel, ornamental features of the patented design." However, the reference to "novel" in this sentence is a reference to the "point of novelty" prong of the two-part test for infringement in design patent cases. In the case citations and parenthetical following the sentence, the *OddzOn* opinion makes clear that the sentence is directed toward the test for infringement and not toward claim construction. (*See KeyStone Retaining Wall Sys., Inc. v. Westrock, Inc.*, 997 F.2d 1444, 1450, 27 U.S.P.Q.2D (BNA) 1297, 1302 (Fed. Cir. 1993); *Lee v. Dayton-Hudson Corp.*, 838 F.2d 1186, 1188, 5 U.S.P.Q.2D (BNA) 1625, 1627 (Fed. Cir. 1988) ("It is the non-functional, design aspects that are pertinent to determinations of infringement.")).

In a way, plaintiff and defendants have been talking past each other on this issue. Although it is clear that "claim construction" of a design patent only involves determining issues regarding functionality, the second prong of the two-part infringement test for design patents involves determining points of novelty. Some district courts erroneously have believed that points of novelty are determined as a matter of law and have determined such novelty as part of the "claim construction" process. With all due respect to these district courts, these courts have confused and conflated the second prong of the infringement test with claim construction. The Federal Circuit has made clear that claim construction and the infringement determination are two separate steps. *See Catalina Lighting, Inc. v. Lamps Plus, Inc.*, 295 F.3d 1277, 1286 (Fed. Cir. 2002). Therefore, even assuming *arguendo* that points of novelty are to be determined as a matter of law (which they clearly should not be), it would be jurisprudentially improper to refer

- 4 -

to such determination as "claim construction." Rather, such determination would be made, for example, on motion summary judgment for non-infringement when analyzing the two-prong infringement test. In any event, a proper analysis of authoritative law indicates that points of novelty should not be decided as a matter of law.

There is a very good reason why points of novelty should not be determined as part of the claim construction process. The Federal Circuit has made clear that the scope and content of the claim is determined during claim construction. Therefore, if any part of the design is eliminated during claim construction, such eliminated part no longer can be considered during the infringement determination. The infringement test consists of two steps. First, the ordinary observer step where the issue is whether the patent and accused designs are substantially similar. Second, the point of novelty step where it is determined whether the similarity is due to points of novelty. *Id.* If the substantial similarity test is not met, then the point of novelty test is not reached. Significantly, during the ordinary observer step, the fact finder is to consider <u>all</u> non-functional (ornamental) aspects of the design, and not just the aspects that are novel. Therefore, if points of novelty were determined as part of the claim construction process where the scope and content of the patent was determined, and non-novel elements were eliminated, it would be impossible to correctly perform the ordinary observer part of the infringement test. That is because the ordinary observer step requires a consideration of not only the novel aspects of the design, but the non-novel aspects as well.

A recent and authoritative case from the Federal Circuit illustrates the point. In *Unidynamics Corp. v. Automotive Products International, Ltd.*, 157 F.3d 1311 (Fed. Cir. 1998), the district court granted summary judgment that the defendants' vending machines infringed Unidynamics' U.S. Design Patent No. 307,446 ('446 design patent) on a design for a vending

machine for food. The district court came to that conclusion by determining the point of novelty of the '446 patent and finding as a matter of law that the accused vending machine appropriated the point of novelty. The Federal Circuit reversed, holding that the district court had improperly merged the ordinary observer and points of novelty tests. The Federal Circuit stated as follows:

> The district court found that the point of novelty of the '446 design patent constituted the large rectangular advertising area and its placement below the snack items and above the smaller rectangular areas for displaying the types and pricing of drinks. The district court found that, as a matter of law, the LCM4 vending machines incorporated the point of novelty.
> ....
>
> In applying the ordinary observer test, however, the district court looked only to the point of novelty. The district court ignored other ornamental features such as the slight variations in door panel width, machine trim, and the placement of the lock because it found they were irrelevant to the point of novelty. The district court concluded: "on the items that can be considered the point of novelty, there is nothing left for a jury to decide, because there can be no genuine dispute regarding whether an ordinary observer would be confused: the ornamental aspects of the LCM4 and the design covered by the '446 patent are substantially the same." This merging of the ordinary observer and the point of novelty tests was legal error. *Id.* at 1324.

Even though some ornamental features were not considered points of novelty ("the slight variations in door panel width, machine trim, and the placement of the lock"), the Federal Circuit held that these ornamental features must still be considered in the ordinary observer test and that to eliminate them entirely improperly merged the ordinary observer and point of novelty tests.

Defendants attempt to explain away *Unidynamics* by arguing that there is a distinction between what it takes to rule out infringement and what it takes to establish infringement. Defendants cite no authority in support of this distinction, and Plaintiff is aware of no such authority. Rather, there is a two-part test for design patent infringement that consists of the ordinary observer test and the point of novelty test. Under the two-part test, a design either infringes or it does not. There is no distinction between what it takes to rule out infringement

- 6 -

and what it takes to establish infringement. Therefore, defendants' attempt to distinguish *Unidynamics* is misguided. *Unidynamics* is clear that all ornamental aspects must be considered during the ordinary observer test, and not just the novel aspects of the patented design. Therefore, it is clear that claim construction should not involve a determination of points of novelty. Rather, such determination should be made when deciding the issue of patent infringement.

The above discussion illustrates why points of novelty should not be decided as part of a claim construction that determines what is compared during the infringement tests. However, this still leaves open the question of whether the Court should decide as a matter of law the points of novelty to be used during the second prong of the infringement test. Some District Courts have done just that, and have referred to their determination as "claim construction." For reasons discussed previously, referring to the determination of points of novelty as "claim construction" is an incorrect and confusing practice in that it could lead to the problem illustrated in *Unidynamics* where non-novel, but ornamental aspects get construed away before the ordinary observer test is applied. In any event, since these District Courts and Defendants raise the issue of whether the Court also should construe points of novelty for the infringement test when the Court is performing claim construction, this issue will be addressed.

4.     Points of Novelty should not be determined as a matter of law

The Federal Circuit <u>never</u> has held in an authoritative and precedential opinion that points of novelty should be determined as a matter of law. The district courts are split on the issue. Defendants cite several district courts and Federal Circuit dictum in support of their argument that points of novelty should be determined as a matter of law. In plaintiff's opening brief, plaintiff explained in detail why such district court opinions and Federal Circuit dictum should not be considered either authoritative or persuasive on the issue. Plaintiff also cited and briefly

discussed the district court cases supporting plaintiff's argument. Plaintiff will not repeat that discussion here, but would like to add the following:

The only district court opinion in Swisa's favor that contains any analysis on the issue (*In re Plastics Research Corp. Litigation*, 2002 U.S. Dist. LEXIS 20547 (E.D. Mich. 2002)) cites to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996)). In *Markman*, the United States Supreme Court held that construction of claims in a patent was to be decided as a matter of law. One of the principle reasons for its holding was that in the opinion of the Court, "[t]he construction of written instruments is one of those things that judges often do and are likely to do better than jurors unburdened by training in exegesis. *Id*. at 386. This reasoning is not applicable to points of novelty in a design patent case because points of novelty do not involve construing a legal instrument, but rather involve determining the scope and content of the prior art and comparing the relevant prior art to the design patent drawing. According to the Federal Circuit, determination of the scope and content of the prior art and a comparison to the patent claim are issues of fact. *See Monarch Knitting Mach. Corp. v. Sulzer Morat GMBH*, 139 F.3d 877, 881 (Fed. Cir. 1998) (obviousness analysis).

A second principal reason the United States Supreme Court held that claim construction should be decided as a matter of law was "the importance of uniformity in the treatment of a given patent...." *Markman, supra,* at 390. While this reasoning is applicable to determinations of functionality in design patent claim construction because the analysis is occurring on a primarily finite (intrinsic) record, it would not be applicable to a point of novelty determination that necessarily involves analysis of prior art. Indeed, even if a patent is held valid over the prior art in one proceeding, each new independent defendant gets to challenge the validity of the patent anew. *See Mendenhall v. Cedarapids, Inc.*, 5 F.3d 1557, 1571 (Fed Cir 1993). One of the

- 8 -

primary reasons for this principle no doubt is a recognition that different defendants will have different motivations and resources to discover prior art. If a first defendant through inadvertence, oversight, or lack of resources does not discover a certain piece of prior art that invalidates a patent, a second defendant is not precluded from offering this prior art to invalidate the patent in a subsequent trial. Likewise, if a first defendant in a design patent case does not discover and disclose a certain piece of prior art that narrows or eliminates points of novelty, a second defendant should not be precluded from doing so. In short, since determining points of novelty involves analyzing and comparing the prior art, which in turn involves doing far more than simply analyzing primarily the intrinsic record (which is done in claim construction), point of novelty determination should not be performed always as a matter of law.[1]

Finally, a recent unpublished case from the Federal Circuit indicates, at least by implication, that points of novelty are not to be determined as a matter of law. In *Fisher-Price, Inc. v. Safety 1st, Inc.*, 2004 U.S. App. LEXIS 17110 (Fed. Cir., 2004) (unpublished) (Reply App. 11-19) defendant Safety 1st argued on appeal that a jury verdict finding infringement was not supported by substantial evidence on the "point of novelty" prong of the design patent infringement analysis. The Court agreed with the defendant and stated as follows:

> According to Safety 1st, the point-of-novelty was that which should have distinguished the D'940 patent from the prior art Zeigler prototype model. It asserts that "Fisher-Price introduced no evidence concerning what, if any, point of novelty the '940 patent had over the prior art Zeigler model, and, consequently, made no effort to prove that the point of novelty was appropriated by the Bouncenette 1." Fisher-Price responds that the jury "was presented with ample testimony and physical evidence about the novelty of the D'940 patented design in view of the Ziegler design."
>
> We find Safety 1st's argument compelling. Fisher-Price does not point to any

---

[1] Of course this is not to suggest that points of novelty never can be determined as a matter of law when there is no genuine issue of material fact to be resolved by the fact finder, i.e., when there is no dispute as the scope and content of the prior art and no factual dispute when comparing the prior art to the claim.

testimony wherein it identified the "point of novelty" that distinguished the patented D'940 design over the Zeigler prior art model. Indeed, during the trial, Fisher-Price attempted to cast doubt as to whether Zeigler was even prior art, a position that Fisher-Price does not take on appeal. We believe that Fisher-Price failed, as a matter of law, to meets its burden of proving the "point of novelty" prong of design patent infringement. The district court erred in not granting Safety 1st's motion for JMOL. We therefore reverse the jury's finding of infringement of the D'940 patent and remand with instructions to enter JMOL of non-infringement with respect to the D'940 patent.

Two points should be noted regarding *Fisher-Price*. First, the Federal Circuit does not indicate that it was at all improper for the jury to determine points of novelty. Second, the Federal Circuit reversed based on lack of evidence even though the patent and the prior art were in the record. If points of novelty were determined as a matter of law, the Court could have made the determination based on the patent and the prior art and would not have reversed on a lack of evidence basis. In sum, for the reasons explained in plaintiff's initial brief and for the reasons discussed above, points of novelty are questions of fact to be determined by a jury in this case.

5.    Points of Novelty Facts

Assuming *arguendo* that this Court decides to determine points of novelty as a matter of law, plaintiff will address the substance of defendants' position. Defendants argue that the only novel feature of the '389 Patent is "the addition of a fourth side without an abrasive surface, or the functional, and therefore invalid point of novelty of four sidedness itself." (Defendants' Brief, page 19). Defendants arrive at their misguided conclusion by comparing the '389 Patent design against only a single piece of prior art, the triangular and hollow Nailco Patent design. As explained in plaintiff's opening brief, defendants' strategy is to attempt to improperly limit claim construction to a single "point of novelty" that is either not found in the accused device or that, according to defendants, is functional. With all due respect, defendants are fundamentally confused about the nature and purpose of the "point of novelty" test in a design patent case.

- 10 -

The "point of novelty" test is part of the test for infringement. In *Litton Systems, Inc. v. Whirlpool Corp.*, 728 F.2d 1423, 1441 (Fed. Cir. 1984), the Federal Circuit explained the purpose of the test as follows:

> For a design patent to be infringed, however, no matter how similar two items look, "the accused device must appropriate the novelty in the patented device which distinguishes it from the prior art." *Sears, Roebuck & Co. v. Talge*, 140 F.2d 395, 396 (8th Cir. 1944); *Horwitt v. Longines Wittnauer Watch Co.*, 388 F. Supp. 1257, 1263, 185 USPQ 123, 128 (S.D.N.Y. 1975). That is, even though the court compares two items through the eyes of the ordinary observer, it must nevertheless, to find infringement, attribute their similarity to the novelty which distinguishes the patented device from the prior art. (This "point of novelty" approach applies only to a determination of infringement. *See, e.g., Medtronic, Inc. v. Cardiac Pacemakers, Inc.*, 721 F.2d 1563, 1567, 220 USPQ 97, 101 (Fed. Cir. 1983).

The point of novelty approach prevents a fact finder from comparing the similarity of the patented design and the accused design without regard to the novelty that distinguishes the patented design from the prior art. *See Winner Int'l Corp. v. Wolo Mfg. Corp.*, 905 F.2d 375, 376 (Fed. Cir. 1990) ("To consider the overall appearance of a design without regard to prior art would eviscerate the purpose of the "point of novelty" approach, which is to focus on those aspects of a design which render the design different from prior art designs."). However, the point of novelty test does not prevent the overall appearance of the design, or a novel combination of elements in the design, from being the point of novelty that distinguishes the design from the prior art. *See L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1124 (Fed. Cir. 1993) (no error in district court's finding "that 'the placement of all the major design elements is the same, creating the same distinctive overall look', and [recognition] that the novelty resided in the overall appearance of the combination."); *see also Hosley Int'l Trading Corp. v. K Mart Corp.*, 237 F. Supp. 2d 907, 913 (N.D. Ill. 2002) ("In appropriate circumstances, a combination of known elements may constitute a point of novelty."); *Bush Indus., Inc. v.*

*O'Sullivan Indus., Inc.*, 772 F. Supp. 1442, 1452 (D. Del. 1991) ("A design's point of novelty need not be one individual newly developed feature, and may instead be a specific combination of elements not found in the prior art.); *Rockport Co., Inc. v. Deer Stags, Inc.*, 65 F. Supp. 2d 189, 195 (S.D.N.Y. 1999) ("A unique combination of known elements can satisfy the point of novelty requirement."); *Jack Schwartz Shoes v. Skechers U.S.A.*, 2002 U.S. Dist. LEXIS 25699, *42 (S.D.N.Y. 2002) (design distinguished from prior art based on combination of elements).

The Court in *Rubbermaid Commercial Prods. v. Contico Int'l*, 836 F. Supp. 1247, 1258 (D. Va., 1993) further explained the legal principle as follows:

> While the point of novelty approach does command an inquiry into specific elements in the prior art as an initial matter, it does not preclude an analysis of how those elements are combined and integrated into an overall design, and of whether that design has been anticipated. Individual design elements, alone or in combination, may well appear again and again in the prior art, but so long as their ultimate integration into the overall design is novel, the patent is valid as to that combination of design elements.

As explained by Adi Torkiya, the novelty of the '389 Patent buffer design resides in its unique combination of, *inter alia*, (1) an open, hollow square tube (2) having rounded 90 degree exposed corners and (3) a plurality of raised rectangular pads attached to the flat sides of, and running longitudinally along the full length of, the tube. (Reply App. 1). The "References Cited" section of the subject patent lists 21 patents. The patents include Design Patent No. 416,648 to Letherby ("the '648 Patent") and Utility Patent No. 2,911,769 to Trussell ("the '769 Patent"). The '648 Patent is the only prior art patent defendants use to determine their point of novelty. The '648 Patent includes an illustration of an open hollow tube, triangular in cross section and rectangular in length, with raised rectangular abrasive surfaces mounted on the sides. The raised abrasive surfaces do not cover the corners of the open, hollow, triangular tube. (Reply App. 2).

Since the '648 Patent includes a hollow tube that is rectangular in length with raised

rectangular abrasive surfaces mounted on the sides that do not cover the corners of the open, hollow, tube, the '648 is relevant prior art from which to determine points of novelty. Indeed, one of the '389 Patent's points of novelty from the '648 Patent is the square cross section. However, the '648 Patent is not the only prior art patent from which points of novelty are determined.

The '769 Patent includes illustrations of an open hollow tube, square in cross section and rectangular in length, which contains surfaces on the exterior. The exterior surfaces are not significantly raised and do cover the corners of the hollow, open, square tube. (Reply App. 2). Since the '769 Patent contains an open hollow tube, square in cross section and rectangular in length, the '769 is also relevant prior art from which to determine the '389 Patent's points of novelty from the prior art. Two of the '389 Patent's points of novelty from the '769 Patent are the raised surfaces and the exposed corners.

Further, as explained in plaintiff's opening brief, there are additional points of novelty that distinguish the subject patent from the prior art. For example, Design Patent No. 369,438 to Resler contains an illustration of a nail file, square in cross section and rectangular in length, with rectangular abrasive pads that do not cover the corners of the underlying square body. However, in Resler the square body is not hollow or open. (Reply App. 2). At the appropriate time, plaintiff will provide a full analysis concerning the appropriate points of novelty.

At this time, for purposes of claim construction, the important point is that defendants' argument is simply wrong that only a single prior art reference should be used to identify a single point of novelty. Points of novelty are not determined by comparing the claimed design against just one reference selected by defendants in an attempt to improperly predetermine the infringement inquiry, but rather by comparing the claimed design against the prior art cited

during patent prosecution. *See, e.g., Goodyear Tire & Rubber Co. v. Hercules Tire & Rubber Co.*, 162 F.3d 1113, 1116 (Fed. Cir. 1998) (Court stated "[t]he points of novelty relate to differences from prior designs, and are usually determinable based on the prosecution history" and determined points of novelty by comparing tread design against multiple prior art references); *see also Catalina Lighting, Inc. v. Lamps Plus*, Inc., 295 F.3d 1277, 1286-1287 (Fed. Cir. 2002) ("According to the "point of novelty" test, the fact-finder must determine whether the accused design appropriates the points of novelty that distinguish the patented design from the prior art."). Since many of the individual elements of the '389 Patent exist in the prior art, but not in their unique combination, it is the unique combination that is the point of novelty.

6.    Functionality Test

As explained in plaintiff's opening brief, the parties disagree on the appropriate test for functionality. Plaintiff contends that an element of a design is ornamental and not functional when the design is not dictated by the function, *i.e.,* when there are several different ways to achieve the function through different designs. This is the test that has been used by the Federal Circuit to determine functionality of design elements in the claim construction context. *See, e.g., Door-Master Corp. v. Yorktowne, Inc.*, 256 F.3d 1308, 1313 (Fed. Cir. 2001) ("Finally, the rear features are not functional. Many different configurations of those features (oval, triangular, etc.) could perform the same functions of an integrated door and frame." (citing *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1123, (Fed. Cir. 1993) ("When there are several ways to achieve the function of an article of manufacture, the design of the article is more likely to serve a primarily ornamental purpose.")).

Defendants argue that this Court should use a different and broader test for functionality in the claim construction context. Defendants argue that a design is functional if it is the *best*

- 14 -

design for a given function.  However, defendants fail to cite a single Federal Circuit decision in support of their argument in the claim construction context, and according to plaintiff's research, the Federal Circuit never has used the functionality test advocated by defendants in the claim construction context.

Further, the test advocated by Defendants had a brief appearance at the Federal Circuit in the patent *invalidity* context, but as explained in Plaintiff's opening brief, it is not the current test and was later abandoned by the Federal Circuit in the very case it first appeared in.  Indeed, the most recent and most authoritative statement from the Federal Circuit regarding the test for functionality in the *invalidity* context is as follows:  "We apply a stringent standard for invalidating a design patent on grounds of functionality: the design of a useful article is deemed functional where 'the appearance of the claimed design is 'dictated by' the use or purpose of the article.'" (emphasis added)  *Rosco, Inc. v. Mirror Lite Co.*, 304 F.3d 1373, 1377 (Fed. Cir. 2002) (quoting *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1123, (Fed. Cir. 1993)).  The *Rosco* case was discussed in detail in Plaintiff's opening brief and that discussion will not be repeated.  However, plaintiffs wish to direct this Court's attention to a critical passage in the case, which was as follows:

> Mirror Lite has not shown by clear and convincing evidence that there are no designs, other than the one shown in Rosco's '357 patent, that have the same functional capabilities as Rosco's oval mirror. Under these circumstances it cannot be said that the claimed design of the '357 patent was dictated by functional considerations. We reverse the district court and hold that the '357 patent claim was not shown to be invalid on functionality grounds. *Rosco, Inc. v. Mirror Lite Co.,* 304 F.3d 1373, 1378-1379 (Fed. Cir. 2002).

The three additional cases that defendants cite in their response brief do not support their position. Defendants cite a passage from *In re Carletti*, 328 F.2d 1020, (C.C.P.A. 1964). (Defendants' Response Brief, page 34)  However, the passage cited concerned the concept of

obviousness in the invalidity context and not functionality in the claim construction context. Further, language in the case directly preceding the portion quoted by defendants is more to the point and in consistent with the Federal Circuit's current test for functionality (advocated by plaintiff):

> But it has long been settled that when a configuration is the result of functional considerations only, the resulting design is not patentable as an ornamental design for the simple reason that it is not "ornamental" - was not created for the purpose of ornamenting. Walker on Patents, Deller Ed., Sec. 138, p. 434; *Connecticut Paper Products* case, cited by the board, *supra, Hueter v. Compco Corp.*, 179 F.2d 416, 84 USPQ 312; *Applied Arts Corp. v. Grand Rapids Metalcraft Corp.*, 67 F.2d 428, 19 USPQ 266; In re Garbo, 48 CCPA 845, 848, 287 F.2d 192, 129 USPQ 72. In the latter case this court said:
>
> > It is true * * * that a design may embody functional features and still be patentable, but in order to attain this legal status under these circumstances, the design must have an unobvious appearance, distinct from that dictated solely by functional considerations. [Emphasis added.]
>
> That is the principle which is believed to apply here. *Id.* at 1022.

The Court's statement that for a design to be patentable it must have an appearance that is not "dictated solely by functional considerations" is consistent with the functionality test advocated by Plaintiffs and currently used by the Federal Circuit: that an element of a design is ornamental and not functional when the design is not dictated by the function, *i.e.,* when there are several different ways to achieve the function through different designs.

Defendants also cite and discuss *Power Controls v. Hybrinetics, Inc.*, 806 F. 2d 234 (Fed Cir. 1986). Defendants' reliance on this case is misplaced. In *Power Controls*, a patentee moved for a preliminary injunction. The defendant opposed and claimed that the design patent covering a clam shell design for a cover on a rotary dimmer switch was functional. The defendant presented the testimony of the inventor, which indicated that each listed element had a functional purpose. The patentee did not present any contrary evidence that the design elements were

ornamental and the Court held that the patentee did not carry its burden to obtain a preliminary injunction. *Power Controls* is simply a "failure of proof" case and contains no analysis or discussion of what the outcome would have been had the patentee offered proof that the design was ornamental. Further, it does not support defendants' proposed functionality test. Rather, the case cites *In re Carletti* and quotes the "dictated by functional considerations" form of the functionality test advocated by plaintiffs. *Id.* at 238.

Finally, defendants cite *Tyco Industries, Inc. v. Tiny Love, Ltd.,* 914 F. Supp. 1068 (D.N.J. 1996). The *Tyco* court considered testimony that alternative designs did not function as well or were more costly to manufacture. However, *Tyco* cites *L.A. Gear, supra,* for the rule that "[t]he design of a useful article is deemed functional when the appearance of the claimed design is 'dictated by' the use or purpose of the article." *L.A. Gear,* 988 F.2d at 1123. Further, the *Tyco* Court found "unpersuasive" the testimony of the patentee's expert because he "admittedly did not engage in an extensive design project and appears to have only somewhat cursorily explored alternative designs." To the extent that the Court considered "best design" or "cost" factors, the Court went beyond the very functionality test the Court stated it should use. According to plaintiff's research, the *Tyco* case has not been cited by any other court on the flawed analysis it apparently used. It should be noted that Swisa is not arguing cost factors in the instant case.

Finally, defendants' comparison to the *Oddzon* case on page 27 of their brief is misplaced. The Court in *Oddzon* upheld the summary judgment of no infringement because the plaintiff failed to bring forth evidence that the accused product was confusingly similar to the *ornamental aspects* of the football shape with tail and fins. The district court did not omit the tail and fins from its claim construction, but rather described the claimed design as follows:

> a ball shaped like a football, with a slender, straight tailshaft projecting from the rear of the football. In addition, the '001 Patent design has three fins

> symmetrically arranged around the tailshaft, each of which has a gentle curve up
> and outward which creates a fin with a larger surface area at the end furthest from
> the ball. The fins flare outwardly along the entire length of the tailshaft, with the
> front end of the fin extending slightly up along the side of the football so that the
> fins seemingly protrude from the inside of the football.

*Oddzon, supra*, at 1400. Therefore, contrary to defendants' statement, the patentee in *Oddzon*

was able to protect the tail and fins on its foam footballs. However, it just could protect the

particular shape of the tail and fins (and those substantially similar to it), and not just any shaped

tail and fins. Similarly, although plaintiff can not protect any shaped hollow nail buffer with

raised abrasive pads, plaintiff can protect the claimed shape and those substantially similar to it.

Defendants argue that since a "best" design criteria is used for determining the

functionality of trademarks, it also should be used for design patents. This argument is not

persuasive. The purpose of the functionality doctrine in trademark law is to prevent competitors

from suffering a competitive disadvantage when the "best" functional design is <u>permanently</u>

protected by a trademark. In *Neiman Marcus Group, Inc. v. Philippe Charriol Int'l, Ltd.*, 2000

U.S. Dist. LEXIS 17590, *8 (D.N.Y., 2000), the court stated as follows:

> Unlike patent protection, trademark protection extends for an unlimited period of
> time. In light of this indefinite protection, to accord expansive trademark
> protection for the design of products would prevent some functional products
> from enriching the public domain. Courts must take care not to grant trademark or
> trade dress protection where such protection would close access to a particular
> market.

However, a design patent is granted only for a <u>limited</u> number of years, and a purpose of

the functionality doctrine in design patent law is to promote the decorative arts, which is in turn a

purpose of the design patent statute. *See Avia Group International, Inc. v. L.A. Gear California,*

*Inc.*, 853 F.2d 1557, 1563 (Fed. Cir. 1988) ("When function dictates a design, protection would

not promote the decorative arts, a purpose of the design patent statute."). Further, "a distinction

exists between the functionality of an article or features thereof and the functionality of the

- 18 -

particular design of such article or features thereof that perform a function. Were that not true, it would not be possible to obtain a design patent on a utilitarian article of manufacture....". [cites omitted]. *Id.*

In sum, the Federal Circuit has not adopted the functionality test advocated by defendants in the invalidity context, and according to plaintiff's research, the Federal Circuit never has used the test advocated by defendants in the claim construction context. Therefore, this Court should not use the functionality test advocated by defendants.

7.    Functionality Facts

Defendants' argument on what allegedly is functional about the patented design is long and confusing. As discussed in the introduction, one reason for the confusion is that Defendants appear to be moving away from an earlier emphasis on the alleged functionality of hollowness to an emphasis on the alleged functionality of four-sidedness. Although the emphasis has shifted, defendants still appear to be claiming that the following elements of the patented buffer are functional under their proposed test:

a.    The square ends because they create "four long sides of equal area and easy handling." (Swisa Brief, page 42);
b.    The space between the raised pads because they allegedly create a "cuticle protection edge" (Swisa Brief, page 43);
c.    The square hollow tube to allow a manicurist to insert a finger to protect the manicurists' own manicure; (Swisa Brief, page 43);
d.    The raised pads to dissipate heat; (Swisa Brief, page 42).

Defendants go on to argue that there allegedly are no design alternatives to the '389 design that "do not lead to a design that is inferior from a functional standpoint." Defendants then conclude that the above four aspects of the '389 design are therefore functional. Defendants' position is not credible. Before Dror Swisa intentionally copied Adi Torkiya's '389 Patent design, defendants' expert, Michael Falley, had for years produced and sold many

- 19 -

thousands of square buffers that were different in design than the '389 Patent, but had the same capabilities that defendants now claim are functional in the '389 design. Indeed, Falley's buffers had square ends, an alleged "cuticle protection edge," and a foam body underneath the abrasive pads to dissipate heat. Although Falley's buffers were not hollow to allow a manicurist to insert a finger, there is no credible evidence that manicurists using Falley's buffer needed a hollow tube to protect their manicures. Given the commercial success of the Falley square solid block buffers, the lack of complaints on its use, and the failure of Michael Falley to change the design over many years, defendant's position that there are no design alternatives to the '389 design that "do not lead to a design that is inferior from a functional standpoint" is not only not credible, it is incredible. Indeed, the Falley square solid buffer block itself proves that other design alternatives existed to the '389 Patent that performed the same functions as those now claimed by defendants to be legally "functional." Defendants' expert Michael Falley effectively concedes the point when he states in his declaration that "[t]here is no significant difference between a hollow buffer block with abrasive on three sides as represented by the drawing for the '389 patent and a solid three way buffer block other than the functional difference for the manicurist being able to protect her own manicure by putting a finger inside the hollow buffer." (Def. App. 26).

With regard to the hollowness aspect, plaintiff's opening brief demonstrated that defendants' functionality arguments were bogus. Plaintiffs offered the declaration of a former contractor of defendants, a declaration from a professional manicurist, and a videotape produced by the defendants themselves. This evidence demonstrated that defendants' position that the hollowness aspect was functional lacked any credibility.

Specifically, Plaintiff's expert Kathleen Eaton, stated that she would not insert a finger in the buffer when performing a manicure because it is awkward and resulted in a loss of control

over the buffer and a loss of flexibility in her wrist and hand movements. (App. 155, paragraph 7). Ms. Eaton states that when she was asked to use the accused buffer for a manicure, she did not stick any fingers inside the buffer. (App. 155, paragraph 6). Rather, she held the outside of the buffer with her fingers and thumb. *Id.* When she used the accused nail buffer in this manner, it was easy for her to avoid rubbing the buffer against her fingernails. *Id.*

Defendants had the opportunity in their response brief to provide the court with credible evidence from a disinterested and qualified witness (for example, a professional manicurist) that supported defendants' position on the functionality of the hollow tube. Significantly, defendants provided no such evidence. Despite having sold many square hollow buffers and having an expert that has been manufacturing and selling nail buffers for years, defendants were unable to come up with a single manicurist to support their theory that the hollow tube is functional because it supposedly allows a manicurist to insert their finger, or finger and thumb,[2] for protection. In light of defendants' failure to produce credible proof, this court should not consider that finger insertion for manicure protection is a credible functional use of the hollow tube.

Even if manicure protection is a concern for a manicurist, the manicurist can protect their manicure by holding the block buffer in such a way that their own manicure is not affected. (Reply App. 7). Further, different designs are available to assist the manicurist in holding the buffer. The Falley block buffer can be held in such a way that the manicure is not affected. The Resler Design Patent D369,438 offers an extended portion to hold the buffer. Further, United States Design Patent D459,548 to Adi Torkiya allows the manicurist to place their finger and

---

[2] On page 8 of their response brief, defendants contend that a manicurist can hold the buffer "between thumb and finger, with the fingernail inserted." This description appears to be different than the description offered by defendants' expert, who contends that the manicurist should "insert a finger" into the buffer. (Def. App. 23).

thumb in a depression. According to Plaintiff's expert manicurist, Kathleen Eaton, these are all preferable ways to hold the buffer because sticking one finger in results in a loss of flexibility and control and sticking a finger and thumb in the hollow ends is uncomfortable due to the stretch and the edges pressing against and into the skin. (App. 155; Reply App. 6, 7).[3] Therefore, even if defendants' proposed functionality test of the "best" design is used, it is clear that the design of the '389 buffer is not functional.

Further, it appears that Defendants are arguing the functionality of the design elements on an individual basis without considering the functionality of the combination. In other words, defendants argue that the four-sidedness of the buffer is functional because four sides are needed to mount four pads. It is unclear whether functionality in the claim construction context is to be decided on a strict individual element basis, on an individual element basis in light of the overall function of the design, or on an overall basis. In *Tyco, supra,* at 1076 the District Court cited Federal Circuit case law on this issue in the invalidity context as follows:

> "The design of a useful article is deemed functional when the appearance of the claimed design is 'dictated by' the use or purpose of the article." *L.A. Gear,* 988 F.2d at 1123. Furthermore,
>
> > in determining whether a design is primarily ornamental the claimed design is viewed in its entirety, for the ultimate question is not the functional or decorative aspect of each separate feature, but the overall appearance of the article, in determining whether the claimed design is dictated by the utilitarian purpose of the article.
>
> *L.A. Gear,* 988 F.2d at 1123 (citations omitted). *See also Keystone,* 997 F.2d at 1450 ("It is the appearance of a design as a whole which is controlling in determining questions of patentability and infringement.") (citations omitted). *But see Power Controls,* 806 F.2d at 240 ("In determining whether a design is

---

Nevertheless, plaintiffs' expert Kathleen Eaton has addressed the "between thumb and a finger" issue in her supplemental declaration. (Reply App. 5-7).

[3] At App. 155, Kathleen Eaton states that when she held the accused buffer with her fingers and thumb it fit in her hand comfortably. The Court is requested to note that she is not stating that she held the buffer by the ends with a finger and a thumb. (the buffer can be held by the buffer pads). When she held the buffers by the ends with a finger and thumb, it was not comfortable. (Reply App. 6, 7).

primarily functional, the purposes of the particular elements of the design necessarily must be considered.").

However, under any approach, and as will be discussed below, it is clear that none of the elements of the '389 design buffer are functional.

In *Jack Schwartz Shoes v. Skechers U.S.A.*, 233 F. Supp. 2d 512 (D.N.Y. 2002), the Court stated as follows:

> In the instant case, the point of novelty of the Rustler Lo design is the combination of a low-cut wallabee shoe, a horizontal strap, and a side buckle. Defendant has not submitted any evidence to suggest that this combination of elements is functional rather than ornamental. The mere fact that the individual elements have some functional value does not create a question of fact as to the ornamentality of the combination. *See Rockport*, 65 F. Supp. 2d at 195-96; *cf. L.A. Gear*, 988 F.2d at 1123 (invalidity due to functionality must be proved by the party asserting the defense by clear and convincing evidence).

*Jack Schwartz Shoes* appears to approach the issue of functionality on a combination of elements basis. If this approach is used in the instant case, it is clear that the '389 Patent's novel combination of a rectangular hollow tube with square ends, raised pads and exposed ends is not functional under either plaintiff's or defendants' proposed functionality tests. Under plaintiff's proposed test, the combination would not be functional because different designs could accomplish the same functions as the patented design. For example, as discussed previously, the Falley solid square buffer block accomplishes all the functions of the '389 design and yet consists of a substantially different design.

Under defendants' proposed test, the '389 Patent design would not be functional because there is no credible evidence that the '389 Patent design is any better than the Falley solid square buffer block at accomplishing any of the buffer's alleged functions. Both designs have square ends, spaces between the buffer pads, foam underneath the pads to dissipate heat, and can be held in such a way that a manicurist can protect her manicure. Further, Defendants' argument that a

four-sided square is functional ignores the fact that a four-sided square buffer can consist of many different designs. For example, a four-sided buffer can be hollow like the '389 design, it can be solid like the Falley buffer block, it can be primarily solid with a circular hole like the "Backscratcher" buffer, it can have any size larger hole in the middle than the "Backscratcher" Buffer, it can be solid but with depressions like the Torkiya D459,548 buffer, and can have many other designs as well. All of these different designs have the equal functionality of four equal sides to place buffer pads on. (Reply App. 3).

Even if the four-sided squareness of the '389 design is looked at as a single element (without considering that the interior of the square can be many different designs), it still is not functional. That is because the claimed function of holding four different pads can also be accomplished by a square that has rounded corners, or 45 degree angle corners with small straight sides (and be in essence an irregular octagon). Further, the four sides need not be straight. Rather, they can be curved. (Reply App. 3). The point is illustrated by *Hsin Ten Enter. United States v. Clark Enterprises*., 149 F. Supp. 2d 60, 65 (D.N.Y., 2001). In *Hsin Ten,* the claimed design was of an electronic foot massager. The defendant claimed that the overall box-like impression of the base was functional. The Court disagreed and held the box-like impression was ornamental, stating as follows:

> The base does not need to have four substantially flat sides which meet at four distinct corners. The base does not, as Clark Enterprises claims, need to be box-shaped for ease of "fabrication, storage, packaging, and shipment." Def. Mem. at 6. The base could be made, alternatively, with rounded sides and rounded corners.

Similarly, a four-sided buffer could be made with rounded sides and rounded corners. Reply App. 3). Indeed, since a commercial embodiment of the square base of the '389 patent is made of extruded plastic, it would simply a matter of changing the extrusion die. Defendants' arguments should be rejected just as they were rejected by the Court in *Hsin Ten.*

- 24 -

Finally, defendants' argument that the four-sided square shape is functional because it is necessary to hold four buffer pads is rendered meritless because the patented '389 design only includes three buffer pads. Indeed, defendants' expert Michael Falley has stated that "[I]t is true that the fourth side is not necessary for the purpose of mounting a fourth abrasive surface, because the buffer is only a three way buffer." (Falley declaration dated Dec 18, 2003, App. 00013). However, the issue of functionality is not decided by analyzing the functions in the accused device, but rather by analyzing the alleged functions of the patented design.

With regard to the other claimed functional elements of the '389 design (space between buffer pads and the raised pads), these items were addressed in detail in plaintiff's opening brief. Plaintiff will not repeat the discussion here, but will simply note that to the extent the space between the pads and the raised pads perform legitimate functions, there are other designs that perform the alleged functions equally well. For example, the Falley solid buffer block does not have raised pads but has a foam core that allegedly dissipates heat. Defendants have made no claim and offer no proof that raised pads dissipate heat any better than a solid foam core. Adi Torkiya states that there is no functional difference. (Reply App. 3).

With regard to the so-called "cuticle protection edges" created by a space between the buffer pads, there is no evidence that such space offers any more protection than a normal block buffer with no space between the pads. Indeed, Plaintiff's expert Kathleen Eaton declared that she has been using block buffers without "cuticle protection edges" in her practice for some time and has never had a problem with a side of the buffer cutting into someone's cuticle. (App. 155). Defendants did not offer any declaration from a manicurist challenging this statement. In short, a "cuticle protection edge" is not a credible function of the space between the pads that results when the pads are affixed to the flat sides of the hollow tube. (Reply App. 4). In sum, when the

- 25 -

proper test for functionality is applied, it is clear that the features of the subject patent are not functional in the design patent sense and therefore are ornamental.

8.      Conclusion

Since none of the features of the subject design patent are functional, this Court need not construe the subject design patent in words.  Rather, after properly charging the jury on the law of design patent infringement, the Court should allow the jury to compare the accused nail buffer against the subject design patent.

Respectfully submitted,

By: _____
Robert G. Oake, Jr.
Texas State Bar No. 15154300
Law Office Of Robert G. Oake, Jr.
101 W. McDermott, Suite 109
Allen, Texas 75013
972-727-7490
972-727-7496 (Fax)

Rudolf O. Siegesmund
Texas State Bar No. 18324570
4627 N. Central Expressway, Ste. 2000
Dallas, Texas 75205-4017
214.528.2407
214.528.2434 (fax)

ATTORNEYS FOR PLAINTIFF EGYPTIAN
GODDESS, INC. and THIRD PARTY
DEFENDANT ADI TORKIYA

CERTIFICATE OF SERVICE

- 26 -

I certify that on October 1, 2004, a true and correct copy of the foregoing was served under the Federal Rules of Civil Procedure to the following:

Frederick L. Medlin
KIRKPATRICK & LOCKHART LLP
2828 North Harwood Street, Suite 1800
Dallas, Texas 75201
Attorneys for Defendant

_____
Robert G. Oake, Jr.

4

(12) **United States Design Patent** (10) Patent No.: **US D467,389 S**

Torkiya (45) Date of Patent: ** Dec. 17, 2002

(54) **NAIL BUFFER**

(76) Inventor: **Adi Torkiya**, 114 Oak Bend Dr.,
Coppell, TX (US) 75019

(**) Term: **14 Years**

(21) Appl. No.: **29/155,619**

(22) Filed: **Feb. 13, 2002**

**Related U.S. Application Data**

(62) Division of application No. 29/149,507, filed on Oct. 11, 2001, now Pat. No. Des. 459,548.

(51) LOC (7) Cl. .................................................. **28-03**
(52) U.S. Cl. ..................................................... **D28/59**
(58) Field of Search ........................... D28/56, 57, 59;
      D4/119, 121, 137; D8/90–94; D32/40, 52;
      132/73, 73.5, 75, 75.6, 76.4, 76.5; 451/490,
      522–525, 540, 552–558; 15/167.3

(56) **References Cited**

**U.S. PATENT DOCUMENTS**

| | | |
|---|---|---|
| 651,479 A | 6/1900 | Essich et al. |
| 965,444 A | 7/1910 | Dahl |
| 1,072,046 A | 9/1913 | Seymoure |
| 2,505,295 A * | 4/1950 | Meyers ...................... 401/205 |
| 2,557,175 A | 6/1951 | Cortes |
| 2,838,057 A | 6/1958 | Smith |
| 2,911,769 A * | 11/1959 | Trussell ................ 451/503 |
| D201,944 S | 8/1965 | Leopoldi |
| 4,246,914 A | 1/1981 | Keyser |
| D260,356 S | 8/1981 | Hall |
| 4,366,828 A * | 1/1983 | Hokama ................ 132/75.6 |
| 4,757,571 A | 7/1988 | Young |
| 4,785,586 A | 11/1988 | Kratfel |
| D328,847 S * | 8/1992 | Button et al. ............ D8/93 |
| 5,177,909 A | 1/1993 | Klocke |
| D360,121 S | 7/1995 | Anderson |
| D369,438 S | 4/1996 | Resler |
| D406,394 S | 3/1999 | Mulaisho |
| 5,899,210 A | 5/1999 | Letherby et al. |
| D416,648 S | 11/1999 | Letherby et al. |
| 6,006,413 A | 12/1999 | Farley |

* cited by examiner

Primary Examiner—Ted Shooman
Assistant Examiner—C. Tuttle
(74) Attorney, Agent, or Firm—Gardere Wynne Sewell LLP

(57) **CLAIM**

The ornamental design for a nail buffer, as shown and described.

**DESCRIPTION**

FIG. 1 is a pespective view of a nail buffer in accordance with my invention;

FIG. 2 is a left side elevation view of the nail buffer shown in FIG. 1;

FIG. 3 is a right side elevation view of the nail buffer shown in FIG. 1;

FIG. 4 is a front elevation view of the nail buffer shown in FIG. 1;

FIG. 5 is a rear end elevation view of the nail buffer shown in FIG. 1;

FIG. 6 is a top plan view of the nail buffer shown in FIG. 1; and,

FIG. 7 is a bottom plan view of the nail buffer shown in FIG. 1.

The dashed outlines in the views of FIGS. 1 and 6 showing the location of indicia are for illustrative purposes only and form no part of the claimed design.

**1 Claim, 3 Drawing Sheets**



App. 73



# FIG. 1

App. 74



FIG. 2



FIG. 3



FIG. 4



FIG. 5

App. 75



# FIG. 6



# FIG. 7

**App. 76**

## PAGE WITH TYPED SINGLE CLAIM OF THE PATENT

This case concerns a design patent, rather than a utility patent.  There is no "preamble" to the patent.  The single claim of the patent states:  "The ornamental design for a nail buffer, as shown and described."

DA-143796 v1 1200770-0001