

ORIGINAL

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

APR  1 2005

CLERK, U.S. DISTRICT COURT
By _____
        Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| EGYPTIAN GODDESS, INC., | § | |
| Plaintiff and Counter-Defendant, | § | |
| | § | |
| VS. | § | |
| | § | |
| SWISA, INC. and DROR SWISA, INDIVIDUALLY, | § | CIVIL ACTION NO. 3-03-CV-0594-N |
| Defendants, Counter-Plaintiffs and Third-Party Plaintiffs, | § | |
| | § | |
| VS. | § | |
| | § | |
| ADI TORKIYA, | § | |
| Third-Party Defendant. | § | |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Michael D. Napoli
State Bar No. 14803400
Linda G. Moore
State Bar No. 14359500
Frederick L. Medlin
State Bar No. 13895930

KIRKPATRICK & LOCKHART
  NICHOLSON GRAHAM LLP
2828 North Harwood Street, Suite 1800
Dallas, Texas 75201
(214) 939-4900
(214) 939-4949 (telecopy)

ATTORNEYS FOR DEFENDANTS

DA-153697 v11

# TABLE OF CONTENTS

TABLE OF CONTENTS...............................................................................................i

TABLE OF AUTHORITIES ..................................................................................ii - iii

SUMMARY ...............................................................................................................1

INTRODUCTION .......................................................................................................2

I.      The Swisa Buffer as a matter of law is not "substantially similar" to the '389 design
        under the "ordinary observer" test. .......................................................................5

II.     The Swisa Buffer cannot infringe the '389 Patent because it does not incorporate the
        '389 Patent's point of novelty...........................................................................12

III.    The '389 Patent is invalid under 35 U.S.C. § 103 as obvious in light of prior art that
        was not before the Patent Office. ......................................................................21

CONCLUSION...........................................................................................................26

DA-153697 v11

# TABLE OF AUTHORITIES

*Bernhardt, L.L.C. v. Collezione Europa USA, Inc.,*
    386 F.3d 1371 (Fed. Cir. 2004)......................................................................................4

*In re Borden,*
    90 F.3d 1570 (Fed.Cir. 1996).........................................................................22, 23, 24

*Brainard v. Custom Chrome, Inc.,*
    872 F. Supp. 39 (W.D.N.Y. 1994) ...............................................................................21

*Braun Inc. v. Dynamics Crop. of America,*
    975 F.2d 815 (Fed. Cir. 1992)......................................................................................13

*Bush Industrial, Inc. v. O'Sullivan Industrial, Inc.,*
    772 F. Supp. 1422 (D. Del. 1991)...................................................................22, 23, 29

*Goodyear Tire & Rubber Co., v. Hercules Tire and Rubber Co.,*
    162 F.3d 1113 (Fed. Cir. 1998)....................................................................................14

*Gorham v. White,*
    81 U.S. (14 Wall.) 511 (1871) ...............................................................................7, 13

*Hosely International Trading Corp. v. K Mart Corp.,*
    237 F. Supp. 2d 907 (N.D. Ill. 2002) .............................................................22, 23, 29

*Hupp v. Siroflex of America, Inc.,*
    122 F.3d 1456 (Fed. Cir. 1997)..............................................................................14, 25

*L.A. Gear, Inc. v. Thom McAn Shoe Co.,*
    988 F.2d 1117 (Fed. Cir. 1993)....................................................................................23

*Litton System Inc. v. Whirlpool Corp.,*
    728 F.2d 1423 (Fed. Cir. 1984)........................................................................5, 14, 22

*Pacific Handy Cutter, Inc. v. Quick Point, Inc.,*
    43 U.S.P.Q. 2d 1624 (C.D.Cal. 1997)..........................................................................13

*Petersen Manufacturing Co., Inc. v. Central Purchasing, Inc.,*
    740 F.2d 1541 (Fed. Cir. 1984)..............................................................................24, 26

*In re Plastics Research Corp. Litigation,*
    2002 WL. 1000450 (E.D.Mich.)...................................................................................13

*Schadig Corp. v. Collezione Europa, U.S.A.,*
    2002 WL. 31253750 (N.D. Ill.) ....................................................................................13

DA-153697 v11

*Sun Hill Industrial, Inc. v. Easter Unlimited, Inc.,*
  48 F.3d 1193 (Fed. Cir. 1995)..............................................................................14

*Unette Corp. v. Unit Pack Co., Inc.,*
  785 F.2d 1026 (Fed. Cir. 1986)..........................................................................7, 13

## FEDERAL STATUTES

35 U.S.C. § 103.......................................................................................................4

DA-153697 v11

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| **EGYPTIAN GODDESS, INC.,** | § |
| | § |
| **Plaintiff and Counter-Defendant,** | § |
| | § |
| **VS.** | § |
| | § |
| **SWISA, INC. and DROR SWISA,** | § |
| **INDIVIDUALLY,** | § **CIVIL ACTION NO. 3-03-CV-0594-N** |
| | § |
| **Defendants, Counter-Plaintiffs and** | § |
| **Third-Party Plaintiffs,** | § |
| | § |
| **VS.** | § |
| | § |
| **ADI TORKIYA,** | § |
| | § |
| **Third-Party Defendant.** | § |

### DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Defendants' Swisa, Inc. and Dror Swisa (collectively, "Swisa") file their Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment.

### SUMMARY

Swisa moves for summary judgment on three grounds:

1.      As a matter of law the accused device ("the Swisa Buffer") cannot infringe United States Patent D467,389 ("the'389 Patent") because no reasonable juror could conclude that the Swisa Buffer was substantially similar to the '389 Patent's design ("the '389 design") under the ordinary observer test.

2.      As a matter of law the accused device ("the Swisa Buffer") cannot infringe because it does not incorporate the novelty of the '389 Patent.

1

3.    As a matter of law the '389 Patent is invalid under 35 U.S.C. § 103 as obvious in light of prior art that was not before the Patent Office.

## INTRODUCTION

The Court's recent claim construction of the '389 Patent has clarified the scope of the patent's protection, and made still more obvious that, as a matter of law, the Swisa Buffer cannot infringe the '389 Patent.  In the briefing on claim construction, Swisa had urged this Court to construe the '389 Patent as "having only the single point of novelty of the addition of a fourth side without an abrasive surface."  Swisa further noted that a short summary judgment motion could "then eliminate this lawsuit, as the Swisa Buffer does not incorporate this feature."  Swisa's Brief in Support of its Response to Plaintiff's Motion for Claim Construction at p. 50 (Docket No. 57).  Subsequent to the briefing on claim construction but prior to this Court's Order, the Federal Circuit handed down its opinion in *Bernhardt, L.L.C. v. Collezione Europa USA, Inc.*, 386 F.3d 1371 (Fed. Cir. 2004).  Based on *Bernhardt* and other authorities, this Court declined to determine points of novelty as part of claim construction, but noted that "[t]his holding does not mean that a court could not in an appropriate case determine points of novelty as a matter of law on an appropriate record at summary judgment."  Order signed March 3, 2005 ("Order") at p. 2, fn. 1.

In its claim construction, this Court ruled that "**perhaps most important**, the Court construes the design at issue as having three sides with abrasive surfaces and a fourth side with no abrasive surface."  *Id.* at p. 1 (emphasis added).  This Court noted that it had "the impression that Swisa may view the Court's claim construction as dispositive of the merits of this case," and this Court stayed the case to permit Swisa to file a motion for summary judgment on that basis. *Id.* at p. 5.

2

Swisa now moves for summary judgment on three grounds.

First, the Swisa Buffer cannot infringe the '389 Patent as a matter of law because no reasonable juror could find infringement under the "ordinary observer" test. Purchasers of buffers distinguish between three-way and four-way buffers, as demonstrated by the fact that various manufacturers and sellers have for many years offered and advertised conspicuously the choice between three-way and four-way buffers. Even Egyptian Goddess, in its advertising on the buffer it makes that embodies 389's design (the "'389 Buffer"), focuses heavily on the fact that the '389 Buffer is a three-way buffer. Given such consumer preferences, it cannot be plausibly argued that an ordinary observer, "giving such attention as a purchaser usually gives," would be deceived into thinking the Swisa four-way buffer was the Egyptian Goddess three-way buffer. But even if consumers had no preferences between four-way and three-way buffers, just as a visual matter consumers could readily see the difference between a buffer with raised abrasive surfaces on all four long sides and a buffer with three-sides with raised abrasive surfaces and one bare side. Thus, the Court should rule that as a matter of law there is no infringement under the ordinary observer test.

Second, the Swisa Buffer cannot infringe the '389 Patent because it does not include what is, as a matter of law, the "novelty which distinguishes the patented device from prior art." *Litton Sys. Inc. v. Whirlpool Corp.*, 728 F.2d 1423, 1444 (Fed. Cir. 1984) (Federal Circuit embraces the point of novelty test.). At the time he applied for his patent, Adi Torkiya had for approximately two years been selling a buffer embodying Design Patent D416,648 (the "Nailco Patent"), an example of which is the 'lil whistler ("'Lil Whistler"). App. 005, 006, 021. Four images illustrate that all that Adi Torkiya did in designing the '389 Patent was to take the design of the Nailco Patent/'Lil Whistler and return it to the block shape of commonly available three-

way and four-way buffer blocks, of the type exemplified by the Falley buffer block, versions of which have been on sale since 1987. Torkiya did this by adding to the Nailco Patent/'lil whistler design a fourth side **without an abrasive surface**.



| *Falley Buffer Block* | *Nailco Patent* | *'Lil Whistler* | *'389 Patent* |

The Swisa Buffer, like the four-way Falley Buffer Block and the Nailco Patent/'Lil Whistler, has abrasive on all long sides. It thus does not incorporate the point of novelty of the '389 Patent, and cannot infringe it as a matter of law.

Finally, when one considers both the disclosed Nailco Patent and the undisclosed four-way and three-way buffer blocks that have been on the market since 1987, it is apparent that the '389 Patent should be declared invalid as obvious. The addition of the fourth side without an abrasive surface was an alteration of the Nailco Buffer that would have been obvious to any ordinary designer of buffers who was familiar with the ubiquitous four-way and three-way Falley Buffer Blocks and the numerous imitations of them, well known to everyone in the business. Torkiya, in applying for the '389 Patent, did not disclose these buffer blocks to the Patent Office. If Torkiya had disclosed the Falley Buffer block or any of the four-way and three-way buffer blocks, the Patent Office would not have granted the patent application. In light of the four-sided, square-ended buffer blocks, some with abrasive on three sides, it is obvious that you could return the Nailco Buffer to the four-sided, square ended shape of its predecessor, the Falley

4

Buffer Block.  Thus, under 35 U.S.C. § 103, this Court should declare the '389 Patent invalid as obvious in light of prior art that was not before the Patent Office.

I.     **The Swisa Buffer as a matter of law is not "substantially similar" to the '389 design under the "ordinary observer" test.**

A plaintiff asserting patent infringement must prove that the accused device infringes under two different tests.  Under the first of these tests, he must show that the accused device is "substantially similar" under the ordinary observer test set forth in *Gorham v. White*, 81 U.S. (14 Wall.) 511, 528 (1871):

> [I]f, in the eye of an ordinary observer, **giving such attention as a purchaser usually gives**, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other.

*Gorham v. White*, 81 U.S. (14 Wall.) 511, 528 (1871) (emphasis added).  The *Gorham* test is **not** about the consumer mistaking the **source** of the accused device as being the same as that of a product covered by the patented design, but rather about an ordinary observer mistaking the accused device for the patented design.  *Unette Corp. v. Unit Pack Co., Inc.*, 785 F.2d 1026, 1029 (Fed. Cir. 1986) ("Likelihood of confusion as to the source of the goods is not a necessary or appropriate factor for determining infringement of a design patent.").

Throughout this litigation, Swisa has pointed out that an ordinary purchaser of nail buffers, giving such attention as such a purchaser usually gives, would immediately recognize the difference between a four-way nail buffer such as the Swisa Buffer, and a three-way nail buffer embodying the '389 design.  Such a purchaser is not going to buy a four-way buffer thinking that it is "really" the Egyptian Goddess three-way buffer.  Sid Lande, owner of the Paul Lande Company, speaks to the distinction based on his over twenty five years in the business of

5

selling professional beauty products to beauty supply retail stores and to wholesale beauty supply distributors with salesmen calling on salons.

> The 3-way buffer and the 4-way buffer are as different as apples and oranges and my customers carry both items in their retail stores or in their warehouses. Stores carry both types of buffers because some customers prefer a 3-way buffer and others prefer a 4-way buffer.

App. 036. Lande notes the simple commercial reality that Sally's Beauty Supply, with its over 2000 stores in all 50 states, would not be carrying both three-way and four-way buffers unless the items were "considered to be different." App. 036. In his opinion, "the consumer would immediately recognize that the Swisa product is a 4-way buffing block and would not confuse this with the Egyptian Goddess product, which only has three different abrasive surfaces." App. 037.

Similarly, Steve Falley, who has been the Production Manager and Sales Manager for Realys Inc. since 1984, explains the importance to consumers of the difference between three abrasive sides and four abrasive sides.

> The number of sides with abrasive surface on them would be important to purchasers because it determines whether a buffer is a "three way buffer" or a "four way buffer." I believe that, based on my many years of experience in the nail buffer business, I know what consumers in the nail buffer business want. End-use consumers of buffers usually have preferences between three-way and four-way buffers. Three way buffers, used in combination with a nail file, can do everything four-way buffers do as a single product, but three way buffers are less expensive than four-way buffers. End-use consumers will almost always buy one or the other, but not both types of buffers. Wholesale purchases of buffers buy both three-way and four-way buffers, so they may meet the needs of both sorts of end-use consumers. For example, Tammy Taylor markets both three-way and four-way buffer blocks manufactured by Realys.

App. 012.

DA-153697 v11

It flies in the face of common sense to assert those buying nail buffers intended specifically for multi-step buffing processes are oblivious to the number of steps that the buffers they purchase are capable of performing.  The fact that since Michael Falley invented the multi-step buffer block, Realys and numerous imitators have been selling both three-way and four-way buffers would seem to demonstrate beyond any reasonable doubt that there was a market for both and that consumers distinguish between the two.  App. 012-013.  Otherwise, as Steve Falley points out, why would the more expensive four-way buffers continue to thrive in the market?  App. 013.

Swisa, nonetheless, anticipates that Egyptian Goddess and Adi Torkiya will necessarily argue in response to this motion, as they have in the past, that consumers do not make any distinction between three-way and four-way buffers.  They must take this position, because if purchasers of multi-step nail buffers distinguish between three-way and four-way buffers, then necessarily such purchasers will not mistake a four-way buffer for a three-way buffer.  Thus, ignoring market realities, Egyptian Goddess and Adi Torkiya will presumably put in expert testimony or other testimony claiming that consumers of nail buffers such as the Swisa Buffer and the '389 Buffer do not have preferences between three-way or four-way buffers.

Such testimony, to have any credibility whatsoever, must overcome the inherent implausibility of the notion that someone who cares about multi-step buffing does not care about or even notice how many steps the buffer can perform.  The testimony must also explain away why both forms flourish in the market, and why sellers of such buffers stress in their advertising whether the buffers they offer are four-way or three-way buffers.

7

The way that nail buffers are advertised vividly illustrates that consumers do distinguish between three-way and four-way buffers. When Nailco's 'Lil Whistler is advertised on Amazon.com, it is as a "Lil Whistler 3-Way Nail Buffer." App. 052, 054. When Amazon displays the 'Lil Whistler on the same page with a buffer block, the buffer block is described as "Club Buffy 3-Way Block." App. 052, 057. When another company offers both a triangular three-way buffer similar to the Nailco Buffer and a four-way buffer block, the advertising explains that one is a "3-Way Triangular Buffer" and the other is a "Buffing Block/ 4 step buffer . . . ." App. 052, 061. Another website offers the "Mysterious" Nail Shining Block in two options: the "3-Way Buffing Block (Black/White/Gray)" and the "4-Way Buffing Block (Black/White/Gray/Yellow)." App. 052, 064. Still another website offers a variety of buffers that it describes by color and whether they are three or four way: "3 Way Orange," "3 Way Purple," "4 Way White," "3 Way Blue," "3-Way Gray." App. 052, 068. When Swisa advertises the Swisa Buffer on the internet, the four different abrasive surfaces are discussed. App. 052, 072-73. When a seller advertises the Falley Buffer Block made by Realys (the "Tropical Shine" buffer), it is advertised as a "Mini 4-Way Block buffer (blue/pink-white/grey)." App. 052, 076.

The fact that Swisa stresses in its advertising that the Swisa Buffer is a four-way buffer, and the fact that Nailco buffers and imitators of the design are advertised as three-way buffers is extremely telling. But perhaps of even greater significance for evaluating any argument by Egyptian Goddess that consumers make no distinction between three-way and four-way buffers is how Egyptian Goddess itself advertises the '389 Buffer. If in its advertising, Egyptian Goddess did not mention the fact that its buffer was a three-way buffer, this might support an argument that consumers did not distinguish between three-way and four-way buffers. If it mentioned the fact that the '389 Buffer was a 3-way buffer, that would seem to indicate that

8

Egyptian Goddess did know full well that consumers distinguished between three-way and four-way buffers. And if it turned out that Egyptian Goddess, in advertising its '389 Buffer, centered the advertising on the fact that its buffer was a three-way buffer, for a three step process, then that would strongly indicate that Egyptian Goddess was acutely conscious that consumers distinguish between three-way and four-way buffers.

As of March 29, 2005, the Egyptian Goddess website contained the following information on its "three-step, three-sided professional buffer."



**STEP 1 - Black Side**

Buff the top surface of the nail with the black side for five seconds to remove all the ridges off the nail. The ridges are unhealthy, and keep the nail from growing. The black side should be used once a month, if necessary, to remove ridges off the surface of the nail.

**STEP 2 - White Side**

Buff the surface of the nail for five seconds with the white side. The white side stimulates blood flow to the nail. The white side should be used once a week.

**STEP 3 - Gray Side**

Buff the surface of the nail for 10 seconds to see the incredible results. The gray side can be used as often as you like.

After using the buffer, massage in one drop of the cuticle oil on each finger. The oil should be used on a daily basis. This helps keep the cuticles moisturized, stimulating healthy nail growth.

9

App. 078-079. Egyptian Goddess' advertising of the '389 Buffer can fairly be characterized as being completely centered on the fact that the buffer is intended for a three step process. Similarly, Swisa's advertising for its buffer can be fairly characterized as being completely centered on the fact that the buffer is for a four step process. App. 072-073.

There is no legitimate issue of fact, then, as to whether purchasers of these buffers "notice" the difference between three-way and four-way buffers. Egyptian Goddess' own advertising, the advertising of others, the fact that both products have existed in the market for years despite the greater cost of four-way buffers, and the compelling logic that purchasers of multi-step buffers would notice and care how many steps the buffer could perform—all these factors taken together leave no doubt. No reasonable juror could think that a purchaser, "giving such attention as a purchaser usually gives," would mistake the Egyptian Goddess three-way buffer for the Swisa four-way buffer.

Even were the Court to accept, however, the anticipated argument of Egyptian Goddess and Torkiya that a fact issue existed as to whether consumers have preferences in this regard, summary judgment under the ordinary observer test would still be appropriate. For while the existence of consumer preferences between three-way and four-way buffers makes it impossible to argue plausibly that purchasers would mistake the Swisa Buffer for one embodying the '389 Patent's design, the absence of such preferences still would not mean that a purchaser would fail to recognize the readily observable distinction between the two designs. There is an immediately apparent visual difference between on the one hand a buffer with three raised abrasive surfaces on three sides and one bare side, and on the other hand a buffer with raised abrasive surfaces on all four sides. Again, this is not a trademark case, where the issue is whether a purchaser might mistake the Swisa buffer as being from the same **source** as a buffer embodying the '389 Patent.

Rather the purchaser must mistake the Swisa Buffer for a buffer embodying the '389 Patent. A visual comparison of the two, without recourse to customer preferences, can establish that, as a matter of law, the Swisa Buffer does not infringe the '389 Patent under the ordinary observer test.

> A finding of infringement or non-infringement may, as a matter of law, be made relying 'exclusively or primarily on a visual comparison of the patented design, as well as the device that embodies the design, and the accused device's design." *See Braun Inc. v. Dynamics Crop. of America*, 975 F.2d 815 (Fed. Cir. 1992). "Likelihood of confusion as to the source of the goods is not a necessary or appropriate factor for determining infringement of a design patent." *Unette Corp. v. Unit Pack Co., Inc.*, 785 F.2d 1026, 1028 (Fed. Cir. 1986).

*Pacific Handy Cutter, Inc. v. Quick Point, Inc.*, 43 U.S.P.Q.2d 1624, 1628 (C.D.Cal. 1997) (finding no infringement as a matter of law).

Such a visual comparison, informed by the Court's claim construction, is decisive here. Again, the Court's claim construction clarifies that the patented design has a fourth side **without** an abrasive surface. There has never been any question that the Swisa Buffer is a four-way buffer with abrasive surfaces on all four sides. Given this, as a matter of law, the Swisa Buffer cannot infringe the '389 patent under the *Gorham* ordinary observer test. No reasonable juror could decide that an ordinary observer would mistake a buffer with raised abrasive on four sides for one with raised abrasive on only three and with one side bare. *See Schadig Corp. v. Collezione Europa, U.S.A.*, 2002 WL 31253750, at *12 (N.D. Ill.) (granting motion for summary judgment where neither of two infringement tests met; as to *Gorham* test, differences between patent and accused device "clearly observable to the ordinary purchaser and make the appearance . . . as a whole distinguishable from the '811 Patent table, so ordinary observer would not be deceived); *In re Plastics Research Corp. Litigation*, 2002 WL 1000450, at *3 (E.D.Mich.) (granting motion for summary judgment where no reasonable juror could find

11

infringement under the ordinary observer test where lattice of horizontal and vertical slats could not be considered "substantially the same" as a diagonal lattice design); *Pacific Handy Cutter, supra,* 43 U.S.P.Q.2d at 1627 ("As a matter of law, no reasonable jury could conclude there is substantial similarity between any of the six designs at issue.").

**II.     The Swisa Buffer cannot infringe the '389 Patent because it does not incorporate the '389 Patent's point of novelty.**

As previously noted, a plaintiff asserting patent infringement must prove that the accused device infringes under two different tests.  In addition to showing that the accused device is "substantially similar" under the "ordinary observer" test, the plaintiff must also show that the accused design contains "substantially the same points of novelty that distinguished the patented design from the prior art." *Goodyear Tire & Rubber Co., v. Hercules Tire and Rubber Co.,* 162 F.3d 1113, 1121-22 (Fed. Cir. 1998) (since several significant points of novelty of the patented design did not appear in the accused design, district court did not err in finding no infringement); *accord Sun Hill Indus., Inc. v. Easter Unlimited, Inc.,* 48 F.3d 1193, 1197 (Fed. Cir. 1995) (as a matter of law, accused device did not incorporate points of novelty of patented design); *Litton Sys. Inc. v. Whirlpool Corp.,* 728 F.2d 1423, 1444 (Fed.Cir. 1984) ("[E]ven though the court compares two items through the eyes of the ordinary observer, it must nevertheless, to find infringement, attribute their similarity to the novelty which distinguishes the patented device from the prior art.").

"The points of novelty relate to differences from prior designs, and are usually determinable based on the prosecution history." *Goodyear,* 162 F.3d at 1118.  For design patents, "[t]he scope of prior art is not the universe of abstract design and artistic creativity, but designs of the same article of manufacture or of articles sufficiently similar that a person of ordinary skill would look to such articles for their designs." *Hupp v. Siroflex of America, Inc.,*

122 F.3d 1456, 1462 (Fed. Cir. 1997) (examining whether a design patent was invalid as obvious).

In this case, the relevant prior art includes the original Falley Buffer Block invented in 1987 and widely copied both in this country and abroad, the Nailco Patent and the 'Lil Whistler manufactured for Nailco pursuant to that patent. App. 003-007. The Nailco Patent is a descendant of the Falley Buffer Block, incorporating in slightly altered form its features of foam support under the abrasive surfaces and cuticle protection edges, as well as employing its concept of multiple abrasive surfaces for a multi-step nail buffing process. App. 003-006. Adi Torkiya, in applying for the '389 Patent, did disclose the Nailco Patent, which is "D416,648 S 11/1999 Leatherby et al." App. 024, 114, 143. Pursuant to the Nailco Patent, Realys, Inc. was manufacturing several different sizes of the Nailco Buffer, including the "'Lil Whistler." App. 005. One version of the "'Lil Whistler" was being manufactured since 1999 by Realys for Nailco with the name "Egyptian Goddess" printed on it, and Nailco was reselling it to Adi Torkiya's company. App. 006. Egyptian Goddess had been ordering this version of the Nailco Buffer for approximately two years at the time he applied for the '389 Patent. App. 006, 024.

Again, the relevant drawings from the Nailco Patent, an image of the 'Lil Whistler" and the drawing from the '389 Patent illustrate that the '389 Patent's design is nothing but the Nailco Buffer with the addition of a fourth side with no abrasive surface on it.



*The Nailco Patent*
App.006, 024.

*The 'Lil Whistler*

*The '389 Patent*

13

As the further illustrations below demonstrate at a glance, what Torkiya did in adding the fourth side and square ends to the Nailco Patent was to return it to the general shape of the Falley Buffer Block.

        

*Michael Falley's Buffer Block*    *The Nailco Patent*    *The '389 Patent*

App. 004-005, 007, 015, 018, 024.

Any doubt that the use of a block shape and square ends in the '389 is a borrowed feature from the Falley Buffer block is banished by a look at Torkiya's original patent application for what later became the '389 Patent. In the original application—which at the Patent Office's direction was later divided into two applications—Torkiya set out two "embodiments" of what he represented to be his design. App. 096-101. The first of these embodiments, which ultimately was patented as U.S. Patent No. D459,548 (the "'548 Patent") was simply the design of Falley's four sided buffer block with a depression at either end, and the raised abrasive surfaces of the Nailco Patent applied to three sides of the block. App. 096-098. The second embodiment of the design in the original application, the design which ultimately became the '389 patent, did not retain the solid block of the Falley Buffer Block, but instead took from the Nailco Buffer the hollow tube with raised foam layers on three sides, and from the Falley Buffer Block the square ends and overall shape.

14



*Falley Buffer Block*



*The first embodiment of the design in Torkiya's original application*



*The second embodiment of the design in Torkiya's original application.*

App. 004, 015, 096, 099. That Torkiya originally considered both the block form and the hollow form as simply two different embodiments of the same design highlights the fact that the block shape with square ends is not a point of novelty, but simply a prominent characteristic of the prior art—but prior art that Torkiya failed to disclose to the Patent Office.

Thus the only arguable "point of novelty" in the design for the '389 Patent is the addition of a fourth side without an abrasive surface to the Nailco Patent. Whether this is really a point of novelty is debatable, because a four-sided configuration had traditionally been the shape of multi-step block buffers since their invention by Michael Falley, and there were versions with abrasive both on three sides and on four sides of the foam block. App. 003-004, 006-007. Assuming, however, that the addition of a fourth side without an abrasive to the Nailco Buffer is considered a point of novelty, then as a matter of law there is no infringement here, because the Swisa Buffer has pads with abrasive surfaces on all four sides and lacks a bare side without an abrasive surface.

The Court's claim construction clarifies what this comparison between the three images indicates visually: that the point of novelty of the '389, if any, was the addition of a fourth side **without an abrasive surface** attached. The Court in this case has construed the '389 Patent as follows:

A hollow tubular frame of generally square cross section, where the square has sides of length S, the frame has a length of approximately 3S, and the frame has a thickness of approximately T = 0.1S; the corners of the cross section are rounded, with the outer corner rounded on a 90 degree radius of approximately 1.25T, and the inner corner of the cross section rounded on a 90 degree radius of approximately 1.25T; and with rectangular abrasive pads of thickness T affixed to three of the sides of the frame, covering the flat portion of the sides while leaving the curved radius uncovered, **with the fourth side of the frame bare.**

Order at p. 3 (emphasis added).

An examination of each element of this claim construction, and the presence of each element in the Nailco Patent and the 'Lil Whistler, demonstrates that Torkiya took from this prior art every element of his design except for the addition of the fourth side without an abrasive surface on it.

**Hollow Tubular Frame and Overall Dimensions.** The "hollow tubular frame . . . where the square has sides of length S, the frame has a length of approximately 3S," is the same in the Nailco Patent. Torkiya took the concept of a hollow tubular frame directly from the Nailco Buffer, although a fourth side without abrasive was added, and the square shape of the end was taken from the Falley Buffer Block. The three to one ratio of length to width of the buffer is approximately the same in the Falley Buffer Block, the Nailco Patent and the '389 Patent. The ratio comes from the Falley Buffer Block in 1987, which was "1" x 1" x 3", as stated in the 1987 Realys Brochure. App. 003-004, 009, 014. The actual 'Lil Whistler is 3 ½ inches long, and 1 1/16th inch wide. App. 010, 051. The Nailco Design Patent drawing shows a frame that is three times as long as it is wide. App. 018, 020.

**Ratio of Frame Thickness to Width.** The Court's claim construction next notes that "the frame has a thickness of approximately T = 0.1S . . . ." In the Nailco Patent drawings, the ratio is approximately T = 0.15S. App. 009, 020. In the actual 'Lil Whistler, however, the side

is an eighth of an inch thick, just as in the '389 design, and the frame is approximately 1 1/16th inches wide, so that the ratio is approximately T = 0.1176S. (App. 010). This is essentially the same as the "approximately T = 0.1S" of the Court's claim construction of the '389. In the '389 design, the frame is just under an eighth of an inch thick, and 1 ¼ inch wide, so that the ratio is approximately T = 0.10S, as in the Court's claim construction. App. 101, Order at p. 3. In the actual Swisa Buffer, the frame is approximately a sixteenth of an inch thick. The Swisa Buffer's frame is 1 inch wide. Therefore T = 0.0625S. App. 010.

These then are the ratios of thickness to width of frame of the relevant designs:

| | |
|---|---|
| Nailco Patent Drawing | T = 0.15S |
| 'Lil Whistler that Torkiya was selling: | T = 0.1176S |
| Court's Claim Construction of the '389 | T = 0.1 ("approximately")S |
| Swisa Buffer | T = 0.0625S |

App. 010.

Thus there is nothing novel about the ratio of the thickness of the frame sides to the width of the frame in the '389 Patent's design. Torkiya just took that approximate ratio from the "Lil Whistler that he was selling. Even if there was anything novel about it, the Swisa Buffer does not incorporate that ratio.

**Rounded Corners of the Cross Section**. Again, Torkiya took the rounded corners of the cross section directly from the Nailco Patent.

17



FIG. 2



FIG. 4

*From the Nailco Patent*                    *From the '389 Patent*

App. 020, 040.

**Rectangular abrasive pads of thickness T affixed to three of the sides of the frame.**
Attached to the Nailco Buffer and the '389 Patent's design are what the Court has termed "abrasive pads." In actual practice in the Nailco and Swisa Buffers these "abrasive pads" consist of $1/8^{th}$ inch thick foam covered with a thin abrasive surface. App. 011. In the Nailco Patent, the pads appear to be of less thickness than the sides. But again, in the actual 'Lil Whistler that Torkiya was selling, both the frame and the foam pad are each an eighth of an inch thick, so that there was nothing novel in the '389's Patent's ratio of pad to tube-side thickness. App. 011. Because the Swisa Buffer's sides are thinner than those of the 'Lil Whistler, the Swisa Buffer does not have this ratio in any event. Instead, in the Swisa Buffer the $1/8^{th}$ inch thick foam pads are twice as thick as the cross section of the frame, which is again only $1/16^{th}$ of an inch thick. App. 011. So even if this ratio were significant and novel, it would not be a basis for finding infringement under the point of novelty test.

**The pads cover the flat portion of the sides while leaving the curved radius uncovered.** Again, Torkiya took these features directly from the Nailco Patent. The gap "leaving the curved radius uncovered" is the "cuticle protection edge" invented by Michael Falley. Realys advertised this feature, in the form in which it took in the Falley Buffer Block, in its brochure printed in 1987, which states: "Block shaped for easier handling, cuticle protection edge for safety." App. 011, 014. "Cuticle protection edge" simply means that the abrasive

18

surfaces do not go all the way to the edge of the buffer block so that they meet, in order to protect the cuticle while buffing the nail. Michael Falley added this feature to the Nailco Buffer, in which it takes the form of not having the abrasive pads meet, but leaving a gap. App. 011. Torkiya simply adopted this feature from the "Lil Whistler" that he was selling. Torkiya also took from the Nailco Patent the fact that the abrasive pads are "covering the flat portion of the sides while leaving the radius uncovered . . . ." In the Nailco Patent the pads cover the entire flat portion of the side. App. 011.

Thus the only aspects of the '389 Patent's design that are not taken directly from the Nailco Patent are those related to the addition of a fourth side with no abrasive surface. In order to add this fourth side, Torkiya transformed the cross section of the '389 Patent's design from an equilateral triangle to a square. This aspect of a square end rather than a triangular end, far from being anything novel, was simply using the most common shape for the end of a buffer with multiple abrasive surfaces: the square end of the original Falley buffer block, on the market since 1987.

Egyptian Goddess and Torkiya thus face a formidable obstacle in arguing what the "point of novelty" of the '389 Patent's design is. They cannot state that the point of novelty is the addition of a fourth side without a raised abrasive surface, because that element is not in the Swisa Buffer. On the other hand, every other element is present in the Nailco Buffer, except the squareness of the ends, which are in the Falley Buffer Block. Of necessity, Egyptian Goddess and Torkiya must draw up some combination of elements that is in the '389 Buffer but not in the Nailco Buffer. But they must leave out of whatever combination they draw up the critical element that is what **actually** distinguishes the '389 Patent from the Nailco Patent—the addition of the fourth side without an abrasive. There is an excellent name for this approach of claiming

19

novelty in a combination of features that conveniently excludes the actual points of novelty. The term "the shopping list approach" was coined by the court in *Bush Indus., Inc. v. O'Sullivan Indus., Inc.*, 772 F.Supp. 1422, 1452-1454 (D. Del. 1991) (no infringement as a matter of law under either point of novelty or ordinary observer test).

The plaintiff in *Bush* contended "that of all the features which combine to distinguish a design from the prior art, [the court] should only consider those which also appear in the accused design." 772 F.Supp. at 1453. But this "is not the function of the point of novelty test." *Id.* The *Bush* court rejected this "shopping list approach."

> Thus, rather than comparing the patented design to the prior art to determine what the point of novelty is and then reviewing the accused design to assess whether it includes this particular combination of elements, under Bush's approach we would simply examine whether we can create a list of features common to the patented and accused designs that are not all found together in any single prior art example.
>
> [Defendant] has referred to this approach as the laundry list approach. We prefer to term it the shopping list approach, since a shopping list will be rewritten for each trip depending on what the shopper needs at the time. In any event, whatever name we apply, we find that Bush's analysis is fundamentally at odds with that of the Federal Circuit in *Litton*, 728 F.2d at 1444, and that Bush's method would undermine the function of the point of novelty test.

772 F. Supp. at 1453.

The same approach was rejected by the court in *Hosely International Trading Corp. v. K Mart Corp.*, 237 F.Supp.2d 907, 911-913 (N.D. Ill. 2002). The accused infringer argued in its motion for summary judgment that the absence of two conspicuous ornamental aspects of the patented design, which were not present in the prior art, defeated the plaintiff's ability to satisfy the point of novelty test. There was no question that the two elements were not in the accused device. But the plaintiff argued that novelty may 'reside ""in the overall appearance of the combination' of features in a patented design." 237 F.Supp.2d at 913, quoting *L.A. Gear, Inc. v.*

DA-153697 v11

*Thom McAn Shoe Co.*, 988 F.2d 1117, 1126 (Fed. Cir. 1993). Thus, argued the *Hosely* plaintiff, the combination of non-novel aspects of the patent was "in and of itself" the point of novelty that was appropriated by the defendant. *Id.*

The *Hosely* court rejected this approach, recognizing that "by focusing the court's attention on a carefully-defined combination that includes *every* ornamental element of the '369 patent, *with the exception of* these two unambiguous points of novelty, plaintiff essentially seeks to turn the 'point of novelty' test on its head." 237 F.Supp.2d at 913. Whether the point of novelty was considered to be a combination that included the only two novel features, or whether it was considered to be the novel features themselves, the accused device, because it lacked the novel features, could not be infringing.

Put differently, when the point of novelty itself is a claimed combination of features (say a fourth side without an abrasive and a resulting square end), the plaintiff cannot construct the point of novelty so as to leave out that part of the combination that is inconvenient. *See Brainard v. Custom Chrome, Inc.*, 872 F.Supp. 39, 42 (W.D.N.Y. 1994) (point of novelty was combination of two features and accused design had only one of those features).

This Court, like the *Bush* court and *Hosely* court, should reject out-of-hand any asserted "combination of elements" point of novelty that ignores the blatant fact that the real point of novelty (if there is any) to the '389 design is or includes the addition of a fourth side without an abrasive surface. The conspicuous absence of this feature in the Swisa Buffer means that as a matter of law, it cannot infringe the '389 Patent under the point of novelty test.

### III.    The '389 Patent is invalid under 35 U.S.C. § 103 as obvious in light of prior art that was not before the Patent Office.

The issue of obviousness of a design is an issue of law . . . ." *Petersen Manufacturing Co., Inc. v. Central Purchasing, Inc.*, 740 F.2d 1541, 1457 (Fed. Cir. 1984). The Federal Circuit

has explained that in order for a design to have been "obvious," there must be a basic reference, the design characteristics of which are basically the same as the claimed design. In order for secondary references to be considered, there must be some suggestion from the prior art to modify the basic design with features from the secondary references:

> The central inquiry in analyzing an ornamental design for obviousness is whether the design would have been obvious to 'a designer of ordinary skill who designs articles of the type involved.' That inquiry focuses on the visual impression of the claimed design as a whole and not on individual features.
>
> In order for a design to be unpatentable because of obviousness, there must first be a basic design reference in the prior art, 'a something in existence, the design characteristics of which are basically the same as the claimed design.' A finding of obviousness cannot be based on selecting features from the prior art and assembling them to form an article similar in appearance to the claimed design.
>
> If the basic reference alone does not render the claimed design unpatentable, design elements from other references in the prior art can be considered in determining whether the claimed design would have been obvious to one of skill in the art. In order for secondary references to be considered, however, there must be some suggestion in the prior art to modify the basic design with features from the secondary references. That is, the teachings of prior art designs may be combined only when the designs are 'so related that the appearance of certain ornamental features in one would suggest the application of those features in the other.'

*In re Borden*, 90 F.3d 1570, 1574-75 (Fed.Cir. 1996)(citations omitted).

The "basic reference" here is the Nailco Patent. As previously discussed, it is a descendant of Michael Falley's Buffer Block, on the market since 1987. App. 003-005. In about 1998, Larry Gaynor of Nailco approached Michael Falley about making a buffer block using a hollow tube as the support. Michael Falley used foam pads on each side, both as a double-sided adhesive and to dissipate heat. Between the foam pads, he left the "cuticle protection edges" that he had been advertising in his buffer blocks since 1987. App. 004-005. This resulted in the

distinctive appearance of the Nailco Buffer, with its rectangular pads covering the sides but with gaps in between. What Adi Torkiya did was to return the three-sided Nailco Buffer to the general shape of the Nailco Buffer's predecessor, the Falley Buffer Block, by adding a fourth side without any abrasive on it, and as a result replacing the equilateral triangle of the cross section with a square.

  

*The Falley Buffer Block*  *The Nailco Buffer*  *The '389 Design*

App. at 015, 018, 024.

Thus in this straightforward analysis, the Falley Buffer Block is the "secondary reference." Again, such a secondary reference cannot be used unless there is "some suggestion in the prior art to modify the basic design with features from the secondary references." *In re Borden*, 90 F.3d at 1575. For design patents, "[t]he scope of prior art is not the universe of abstract design and artistic creativity, but designs of the same article of manufacture or of articles sufficiently similar that a person of ordinary skill would look to such articles for their designs." *Hupp v. Siroflex of America, Inc.*, 122 F.3d 1456, 1462 (Fed. Cir. 1997) (examining whether a design patent was invalid as obvious.). Any designer of a multi-step buffer that was to be a variant on the Nailco Buffer would naturally look first to the original four-way and three-way buffer blocks that Realys had been marketing since 1987, and which were widely copied both in this country and abroad long before Adi Torkiya began selling a version of the Nailco Buffer in 1999. App. 003-004, 006-007. Torkiya was necessarily aware of these three-way and four-way

23

buffer blocks when he applied for the '389 in October, 2001. App. 007, 002, 036. "[T]he teachings of prior art designs may be combined only when the designs are 'so related that the appearance of certain ornamental features in one would suggest the application of those features in the other.'" *Borden*, 90 F.3d at 1575. In the present case, the designs are so related that the appearance of four-sidedness and square ends in the Falley Buffer Block would unquestionably "suggest the application of those features" in the '389 Patent's design. The Patent Office made the mistake of issuing the '389 Patent because it did not have before it any of the numerous three-way and four-way buffer blocks on the market, none of which were disclosed by Torkiya. App. 024, 143, 152.

This is one of those rare instances where the design concepts are so basic that the combination is readily apparent to any layman, and expert testimony should not even be necessary. *Petersen*, 740 F.2d at 1548 (expert testimony is not necessary to establish, for summary judgment purposes that a design patent is invalid for obviousness). But an expert in the field confirms what is readily apparent to anyone who is aware of the Nailco Buffer and the Falley Buffer Block. Steve Falley, brother of the late Michael Falley, has been Production Manager and Sales Manager for Realys Inc. for over twenty years. App. 002. He explains what the images above and the history of three-way and four-way buffers already make clear: a four-sided Nailco Buffer without an abrasive on one surface would have been obvious to any designer of nail buffers.

> The only aspects of the '389 design that are not taken directly from the Nailco Patent are those related to the addition of a fourth side with no abrasive surface. As I said above, I have worked in the nail buffer industry for many years and am extremely familiar with the buffers available as well as their manufacturing process. It would have been obvious to any designer of nail buffers, or even, I believe to any lay person who looked at the Falley Buffer Block, three-way buffer blocks, and the Nailco Buffer, that you could

simply add to the Nailco Buffer a fourth side without an abrasive on it. This merely takes the Nailco Buffer to the block shape of the original Falley Buffer Block, while keeping the hollow aspect of the Nailco Buffer. As there had already been on the market for a long time 3-way buffer blocks that had no abrasive on one side, it was also obvious after the Nailco Buffer that you could have a three way hollow buffer that had four sides but with no abrasive on one side.

App. 012.

Torkiya's original patent application for what later became the '389 Patent makes even more evident his reliance on the Falley Buffer Block in arriving at the design that became the '389 design. As previously discussed, in that original application—which at the Patent Office's direction was later divided into two applications—Torkiya set out two "embodiments" of what he represented to be his design. App. 096-101. The first of these embodiments, which was later patented as the '548 Patent, was simply the design of Falley's four sided buffer block with a depression at either end, and the raised abrasive surfaces of the Nailco Patent applied to three sides of the Falley Buffer Block. App. 096-098.



*The first embodiment of the design in Torkiya's Original Patent Application*



*The Falley Buffer Block*

App. 004, 015, 096.

The second embodiment of the design in the original application, the design which ultimately became the '389 patent, did not retain the solid block the Falley Buffer Block, but

25

instead took from the Nailco Buffer the hollow tube with raised foam layers on three sides, and from the Falley Block the square ends and overall shape. That Torkiya originally considered both the block form and the hollow form as simply two different embodiments of the same design illustrates that all Torkiya did in creating the '389 design was to make a Nailco Buffer in the general shape of the original Falley Buffer Block, with one side left bare, an extremely obvious step in light of the fact that three-way buffer blocks had been on the market for years.



*Falley Buffer Block*



*The first embodiment of the design in Torkiya's Original Application*



*The second embodiment of the design in Torkiya's original application.*

App. 004, 015, 096, 099.

The Court should declare the '389 Patent invalid under 35 U.S.C. § 103 as being obvious in light of the undisclosed prior art.

## CONCLUSION

The Swisa Buffer is a four-way buffer, with abrasive on all four sides. The '389 Patent's design is for a three-way buffer, with raised abrasive surfaces on three sides and one side bare. Purchasers of buffers have preferences between three-way and four-way buffers, and would not mistake the four-way Swisa Buffer for the three-way '389 design. But even if consumers did not have preferences between three-way and four-way buffers, they would recognize the prominent visual difference between a buffer with raised abrasive surfaces on all four sides and one with a

bare side and raised abrasive surfaces on the other three. No reasonable juror could find that an ordinary observer, "giving such attention as a purchaser usually gives" would mistake the Swisa Buffer for the '389 design, and the Court should rule that as a matter of law there is no infringement under the ordinary observer test.

The Court should also rule that the Swisa Buffer cannot, as a matter of law, be found to infringe under the point of novelty test. The distinguishing point of novelty—if there is any--of the '389 Patent over the prior art is the addition of a fourth side without an abrasive surface to the Nailco Buffer, where every side was covered with abrasive. Because the Swisa Buffer has a raised abrasive surface on all four sides, it cannot be said to incorporate the novelty of the patented design. Egyptian Goddess and Torkiya will necessarily try to "turn the point of novelty test on its head" by adopting the "shopping list approach." They will draw up combinations of features that they will assert are the points of novelty of the '389 Patent, that are also present in the Swisa Buffer. These combinations will necessarily exclude the true novelty—the addition of a fourth side without an abrasive surface. This Court should reject such sophistry, as did the *Bush* court and the *Hosely* court.

Finally the Court should declare that the '389 Patent is invalid under 35 U.S.C. § 103 as obvious in light of prior art that Torkiya did not disclose to the Patent Office. All Torkiya did in creating the '389 Patent was to add to the Nailco Patent, "the primary reference," the aspects of four sides, one without an abrasive surface, and square ends. The secondary reference, the undisclosed Falley Buffer Blocks, would have made this obvious to any designer of nail buffers, or even a lay person familiar with the prior art.

27

Respectfully submitted,


Michael D. Napoli
State Bar No. 14803400
Linda G. Moore
State Bar No. 14359500
Frederick L. Medlin
State Bar No. 13895930

KIRKPATRICK & LOCKHART NICHOLSON
GRAHAM LLP
2828 North Harwood Street, Suite 1800
Dallas, Texas 75201
Telephone:   (214) 939-4900
Facsimile:    (214) 939-4949

ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that, on the 1st day of April, 2005 I caused to be served

the foregoing Brief upon the parties listed below, via certified mail, return receipt requested:

Robert G. Oake, Jr., Esq.,
Law Office of Robert G. Oake, Jr.,
101 W. McDermott, Suite 109,
Allen, Texas 75013

Rudolf O. Siegesmund
4627 N. Central Expressway, Ste. 2000
Dallas, Texas 75205-4017


Frederick L. Medlin

DA-153697 v11